# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  March 27, 2017

Mr. Perry Russell Arnold
Kentucky State Police
919 Versailles Road, 106
Frankfort, KY 40601

Mr. Thomas E. Clay
Mr. David N. Ward
Clay, Daniel, Walton & Adams
462 S. Fourth Street, Suite 101
Louisville, KY 40202

Re: Case No. 16-5949, *Susan King v. Todd Harwood, et al*
Originating Case No. : 3:15-cv-00762

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Vanessa L. Armstrong

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0070p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

SUSAN JEAN KING,

　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

TODD HARWOOD, VIC HUBBUCH, CHAD WHITE, and
JEFF MEDLEY, in their individual capacities;
COMMONWEALTH OF KENTUCKY, dba Kentucky State
Police; UNNAMED LAW ENFORCEMENT OFFICERS;
UNNAMED SUPERVISORS OF INDIVIDUAL DEFENDANTS,

　　　　　　　　　　　*Defendants-Appellees*.

No. 16-5949

———————————

Appeal from the United States District Court for
the Western District of Kentucky at Louisville.
No. 3:15-cv-00762—Gregory N. Stivers, District Judge.

Argued: January 26, 2017

Decided and Filed: March 27, 2017

Before: BOGGS, SILER, and DONALD, Circuit Judges.

———————————

#### COUNSEL

**ARGUED:** Thomas E. Clay, CLAY DANIEL WALTON ADAMS, PLC, Louisville, Kentucky, for Appellant. Perry R. Arnold, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellees. **ON BRIEF:** Thomas E. Clay, David N. Ward, CLAY DANIEL WALTON ADAMS, PLC, Louisville, Kentucky, for Appellant. Perry R. Arnold, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellees.

No. 16-5949                      *King v. Harwood, et al.*                      Page 2

_____

## OPINION

_____

BOGGS, Circuit Judge.   Susan King brought suit under 42 U.S.C. § 1983 against Kentucky State Police (KSP) Detective Todd Harwood, three of Harwood's supervisors, and unnamed law-enforcement officers and their supervisors, all in their individual capacities, along with the Kentucky State Police.   The district court granted Defendants' "Motion to Dismiss/Motion for Summary Judgment," holding that King's claims were time-barred and, in the alternative, that no genuine issue of material fact existed as to Defendants' qualified immunity.   The court also denied King's request under Fed. R. Civ. P. 56(d) for additional discovery to oppose summary judgment.   King appeals both rulings.   For the reasons that follow, we reverse as to King's malicious-prosecution claim against Harwood, holding that (1) under the rule in *Heck v. Humphrey*, 512 U.S. 477 (1994), King's malicious-prosecution claims are not time-barred, and (2) Harwood is not entitled to summary judgment on the issue of his qualified immunity.

### I.  King Was Convicted of Homicide and Subsequently Exonerated

On November 5, 1998, ten days after going missing, Kyle Breeden was found dead in the Kentucky River near Gratz and Lockport, Kentucky.   Breeden's autopsy revealed that the cause of his death was two non-exiting .22-caliber magnum gunshot wounds to the head.   Breeden's legs had been bound with a guitar-amplifier cord.

### *The Initial Investigation*

Various KSP detectives, including Sergeant Duncan and Detectives Figg and Bess, investigated the murder, but were unable to identify the perpetrator.   All the potential suspects resided either in Mount Eden or in Shelbyville, Kentucky.   King was a suspect because of her "on / off again relationship" with Breeden and because during the time between Breeden's disappearance and the location of his body, King had shared with others her premonitions of "Breeden being found in water."   Appellant's Br. 46.

During the course of the investigation, Figg and Bess attempted to obtain a search warrant of King's residence based on information they had that King's home had bullet holes in its floor and that King played the guitar. Figg and Bess met with King for several hours on October 27, 1999, and attempted to obtain King's consent to search. But Figg and Bess were unable to obtain either the warrant or King's consent.

One week later, on November 3, 1999, Sergeant Duncan met with King in her home after being escorted into the home by King's live-in boyfriend Curtis Carruthers. Duncan advised King that KSP had information indicating that a firearm had been discharged in her home, and Duncan asked to see the bullet holes. King showed Duncan two bullet holes in her kitchen floor, and explained that several years before, "a man named Bo . . . had come uninvited to her home" and "made sexual advances towards her," so "she told him to leave" and "she then picked up a .22 handgun and fired three shots: one in the kitchen floor, one in the kitchen ceiling and one in the driveway . . . in an effort to make him leave." King also stated that Breeden had subsequently pawned that handgun. King did not explain why there was a second hole in the floor, nor did she know where the bullet hole in the ceiling was, although she stated that the area had been painted over. King did state that the home's previous residents "had also caused holes in the home by gunfire."

Duncan then asked King for permission to search King's floor area to find the bullets that had made the holes for comparison with the bullets that killed Breeden. King spoke with her attorney, who advised Duncan that "he might advise her to allow the search" if he could review the consent-to-search document. Duncan then left without conducting any further investigation. King alleges that Duncan then directed Figg to request a search warrant again, but "the Commonwealth's Attorney stated that there was not enough probable cause to obtain a search warrant." Duncan's notes indicate that he "did not believe that King was responsible for Breeden's death."

### *Harwood's Investigation*

The case then went cold for nearly seven years until KSP Detective Todd Harwood was assigned to it on May 22, 2006. King alleges that much of Harwood's initial investigation,

No. 16-5949            *King v. Harwood, et al.*            Page 4

including conversations he had with Duncan, Figg, Bess, and others, was not documented, and that Harwood "routinely failed to record interviews" with individuals. According to King, Harwood interviewed her on May 31, 2006, and June 12, 2006, but did not document either interview—though when Harwood sought a search warrant for King's home on June 12, 2006, he referred to a May 31, 2006, visit to her home.

Notably, when Harwood sought the search warrant on June 12, 2006, he had only the same information that Figg and Bess had when they had previously sought and failed to obtain a search warrant. Harwood's affidavit in support of the search warrant is recited here in full:

Affiant received information from/observed:

The affiant is the detective presently in charge of the murder investigation of Kyle "Deannie" [sic] Breeden. The cause of death was apparently two gunshot wounds to the head from a 22 caliber firearm using magnum ammunition. The decedent's legs were bound with a guitar amplifier cable. The decedent was found floating in the Kentucky River at the separation point between Henry and Owen Counties. On November 3, 1999, two 22 caliber bullit [sic] holes were seen in King's kitchen floor by a state police detective. This information was provided by Susan King and she stated that the holes were from a 22 caliber weapon and was caused as a result of a domestic altercation with "Bo", a motorcycle guy. This happened according to her three to six years before 1999. King stated that Breeden had sold or pawned the weapon some time before and she has no knowledge of it [sic] location or whereabouts.

Prior to the finding of the decedent's body Susan King told Debbie Jordan, Ronnnnie [sic] Haydon and Mildred Breeden that she had had dreams or premonitions that Breeden being found in water. These conversations were confirmed by interviews in 1998 and 1999. Susan King and Breeden were good friends and lovers in the weeks prior to his disappearance. Breeden had stated that King had taken $300.00 from him. (See sep. sheet for continuation)

Continuation sheet:

Breeden had stated to individuals that he would get his money back and further that he had told his mother, Mildred Breeden, that King had some of his property and that he would get it from her. Breeden and King were good friends with Ronnie Haydon and Jackie Callahan (now the wife of Ronnie Haydon) who only lived one to two miles from Susan King. A prior boyfriend of Callahan had found large bleach stains in Callahan's car two to three weeks two weeks [sic] or so after Breeden's death. This was confirmed by Detective Bess.

Susan King plays the guitar and this fact was confirmed by interviews with Larry Mobley, Ronnie Haydon and Shawn Wright. Decedent was bound at the legs with a [sic] amplifier/guitar cord.

Fragments of the bullits [sic] that killed Breeden were recovered and are available for comparison with other samples.

Acting on the information received, Affiant conducted the following independent investigation:

May 31, 2006 Susan King was again interviewed and at her residence a guitar, an amplifier and other musical instruments were observed at King's residence.

The affidavit requested a warrant to search for "property or things used as means of committing a crime" and "property or things in possession of a person to whom it was delivered for the purpose of concealing it or preventing its discovery and which is intended to be used as a means of committing a crime." The affidavit omits the fact that the bullet wounds in Breeden's head were non-exiting (thus leaving open the possibility that the bullet holes in King's floor were made by the bullets that killed Breeden, which was not possible). The affidavit also omits the fact that King had one leg (and, though she now has a prosthetic leg, she did not at the time) and weighed 100 pounds, while Breeden weighed 187 pounds, which would make it less probable than otherwise that King killed Breeden in her kitchen, tied up his body, dragged him to her car, drove forty miles north, and dumped his body into the Kentucky River.

Harwood received the search warrant. While two other troopers executed the warrant, King alleges that Harwood directed King to go for a drive with Harwood, saying, "If you don't get in my car, I will take away your crutches, handcuff you, and drag you across that gravel driveway and put you in my car." King alleges that Harwood drove around recklessly for most of the six hours during which the other troopers searched King's home.

The search recovered a section of King's kitchen floor and a .22-caliber bullet. KSP conducted a forensic examination of the bullets, which determined that the "configuration" of the bullet from King's floor was different from that of the bullets that killed Breeden.

Harwood obtained a second search warrant, based on the same affidavit, on July 27, 2006, and recovered 130 bullets from a tree in King's back yard that had evidently been used for target practice. A February 2, 2007, KSP lab report did not identify any of the 130 bullets or

bullet fragments as matching the bullets found in Breeden's skull. KSP also tested the kitchen-floor bullet holes for blood, and, according to King, found blood in one bullet hole that with "one allele" that was "positive for male DNA." "No comparison [could] be made" between this DNA and Breeden's, however, evidently "due to insufficient DNA being obtained from Kyle Breeden's blood sample."

King alleges that on April 3, 2007, Harwood spoke with KSP firearm examiner Matthew Clements, who had performed the bullet comparisons, and Clements told Harwood that unlike the magnum bullets that killed Breeden, which had "a complete copper jacket," the bullet in King's floor was a standard .22-caliber bullet with "a copper wash," establishing that the bullets did not match. King thus concludes in her complaint that Harwood "well knew" that King did not own the weapon that was used in Breeden's murder.

Despite this, King alleges that Harwood made a report to the Commonwealth's Attorney identifying King as Breeden's killer and setting forth his theory of the murder. According to King, Harwood's report included "his theory that King shot Breeden in her kitchen, dragged his body out of her home, placed Breeden into her vehicle, then drove Breeden to Gratz's bridge, and finally, removed Breeden's body from the vehicle and threw it off the bridge," after which "King went home and cleaned up the crime scene, including scraping away a layer of linoleum on her kitchen floor." A KSP lab report indicates that no cleaning solvents were identified on King's floor.

Harwood then sought to obtain an indictment against King for murder, and Harwood testified before the grand jury. King alleges that on April 5, 2007, Harwood "gave false testimony[,] withheld exculpatory evidence[,] and offered misleading evidence to the grand jury." Specifically, King alleges that Harwood testified that there were four rather than two bullet holes in the floor; that "no comparison could be made regarding the bullets found in King's floor against the bullets found in Breeden's skull" when in fact Harwood knew that a comparison had been made and that the bullets were not the same; and that King's telephone behavior changed after Breeden's disappearance (that is, that King previously called Breeden repeatedly but stopped calling after he disappeared, indicating that she may have known he was dead if not that she caused his death) when in fact King rarely called Breeden in the first place

(instead, Breeden frequently called her). According to King, Harwood also omitted the fact that King was missing a leg at the hip.

King was indicted for murder on the same day as the grand-jury hearing, and King alleges that Harwood personally arrested her within hours of the indictment. King alleges that Harwood again testified before the grand jury on June 7, 2007, this time seeking an indictment for tampering with physical evidence. King alleges that Harwood "falsely testified that King dragged Breeden's body across the floor to her back door, and afterwards, she cleaned up the scene" even though "Harwood was aware at the time he testified that KSP's Lab determined that no cleaning solvents were found on the kitchen floor." King was indicted for tampering with physical evidence on June 7, 2007.

### *King's* Alford *Plea*

In August 2008, King was offered a plea agreement in which the Commonwealth agreed to a ten-year sentence for manslaughter and a concurrent five-year sentence for tampering. King alleges that her court-appointed attorney "did not believe" that she was innocent, and told her "that she would get the death penalty if she went to trial." King alleges that if she did not take the plea bargain, she faced twenty years to life imprisonment on the murder charge. King also alleges that Harwood told her "that he would make sure she spent the rest of her life in jail if she decided to go to trial and, on several instances, told King that she would get the electric chair." King therefore entered an *Alford* plea, accepting the plea agreement while maintaining her innocence, on September 18, 2008. On October 23, 2008, King was sentenced to ten years of imprisonment. King notes that in May 2009, Harwood received a KSP "Commissioner's Commendation for his outstanding achievement in solving Breeden's murder."

### *Jarrell's Confession*

On May 4, 2012, a serial murderer named Richard Jarrell confessed to a Louisville Metro Police (LMPD) detective that he had in fact killed Breeden. Jarrell sought leniency for his "brother" who was in federal custody on drug charges. As is documented extensively in state-court proceedings, Jarrell provided a graphic account of Breeden's murder to LMPD Detective Barron Morgan, including very specific details that had not been released in media reports.

Another LMPD officer, Detective Russ, recorded another interview with Jarrell. King alleges that Russ attempted to speak with Harwood or secure Harwood's attendance at an interview with Jarrell, but Harwood refused. Nevertheless, on May 11, 2012, Harwood himself visited Jarrell in jail and taped an interview with him with his KSP-issued recorder. King alleges that Harwood intimidated Jarrell into recanting his prior confession, and that following Harwood's visit, Jarrell refused to continue providing any information about any of murders that he had previously confessed to committing. Harwood's tape recorder went missing.

### *King's Vindication*

On May 18, 2012, after Detective Morgan apparently forwarded a copy of Jarrell's confession to the Kentucky Innocence Project (which had been investigating King's case since 2009), King filed a motion for a new trial based on Jarrell's confession.[1] On October 5, 2012, the Spencer Circuit Court denied King's motion because King had pleaded guilty. King appealed, and on July 18, 2014, the Kentucky Court of Appeals reversed the circuit court based on King's evidence of "actual innocence," vacating King's *Alford* plea and remanding the case for jury trial upon the indicted offenses. *King v. Commonwealth*, 2014 WL 3547480, at *1, *5. On October 9, 2014, the Spencer Circuit Court entered an order dismissing the charges against King, thereby terminating the criminal prosecution against her. King now seeks to bring claims under both 42 U.S.C. § 1983 and Kentucky tort law against Defendants, chiefly arising from her prosecution and confinement.

---

[1] The record before us is silent as to how King learned of Jarrell's confession. According to the state-court record, however, "Detective Morgan consulted his supervisor and the Jefferson County Commonwealth Attorney's office regarding Jarrell's confession . . . . Detective Morgan was advised that he should contact the Innocence Project with the Department for Public Advocacy, to provide them with the information obtained from Jarrell." *King v. Commonwealth*, No. 2012-CA-001985-MR, 2014 WL 3547480, at *2 (Ky. Ct. App. July 18, 2014). Detective Morgan subsequently sued the LMPD, claiming that he was demoted to graveyard-shift patrol officer as punishment for notifying the Innocence Project, in violation of whistleblower-protection laws. Morgan has apparently won a $450,000 settlement as to that lawsuit, and Morgan has another lawsuit against the LMPD currently pending in Jefferson Circuit Court. *See* Andrew Wolfson, *Louisville to Pay Whistleblower Cop $450,000*, Louisville Courier-Journal (Apr. 16, 2014, 10:31 a.m.), http://www.courier-journal.com/story/news/crime/2014/04/16/louisville-pay-whistleblower-cop/7771933/; Jason Riley, *LMPD Officer Who Won $450,000 Settlement in Whistleblower Lawsuit Again Sues the Department*, WDRB.com (Sep. 30, 2015, 12:15 p.m.), http://www.wdrb.com/story/30152536/lmpd-officer-who-won-450000-settlement-in-whistleblower-lawsuit-again-sues-the-department; *Morgan v. Louisville-Jefferson County Metro. Police Dep't*, Jefferson Cir. Ct. No. 15-CI-004988.

No. 16-5949                        *King v. Harwood, et al.*                        Page 9

## II. The District Court Dismissed King's Claims

King filed her verified complaint on October 1, 2015, more than one year after the Court of Appeals vacated her *Alford* plea, but less than one year after the circuit court dismissed the indictment against her.  On October 15, 2015, prior to any discovery, Defendants filed a hybrid "Motion to Dismiss/Motion for Summary Judgment."  King opposed the motion, the Defendants replied, and King moved for leave to file a surreply.  The district court construed Defendants' motion as a motion for summary judgment and analyzed two issues: whether King's complaint "is time-barred by the statute of limitations," and whether "all individual Defendants are entitled to qualified immunity."  On June 1, 2016, the district court granted Defendants' motion, denied King's request under Fed. R. Civ. P. 56(d) to take discovery before summary judgment, and dismissed King's motion for leave to file a surreply as moot.

The district court held that under *Wallace v. Kato*, 549 U.S. 384 (2007), the accrual date for King's claims was the date of the decision of the court of appeals, such that the one-year statute of limitations applicable to malicious-prosecution claims expired before King filed her complaint.  In the alternative, in a section entitled "Merits of Plaintiff's Claims," the district court held that King "fails to establish a genuine issue of material fact that any of the individual defendants in this case are not entitled to qualified immunity. . . . Plaintiff must establish that Defendants reasonably believed Plaintiff was innocent yet pursued an investigation and prosecution anyway."  *King v. Harwood*, No. 3:15-CV-00762-GNS, 2016 WL 3094044, at *3 (W.D. Ky. June 1, 2016).

The court held that the record reflected sufficient probable cause to prosecute King[2] because (1) "witnesses reported Plaintiff had stated she had a 'vision' that Breeden's body would be found floating in water before he was found dead in the Kentucky River"; (2) King owned a .22-caliber gun, Breeden was killed with .22-caliber bullets, and a .22-caliber bullet fragment was found in King's floor; (3) multiple bullet holes were found in King's floor at least one of which "contained some form of blood"; and (4) King entered an *Alford* plea, which itself implies that there was sufficient probable cause to sustain a conviction.  The court therefore held that

---

[2]The full import of the court's statement here is unclear and is discussed below in Parts VI and VII.

No. 16-5949                    *King v. Harwood, et al.*                    Page 10

King could not show that "Defendants lacked a reasonable basis to believe that she killed Breeden when she herself acknowledged that the state's evidence was sufficient to convict her through the voluntary entry of her *Alford* plea." The court also held that KSP was entitled to immunity, which King conceded, and dismissed King's claims against KSP.

In the section of its opinion entitled "Merits of Plaintiff's Claims," the district court uses language granting summary judgment to Defendants based on qualified immunity, but the court also appears—as is evident from the portions cited in the preceding paragraph—to base its holding on the merits question of whether there was probable cause to support King's prosecution. *See, e.g.*, *King v. Harwood*, 2016 WL 3094044, at *4 ("Thus, the Court finds all individual Defendants are immune from liability, and Plaintiff cannot establish the lack of probable cause necessary to maintain a wrongful prosecution claim."). We will therefore consider both whether the district court erred in granting summary judgment based on King's inability to prove a lack of probable cause to support her prosecution and whether the district court erred in granting summary judgment based on qualified immunity.

### III.  Burden of Proof and Standard of Review

As a threshold matter, although some of the factual allegations recited above are substantiated only by King's verified complaint, "a verified complaint . . . satisfies the burden of the nonmovant to respond" to a motion for summary judgment, unlike "mere allegations or denials" in unverified pleadings. *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999) (en banc); *see also El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (a "verified complaint . . . carries the same weight as would an affidavit for purposes of summary judgment"). This is important because in opposing Defendants' motion for summary judgment, King's burden was to demonstrate that a genuine issue of material fact is in dispute, *see Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986), with "[t]he evidence of the nonmovant"—i.e., King—"to be believed, and all justifiable inferences . . . drawn in [her] favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014). Given such deference, if King is able to demonstrate that there is a genuine issue of material fact in dispute, then Defendants are not entitled to summary judgment. *Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

No. 16-5949                    *King v. Harwood, et al.*                    Page 11

We review the district court's rulings de novo, *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1176 (6th Cir. 1996), except that we review the district court's denial of King's motion for discovery for abuse of discretion, *McKinley v. City of Mansfield*, 404 F.3d 418, 443 (6th Cir. 2005).

## IV. King's Malicious-Prosecution Claims Are Not Time-Barred Under *Heck v. Humphrey*

In § 1983 suits, the applicable statute of limitations is determined by state law, while the "date on which the statute of limitations begins to run . . . is a question of federal law." *Eidson v. State of Tenn. Dept. of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007). In Kentucky, a one-year statute of limitations applies to § 1983 claims that are characterized as malicious-prosecution actions. *See Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990); *Fields v. Louisville/Jefferson Cty. Metro Gov't*, No. 3:07-CV-134-S, 2007 WL 4224216, at *3–4 (W.D. Ky. Nov. 27, 2007).

Because an "element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused," *Heck*, 512 U.S. at 484, the statute of limitations in such an action does not begin to run until "the plaintiff knows or has reason to know of" such favorable termination. *Eidson*, 510 F.3d at 635. Were it not so, the plaintiff would be compelled to sue during the pendency of the allegedly malicious prosecution, risking the possibility of the plaintiff's "succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." *Heck*, 512 U.S. at 484 (citation omitted).

The Supreme Court clarified in *Wallace* that the rule in *Heck* does not extend to claims for false arrest or false imprisonment, in which the limitations period begins when the allegedly false imprisonment ends, such as by the commencement of legal process. *Wallace*, 549 U.S. at 389–90 (discussing false imprisonment and the "entirely distinct" tort of malicious prosecution). Whereas some circuits, including ours, *see, e.g.*, *Shamaeizadeh v. Cunigan*, 182 F.3d 391 (6th Cir. 1999), had held that *Heck* applied to pre-conviction claims for false arrest, *Wallace* limited the rule in *Heck* to claims of malicious prosecution. In short, under *Heck*, a malicious-

prosecution claim is not available before the favorable termination of criminal proceedings, nor does the limitations period for such a claim begin until the favorable termination of criminal proceedings.

Here, the district court recognized that King's § 1983 suit was "based upon a malicious prosecution claim."  Nevertheless, the district court applied the rule in *Wallace* to hold that King's "cause of action accrued and the statute of limitations began to run on the date the judgment was vacated on July 18, 2014, rather than the date the charges were dropped."[3]  This language comes from *Wallace*, where the Supreme Court held that the date on which charges are dropped is not necessarily the date on which a false-imprisonment claim accrues, because such a claim instead accrues when the *false* imprisonment ends, which may be the date of indictment or arraignment.  *Wallace*, 549 U.S. at 393.

When the Kentucky Court of Appeals granted King relief, it vacated her *Alford* plea, but it did not result immediately in a "termination of the . . . criminal proceeding in favor of the accused," as *Heck* would require for the limitations period to begin.  512 U.S. at 484.  Rather, King's case was remanded for trial on the same charges that formed part of the malicious prosecution for which King now seeks relief.  Accordingly, the one-year statute of limitations period did not begin until October 9, 2014, when King's indictment was dismissed, and King's complaint—filed October 1, 2015—is timely under *Heck*.  The district court therefore erred in holding that King's malicious-prosecution claims were time-barred.

## V.  The District Court Did Not Abuse Its Discretion in Denying Pre-Summary-Judgment Discovery

We review the denial of a motion for pre-summary-judgment discovery for abuse of discretion.  *McKinley*, 404 F.3d at 443.  An abuse of discretion occurs when a district court "commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 454 (6th Cir. 2008).  A party seeking additional discovery before the court considers the opposing party's motion for summary judgment bears the burden

---

[3]Whereas King's brief on appeal lists the date of the decision of the court of appeals as July 14, 2014, Appellant's Br. 17, the district court opinion states July 18, 2014.  The correct date is July 18, 2014.

of demonstrating why such discovery is necessary.  *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004).  While the party seeking discovery may satisfy that burden upon showing "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" without discovery, Fed. R. Civ. P. 56(d), mere recitations of conclusory allegations are insufficient.  *Ibid.* (holding burden was not satisfied where party's affidavit contained allegations like: "Counsel believes evidence will demonstrate the Plaintiff was arrested for no other reason than dragging the American Flag").

Here, King's counsel filed a declaration seeking additional discovery under Rule 56(d).  But the declaration was no more specific than the one in *Summers*: King's counsel declared, for example, "we simply do not know all of Defendants' involvement in the events that gave rise to King's prosecution," and "Plaintiff needs to conduct discovery regarding the following areas:" before listing the various claims that King has asserted against Defendants.  King's counsel did not specify any actual discoverable evidence that he hoped to obtain with discovery.  Combined with the fact that King's verified complaint has the force of an affidavit on summary judgment, *El Bey v. Roop*, 530 F.3d at 414, the district court did not abuse its discretion in denying the motion for discovery.

### VI.  King Has Shown the Existence of a Genuine Issue of Material Fact as to Whether There Was Probable Cause to Support Her Prosecution, Despite King's *Alford* Plea

As we noted above, although the district court's opinion initially states that its summary-judgment inquiry will be limited to whether Defendants "are entitled to qualified immunity," the court goes on to label the summary-judgment section of its opinion, "Merits of Plaintiff's Claims," and therein discusses both Defendants' qualified immunity *and* whether Defendants are entitled to summary judgment on the merits.  Indeed, when the district court writes that "[t]he record reflects probable cause existed sufficient to arrest and prosecute Plaintiff," the full import of the court's statement is unclear.  The court could be implying that Defendants did not prosecute someone whom they believed they lacked probable cause to prosecute, which would favor granting summary judgment to Defendants on the issue of *qualified immunity*, because Defendants would lose qualified immunity only if they "recklessly or knowingly" violated King's clearly established right to be free from malicious prosecution.  *Webb v. United States*,

No. 16-5949            *King v. Harwood, et al.*            Page 14

789 F.3d 647, 660 (6th Cir. 2015). Or the court could be saying simply that there *was* probable cause to prosecute King, which would go to the *merits* of King's malicious-prosecution claim because if there was probable cause to prosecute King, then King cannot prove all the elements of malicious prosecution. We first analyze the court's statement as though the court decided on the merits that Defendants were entitled to summary judgment and then analyze the issue of qualified immunity in the following section.

In *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010), we articulated the elements of a § 1983 claim for malicious prosecution: "(1) a criminal prosecution was initiated against the plaintiff, and the defendant made[,] influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Sanders v. Jones*, 845 F.3d 721, 728 (6th Cir. 2017) (citing *Sykes*, 625 F.3d at 309–10). We recognized in *Sykes* that "malicious prosecution" was a misnomer: unlike the common-law tort of malicious prosecution, which has malice as an element, we noted that the constitutional tort of malicious prosecution that is actionable in our circuit as a Fourth Amendment violation under § 1983 does not require a showing of malice at all, and might more aptly be called "unreasonable prosecutorial seizure." *Sykes*, 625 F.3d at 310. Nevertheless, we continued to call the constitutional tort "malicious prosecution," concluding that we were "stuck with that label" in part because of its use by the Supreme Court and other circuits.[4] *Ibid.*

---

[4]Section 1983 was enacted in 1871 and, on its face, imposes civil liability upon a person acting under color of state law who deprives an individual of "rights, privileges, or immunities secured by the Constitution," but § 1983 itself does not define those rights. Prior to 1994, we recognized a § 1983 claim for malicious prosecution under the Substantive Due Process Clause of the Fourteenth Amendment. *See, e.g.*, *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 340 (6th Cir. 1990). Following the Supreme Court's splintered decision in *Albright v. Oliver*, 510 U.S. 266 (1994), in which a plurality of the Court concluded that § 1983 claims for malicious prosecution could be brought only under the Fourth Amendment and not under the Substantive Due Process Clause of the Fourteenth Amendment, our circuit recognized a Fourth Amendment malicious-prosecution claim, with its four elements as recited above by *Sykes* and *Sanders*. See *Spurlock v. Satterfield*, 167 F.3d 995, 1005–06 (6th Cir. 1999) (recognizing the malicious-prosecution claim) (citing *Smith v. Williams*, No. 94-6306, 1996 WL 99329, at *5 (6th Cir. 1996) (unpublished table decision)). We rejected the requirement of malice on the grounds that *Albright* required us to look to the *constitutional* substance of the Fourth Amendment to set forth the elements of a § 1983 malicious-prosecution claim (i.e., an unreasonable seizure without probable cause), rather than looking to the elements of an analogous *common-law* claim for malicious prosecution, which several other circuits have done. *See Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010); *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009); *Lassiter*

No. 16-5949        *King v. Harwood, et al.*        Page 15

The district court held that King "cannot establish the lack of probable cause necessary to maintain a wrongful prosecution claim" because King entered an *Alford* plea, which the district court held sufficed to prove that there *was* probable cause at the time of King's plea, and because of three pieces of evidence: King's premonitions, the fact that King owned a .22-caliber gun, and the bullet holes in the floor. The district court gave great weight to the *Alford* plea, holding that King "impliedly conceded probable cause" from "the moment she entered an *Alford* plea."

But King's *Alford* plea does not help Defendants on summary judgment for two reasons. First, the district court's position requires inferring from King's *Alford* plea that King herself must have believed, at the time of entering the plea, that there was probable cause to prosecute her. But what King believed is either irrelevant to Harwood's actions, or is only evidentiary as to the factual issue of the existence of probable cause and is, therefore, inappropriate for resolution at summary judgment. Second, even if King did impliedly concede probable cause by signing the *Alford* plea, that does not retroactively prove that there had been probable cause to support King's prosecution all along.

At oral argument, Defendants argued that King's *Alford* plea conclusively foreclosed her malicious-prosecution claim under *Broaddus v. Campbell*, 911 S.W.2d 281, 284–85 (Ky. Ct. App. 1995), a case not cited in Defendants' brief on appeal, but relied upon by the district court. *Broaddus* has nothing to do with the effect of a subsequently vacated *Alford* plea on a malicious-prosecution claim, however. In *Broaddus*, the plaintiff had been indicted "on one count of theft by failure to make required disposition over $100 and one count of theft by unlawful taking over $100," *id.* at 282. The plaintiff and the attorney for the Commonwealth of Kentucky subsequently entered into a stipulated "order of dismissal due to insufficient evidence," in which the plaintiff "stipulated probable cause for the issuance of the indictment" and the Commonwealth agreed that the charges would be "dismissed without prejudice and stricken from the docket." *Ibid.* Less than a year later, the plaintiff brought a malicious-prosecution suit

---

*v. City of Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009); *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008); *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010). In short, we have conformed our § 1983 jurisprudence to the demands of new factual applications and new Supreme Court recognitions of "constitutional rights," and we have distinguished our recognition of § 1983 *claims* from, for example, our articulation of whether a given right is *clearly established*, or our articulation of the mens rea requirement that a plaintiff must prove in order to overcome a defendant's *qualified immunity*.

against the complaining witness, and the Kentucky Court of Appeals affirmed the dismissal of his suit on the grounds that his stipulation of probable cause in the agreed order of dismissal—*which had not been vacated or otherwise called into question*—had preclusive effect in his malicious-prosecution suit. Nothing in *Broaddus* helps Defendants to use King's *vacated Alford* plea to prove, at summary judgment, that no reasonable trier of fact could find a lack of probable cause to support King's prosecution.

Further, once the strength of the *Alford* plea is removed from the district court's probable-cause analysis, a genuine issue of material fact remains as to whether the "facts and circumstances" known to Harwood would be "sufficient to lead an ordinarily prudent person to believe" that King was guilty of murdering Breeden. *Mott v. Mayer*, 524 F. App'x 179, 186 (6th Cir. 2013) (citation omitted). Giving King all reasonable inferences from the factual record, Harwood knew that King's gun could not have fired the bullets that killed Breeden (and no evidence of record links King to the weapon that did), Harwood knew that the bullet holes in King's floor were not caused by the bullets that killed Breeden, and the only evidence Harwood had to go on was King's premonitions that Breeden would be found "in water," King's prior relationship with Breeden, and the fact that King owned a guitar and an amplifier. There was no physical evidence tying King to the crime, no eyewitness evidence, and at best a weak motive, to the extent that King and Breeden's $300 dispute would provide one. All this was known to Officers Figg and Bess who were unable even to obtain a search warrant for King's house. Thus, in light of the fact that all reasonable inferences must be given to King at the summary-judgment stage, the district court erred in holding that King would be unable to prove the requisite lack of probable cause to win her malicious-prosecution claim.

## VII.  King Has Shown the Existence of a Genuine Issue of Material Fact as to Whether Harwood Knowingly or Recklessly Set Her Prosecution in Motion Despite the Absence of Probable Cause to Support a Murder Conviction

Law-enforcement officers enjoy qualified immunity from suit when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). In evaluating whether Defendants violated King's clearly established rights, even though we give King all reasonable inferences, we consider "only the

facts that were knowable to" Defendants. *Id.* at 550. And it is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *Id.* at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Ibid.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Ibid.* (quoting *Anderson*, 483 U.S. at 639).

That said, individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has "made, influenced, or participated in the decision to prosecute the plaintiff" by, for example, "knowingly or recklessly" making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants. *Webb*, 789 F.3d at 660, 665 (holding officer violated clearly established right to be free from malicious prosecution by fabricating evidence that defendant was a drug dealer); *Smith*, 1996 WL 99329 at *4–5 (holding reasonable police officer would have known that seeking felony warrants and making "efforts to get the Commonwealth Attorney to convene a grand jury" when probable cause was lacking violated clearly established constitutional rights); *see also Malley v. Briggs*, 475 U.S. 335, 340–45 (1986) (affirming lower court's holding that "an officer who seeks an arrest warrant by submitting a complaint and supporting affidavit to a judge is not entitled to immunity unless the officer has an objectively reasonable basis for believing that the facts alleged in his affidavit are sufficient to establish probable cause").

Here, the district court erred in failing to draw all reasonable inferences in favor of King, as it is required to do at summary judgment. Giving King all reasonable inferences from the factual record, Harwood knew that King's gun was not the murder weapon (and no evidence of record links King to the weapon that bullets that *did* kill Breeden); Harwood knew that the bullet holes in King's floor were not caused by the bullets that killed Breeden; and the only pieces of evidence that Harwood had to go on were (1) King's premonitions that Breeden would be found "in water," (2) King's prior relationship with Breeden, and (3) the fact that King owned a guitar and an amplifier. Defendants cite no caselaw to support the proposition that this evidence, without more, can sustain a conviction for murder—or that any reasonable officer would believe

No. 16-5949                    *King v. Harwood, et al.*                    Page 18

that it could.  *See* Appellees' Br. 23–26.  Moreover, Defendants do not appear to contest the assertion that when Harwood sought search warrants for King's home, he was armed with no more evidence than what was known to Officers Figg and Bess at the time of the initial investigation, and those officers were unable even to obtain a search warrant, let alone an indictment for murder.  *Cf. Buckley v. Fitzsimmons*, 509 U.S. 259, 261–62, 274–75 (1993) (holding that a prosecutor was not entitled to absolute prosecutorial immunity where, after a special grand jury initially declined to return an indictment following an eight-month investigation, the prosecutor called a press conference at which he made statements falsely implicating the petitioner and then sought and received an indictment against the petitioner despite lacking any new evidence to support a finding of probable cause).

We also note that, while Defendants made other arguments, they chose to focus at oral argument on the factual issues in this case.  Even though the Kentucky Court of Appeals credited Jarrell's confession as evidence of King's innocence, for example, Defendants referred to the confession as "false" and strongly implied that the court of appeals committed error in vacating King's plea.  Defense counsel further chose to argue that Jarrell could not have killed Breeden for various reasons, disputed whether Harwood had discussed with the KSP forensics officer the copper wash or copper jacket on the bullets that were recovered from King's home and Breeden's skull, and argued that King indeed had a prosthetic leg at the time of Breeden's murder.  Though our ultimate ruling is based on the written record, Defendants' arguments at oral argument reflect just how much of the dispute before us consists of contested facts.  Summary judgment is therefore inappropriate for disposing of King's malicious-prosecution claim against Harwood.

We therefore hold that the district court erred in granting summary judgment for Harwood on the issue of Harwood's qualified immunity from suit.

### VIII.  Absolute Immunity Does Not Bar King's Suit

#### A.  *Absolute Immunity for Grand-Jury Witnesses*

Although not developed extensively below, Defendants raised in their motion to dismiss and their brief on appeal—and King conceded at oral argument—the relevance of *Rehberg v.*

No. 16-5949                          *King v. Harwood, et al.*                          Page 19

*Paulk*, 566 U.S. 356 (2012), which extends *absolute* immunity, rather than *qualified* immunity, to law-enforcement officers for their acts as grand-jury witnesses.  Because we may affirm the district court's judgment on any grounds properly before us, *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002), we pause to consider what role, if any, *Rehberg* plays in our analysis.

In *Rehberg*, after a Certified Public Accountant (Rehberg) sent anonymous faxes to a Georgia hospital criticizing its management, the local prosecutor on three separate occasions sought and obtained indictments against Rehberg for assault, burglary, and other offenses, "allegedly as a favor to the hospital's leadership." *Rehberg*, 566 U.S. at 359.  All the indictments were challenged and dismissed for insufficiency.  *Id.* at 359–60.  The sole grand-jury witness was the chief investigator for the district attorney's office, whom Rehberg sued under § 1983, alleging that the investigator maliciously prosecuted Rehberg by testifying falsely before the grand jury.  The Supreme Court held that the investigator was absolutely immune from suit based on his grand-jury testimony, reasoning that a grand-jury witness should enjoy absolute immunity from suit on the same terms as any trial witness would.  And, although the defendant in *Rehberg* was the prosecutor's investigator, *Rehberg* made clear that absolute immunity is to be afforded to *all* grand-jury witnesses, even law-enforcement officers who have "conspired to present false testimony."  *Id.* at 367, 369 ("Neither is there any reason to distinguish law enforcement witnesses from lay witnesses.").

Crucially, however, *Rehberg* does not affect the thin but conspicuous line between, on the one hand, law-enforcement officers who only provide grand-jury testimony (including related "preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony," *Rehberg*, 566 U.S. at 370, and including any conspiracy with prosecutors or other officers to *testify* falsely), and, on the other hand, law-enforcement officers who either (1) "set the wheels of government in motion by instigating a legal action," *id.* at 371 (quoting *Wyatt v. Cole*, 504 U.S. 158, 164–65 (1992)), or (2) "falsify affidavits" or "fabricate evidence concerning an unsolved crime," *Rehberg*, 566 U.S. at 370 n.1 (citing *Kalina v. Fletcher*, 522 U.S. 118, 128–31 (1997); *Malley*, 475 U.S. at 340–45 (holding law-enforcement officers enjoy only qualified immunity from suit arising from false statements in affidavits made

No. 16-5949        *King v. Harwood, et al.*        Page 20

### B. Rehberg*'s Reception in the Sixth Circuit*

Although *Rehberg* was decided in 2012, no published opinion of our court had cited it for any purpose until January 2017—well after both the close of the district-court record and the submission of briefing on appeal in this case—when our court decided *Sanders*, 845 F.3d at 735 (reversing denial of absolute immunity for law-enforcement officer who gave false grand-jury testimony wrongly identifying the plaintiff as a drug dealer).

In *Sanders*, the defendant (Officer Jones) was one of numerous law-enforcement officers participating on a district-wide drug task force in Decatur County, Tennessee.  Participating officers used confidential informants to locate drug dealers; the informants would then communicate with the dealers and meet the dealers to engage in controlled buys of drugs, all under law-enforcement surveillance. As part of one such controlled buy, an informant operating for Jones met a prospective seller he referred to as "Amy."  The informant was given money to buy drugs and met the seller in a park.  In fact, although the seller never audibly identified herself to the informant either in the phone call or at the park, the seller would later turn out to be not "Amy" but "Ramey" (Amanda Ramey), who was the roommate of a woman named Amy Sanders, who would become the plaintiff in *Sanders*.  Ramey's roommate relationship with Sanders, however, was unknown at the time to the informant, who relayed only a physical description of the seller to Jones, who had observed the buy from a distance.

Jones "asked around" the sheriff's department whether anyone knew of a person matching the informant's description of the seller, and another officer (Inman) thought that the description matched Sanders, an individual with whom Inman was familiar.  Jones then retrieved Sanders's driver's-license photograph, showed it to the informant, and asked the informant whether Sanders was the seller; the informant identified Sanders as the seller and later reiterated that identification to Jones.  Jones prepared a police report that identified Sanders as the seller and forwarded it to the district attorney's office. Jones did not discuss his report on Sanders "with anyone from the district attorney's office" until the day of the grand-jury hearing, at which

No. 16-5949                      *King v. Harwood, et al.*                      Page 21

Jones testified that Sanders was the seller.  Sanders was indicted, but the indictment was later dismissed due to the misidentification.

The gravamen of Sanders's malicious-prosecution complaint was that Jones should have known from previous dealings that he had had with Ramey that the car that pulled into the park at the time of the controlled drug buy was Ramey's and not Sanders's (Sanders alleges that Jones knew that Ramey drove a silver Monte Carlo while Sanders drove a Ford Explorer), and that Jones should have recognized that the driver's-license photograph of Sanders, which Jones reviewed when preparing his police report, did not resemble the image of Ramey that was visible in the surveillance video of the controlled buy.  According to Sanders, Jones was therefore liable for malicious prosecution for knowingly testifying to the false contents of his police report before the grand jury.

*Sanders* held that Jones was entitled to absolute immunity based on his grand-jury testimony, and that (for reasons discussed below) his police report provided an insufficient basis on which Sanders could pursue a malicious-prosecution claim against him.  Even if all Sanders's facts are true, however—and *Sanders* properly took the plaintiff's version of the events as true in its absolute-immunity analysis, *Buckley*, 509 U.S. at 261—*Sanders* and our present case fall squarely on opposite sides of the line recognized in *Rehberg*: Sanders did not allege that Jones "set the prosecution in motion," *Rehberg*, 566 U.S. at 372, but King *has* alleged that Harwood set *her* prosecution in motion.  Though Jones may well have recklessly drafted his police report, the ultimate charging decision in *Sanders* lay wholly with the prosecutor, and Jones's involvement in Sanders's prosecution was ancillary to an already-existing drug task force.  Further, Jones's misidentification of Sanders does not reflect Jones's personal decision to initiate a prosecution against Sanders but is more accurately described as negligence, or perhaps recklessness, on the part of Jones, Inman, and the informant.  *See Sanders*, 845 F.3d at 734 ("[T]he essence of [Sanders's] malicious prosecution claim is that Jones misled the prosecutor and the grand jury through *negligent and reckless investigation* and critical *omissions* of material evidence." (emphasis added)).  Sanders made no allegation that Jones *deliberately* targeted her over Ramey or anyone else.  Unlike in the present case, Jones did not apply for a search or arrest warrant, nor did Jones do anything beyond "forward" his report to the district attorney; King, on

No. 16-5949                    *King v. Harwood, et al.*                    Page 22

the other hand, alleges that Harwood singled out King in order to close the cold case of Breeden's murder, filed affidavits for search warrants *knowing* that probable cause was lacking, *made false statements* identifying King as Breeden's killer in his investigative report, and *personally sought* to have King indicted.

Thus, while *Sanders* may control the outcome of many malicious-prosecution cases in which the sole or primary act of the defendant law-enforcement officer is delivering grand-jury testimony, *Sanders* does not control our decision here. True, *Rehberg* most certainly applies to our case and affords Harwood absolute immunity from suit to *the extent that King's claims are based on his grand-jury testimony*, but *Rehberg* does not afford Harwood absolute immunity for his actions that are prior to, and independent of, his grand-jury testimony. And because King has alleged that Harwood set her prosecution in motion—and that Harwood both sought warrants despite the absence of probable cause *and* made knowing or reckless false statements implicating King in his investigative report—King may properly base her malicious-prosecution claim on those actions by Harwood without triggering the absolute immunity established by *Rehberg*.

### C.  The Viability of Post-Rehberg *Malicious-Prosecution Claims*

We cannot conclude our discussion of *Sanders*, however, without considering *Sanders*'s contemplation of the extent to which a law-enforcement officer's actions that are *not* directly related to the officer's grand-jury testimony (like Officer Jones's act of writing his police report) may form the basis of a post-*Rehberg* malicious-prosecution claim in our circuit. *Sanders* ultimately concludes that Sanders could not base her claim on Jones's police report, but *Sanders* reaches that conclusion *not* because Jones's actions in preparing the police report afford him absolute immunity, but rather because with only the police report, Sanders would not be able to prove the *elements* of malicious prosecution—one of which is that no probable cause supported her prosecution—given the presumption of probable cause created by the grand-jury indictment. Without the rule of *Rehberg*, *Sanders* notes, Sanders could overcome that presumption by relying on our longstanding exception that when an officer has made "knowing or reckless falsehoods" to the grand jury, *Webb*, 789 F.3d at 663, the grand-jury indictment no longer offers conclusive proof of probable cause. That exception is no longer available post-*Rehberg*, *Sanders* posits, because grand-jury testimony is subject to absolute immunity. Thus, the logic goes, even

No. 16-5949 *King v. Harwood, et al.* Page 23

if Sanders could overcome Jones's qualified immunity and use his police report as evidence of Jones's influence upon or participation in Sanders's prosecution, Sanders would not be able to prevail on the merits of her claim because the grand-jury indictment provides proof of probable cause, and nothing Sanders can enter into evidence could call the indictment into question.

The result, *Sanders* admits, is "harsh," 845 F.3d at 734, because *Rehberg*'s extension of absolute immunity to grand-jury testimony "largely foreclose[s] malicious prosecution claims where the plaintiff was indicted." *Ibid.* Indeed, *Sanders* asks "whether malicious prosecution remains a viable claim" *at all* after *Rehberg*, in light of the apparent difficulty of overcoming the presumption of probable cause created by an indictment. *Id.* at 731.

But, as *Sanders* expressly recognized, "*Rehberg* left the door open for at least some § 1983 claims against grand jury witnesses." *Id.* at 734. As *Sanders* notes, *Rehberg* "specifically mentioned that falsifying affidavits and fabricating evidence would constitute unprotected acts," *ibid. Sanders* continues:

> *Rehberg* also distinguished officers who, prior to and independent of any grand-jury testimony they might give, "set the wheels of government in motion by instigating a legal action." *Rehberg*, 566 U.S. at 371 (quoting *Wyatt v. Cole*, 504 U.S. 158, 164–65 (1992)). *Rehberg* apparently left the door open for at least some § 1983 claims against such officers, whose actions would be entitled only to qualified immunity rather than absolute immunity. *Id*. at 371–73. Because Sanders has not alleged that Jones's actions rose to the level of "instigating" Sanders's prosecution, however, we have no occasion to decide whether or how a plaintiff in this circuit would be able to overcome the presumption of probable cause created by a grand-jury indictment in order to bring such a malicious-prosecution claim.

*Id.* at 734 n.6.

*Sanders* rightly concludes that in order for a plaintiff to bring a malicious-prosecution claim against an officer arising from these "unprotected acts," there would have to be some exception to the principle that the grand-jury indictment is proof of probable cause. And because Sanders did not allege that Jones had done any of the unprotected acts, *Sanders* had no reason to articulate any such exception. *Sanders*, 845 F.3d at 734 ("[W]e decline to create another exception . . . *when the scenarios mentioned by the Supreme Court are not before us*." (emphasis added)).

No. 16-5949                    *King v. Harwood, et al.*                    Page 24

One of the "scenarios mentioned by the Supreme Court" *is* presently before us, however, because King has alleged that Harwood set her prosecution in motion, leaving us to articulate how, after *Rehberg*, a plaintiff like King may overcome the presumption of probable cause created by her indictment.

We hold that where (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury), the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive. This exception to the presumption of probable cause finds support in Supreme Court caselaw, in our precedent, and in the decisions of our sister circuits and the district courts.

First, the plain language and intent of *Rehberg* extend absolute immunity to grand-jury witnesses without declaring or even contemplating the complete foreclosure of malicious-prosecution claims. If a grand-jury indictment created an irrebuttable presumption of probable cause (which it would if the *only* way to overcome such a presumption were to rely on grand-jury testimony that is inadmissible under *Rehberg*), then there would be no point in distinguishing, as *Rehberg* and even *Sanders* did, cases in which a law-enforcement officer has set the prosecution in motion, for a plaintiff would be unable to prove the lack-of-probable-cause element of a malicious-prosecution claim even in such cases.

Moreover, the Supreme Court's recent decision in *Manuel v. Joliet*, No. 14-9496 (U.S. Mar. 21, 2017), considered and rejected the argument that either a judge's finding of probable cause or "a grand jury indictment or preliminary examination" forecloses a Fourth Amendment claim arising from unlawful pretrial detention. *Id.*, slip op. at 11 n.8 (holding that plaintiff could pursue a § 1983 claim for unlawful pretrial detention, and that the Fourth Amendment properly governed such a claim, where he spent forty-eight days in jail "based entirely on made-up evidence" that a vitamin bottle in his possession actually contained illegal drugs, slip op. at 2, 4,

even though a judge found there was probable cause for the charge on the day of arrest, and even though a grand jury returned an indictment twelve days later).  The Court in *Manuel* went on: "Whatever its precise form, if the proceeding [finding probable cause] is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights."  *Ibid.*

Second, maintaining the viability of malicious-prosecution claims against officers who wrongly set prosecutions in motion is rooted in the common-law distinction of "complaining witnesses," who—unlike *testifying* witnesses—were not afforded absolute immunity, as *Rehberg* details at length.  *Rehberg*, 566 U.S. at 370–73 (discussing grand-jury witnesses, who testify before the grand jury, and "complaining witnesses" who "set the wheels of government in motion by instigating an action"; "a mid-19th-century complaining witness *might* testify, either before a grand jury or at trial. But testifying was not a necessary characteristic of a 'complaining witness.'"); *see also Kalina*, 522 U.S. at 135 (Scalia, J., concurring) ("a 'complaining witness' could be sued for malicious prosecution whether or not he ever provided factual testimony, so long as he had a role in initiating or procuring the prosecution"); *Malley*, 475 U.S. at 340–41 ("[C]omplaining witnesses were not absolutely immune at common law. In 1871, the generally accepted rule was that one who procured the issuance of an arrest warrant by submitting a complaint could be held liable if the complaint was made maliciously and without probable cause.").

Third, the decisions of our court have, since our court first recognized "malicious prosecution" as a § 1983 claim cognizable under the Fourth Amendment, slowly but continually articulated both the elements of the claim and the contours of the exceptions to the presumption that an indictment provides proof of probable cause.  *See Spurlock v. Satterfield*, 167 F.3d 995, 1005–06 (6th Cir. 1999) (recognizing the malicious-prosecution claim) (citing *Smith*, 1996 WL 99329, at *5).  Though *Sanders* states in dicta that "it is well-established in this circuit that an indictment by a grand jury *conclusively* determines the existence of probable cause *unless* the defendant-officer 'knowingly or recklessly present[ed] false testimony to the grand jury,'" *Sanders*, 845 F.3d at 732 (citing *Webb*, 789 F.3d at 660, *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014), and *Cook v. McPherson*, 273 F. App'x 421, 424 (6th Cir. 2008)), this statement

mistakes the precedents it cites: while we certainly said in those cases that an officer's false statements to a grand jury are *sufficient* to overcome the presumption of probable cause, we have not said that such statements are *necessary* to do so. *See Webb*, 789 F.3d at 660 ("An exception to this general rule applies when defendants knowingly or recklessly present false testimony to the grand jury to obtain the indictment."); *Robertson*, 753 F.3d at 616 ("[A]n exception applies where the indictment was obtained wrongfully by defendant police officers who knowingly presented false testimony to the grand jury."), and *Cook*, 273 F. App'x at 424 ("An exception to the *Barnes* rule applies where the indictment was obtained wrongfully by defendant police officers who knowingly present false testimony to the grand jury."). Nor did we have reason in *Webb* or other cases specifically to address the question whether the presumption of probable cause may be overcome by an officer's wrongful setting in motion of a prosecution or falsification or fabrication of evidence *apart* from the officer's grand-jury testimony, either because *Rehberg* had not yet been pronounced (as in *Cook*) or because the parties waived the applicability of *Rehberg* by failing to raise it (as in *Webb* and *Robertson*). None of these cases, which are the only cases cited by *Sanders* for its far-reaching statement that false *grand-jury testimony* is the *only* means of overcoming the presumption of probable cause, foreclose our adoption of the rule we pronounce today, which only clarifies, in light of *Rehberg*'s distinction of ordinary grand-jury witnesses and officers who do more than only testify before a grand jury, that a plaintiff may overcome the presumption of probable cause in cases like King's upon a showing that the officer has made knowing or reckless false statements or has falsified or fabricated evidence in the course of setting a prosecution in motion.

Fourth, there is no logical obstacle to the rule we articulate today. According to the discussion in *Sanders*, 845 F.3d at 732–33, a malicious-prosecution claim resting on evidence *other than* grand-jury testimony would seemingly fail for one of two reasons in attempting to overcome the presumption of probable cause created by an indictment: (1) if the other evidence were material to the grand jury's return of the indictment, then the evidence must have been introduced to the grand jury by means of grand-jury testimony (how else would the grand jury know of it?), in which case absolute immunity would foreclose a claim based on that evidence; or (2) if the evidence were not material to the indictment, then the plaintiff would be unable to

show that probable cause did not exist apart from the evidence, and thus would be unable to prevail on the merits of a malicious-prosecution claim.[5]

But an officer's actions of wrongly setting a prosecution in motion or falsifying or fabricating evidence may be material to the grand-jury indictment *even though* they do not constitute "testimony" or related preparation for testimony, and nothing in the caselaw indicates that such actions somehow *mutate into* grand-jury testimony simply because they are material to the return of an indictment. *See, e.g.*, *Sykes*, 625 F.3d at 315 ("[H]olding Sgt. Anderson liable for all reasonably foreseeable consequences of his initial misdeeds finds support in the Supreme Court's decision in *Malley v. Briggs*, 475 U.S. 335. In *Malley*, the Supreme Court made clear that normal causation principles apply to 42 U.S.C. § 1983 actions by stating that if an 'officer caused [a] plaintiff[] to be unconstitutionally arrested by presenting a judge with a complaint and a supporting affidavit [that] failed to establish probable cause,' *id.* at 337, it is 'clear' that the argument that 'the officer should not be liable because the judge's decision to issue the warrant breaks the causal chain between the application for the warrant and the improvident arrest' would be 'inconsistent with [its] interpretation of § 1983,' *id.* at 344 n.7."). Thus, evidence of an officer's actions prior to and independent of his grand-jury testimony may call into question the presumption of probable cause created by an indictment even if a malicious-prosecution plaintiff may not bring in evidence of the grand-jury testimony *itself* to do so.

Fifth, other courts have likewise rejected the proposition that *Rehberg* completely forecloses malicious-prosecution claims against law-enforcement officers who set a prosecution in motion or who falsify or fabricate evidence. *See, e.g.*, *Sanchez v. Hartley*, 810 F.3d 750, 755 (10th Cir. 2016) ("*Rehberg* does not bear on our issue. There the Supreme Court held only that 'a grand jury witness,' including a law-enforcement officer, 'has absolute immunity from any § 1983 claim based on the witness' testimony.' Mr. Sanchez's allegations relate to the defendants' conduct *before* Mr. Sanchez was charged, not testimony before a grand jury." (citation omitted) (emphasis added)); *Lisker v. City of Los Angeles*, 780 F.3d 1237, 1242 (9th

---

[5]Of course, we have held that "even if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect." *Webb*, 789 F.3d at 670 (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) ("A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant.")).

No. 16-5949                    *King v. Harwood, et al.*                    Page 28

Cir. 2015) ("Immunity for pre-testimony conduct, however, 'is not limitless.'  In addressing claims of witness immunity, we have distinguished conspiracies to testify falsely from 'non-testimonial' acts, such as 'tampering with documentary or physical evidence or preventing witnesses from coming forward.'" (citation omitted)); *Sankar v. City of New York*, 867 F. Supp. 2d 297 (E.D.N.Y. 2012) (on motion for summary judgment); *Sankar v. City of New York*, No. 07 CV 4726(RJD)(SMG), 2012 WL 2923236 (E.D.N.Y. July 18, 2012) (on motion for reconsideration).

In *Sankar*, for example, a landlord alleged that one of her tenants filed false police reports accusing the landlord of assaulting her.  The landlord had been charged with assault, harassment, and other offenses, but all the charges were ultimately dismissed.  In her subsequent § 1983 suit, the landlord alleged that one officer in particular, Officer Ostrowski, knew that the tenant had a motive to lie and relied solely on the tenant's uncorroborated report in both effectuating the landlord's arrest and seeking her prosecution.  *Sankar*, 867 F. Supp. 2d at 301.  The district court denied summary judgment as to the landlord's malicious-prosecution claims against Ostrowski, *id.* at 315, and denied Ostrowski's motion for reconsideration that relied on *Rehberg*, *Sankar*, 2012 WL 2923236, at *3, holding that "Ostrowski's testifying at the grand jury was but one additional step this officer took in his effort to push the case against plaintiff forward. If anything, *Rehberg* reinforces the distinction between one who simply testifies at a grand jury and 'does not make the decision to press criminal charges,' *Rehberg*, 132 S. Ct. at 1508, and one, like Ostrowski, who 'set[s] the wheels of government in motion by instigating a legal action.'" The court held that the landlord had shown there to be genuine issues of material fact as to whether probable cause existed that were sufficient to overcome a motion for summary judgment, and that Ostrowski's "filing of a sworn complaint" and "involvement in laying the groundwork for an indictment" was not immune from suit simply because Ostrowski also testified before the grand jury.  *Sankar*, 2012 WL 2923236, at *3.

### D.  King Has Raised Genuine Issues of Material Fact as to the Existence of Probable Cause

Applying our rule, we therefore hold that King has raised genuine issues of material fact as to (1) whether Harwood set King's prosecution in motion by applying for search warrants despite the lack of probable cause to search, by seeking King's indictment despite the lack of

No. 16-5949                    *King v. Harwood, et al.*                    Page 29

probable cause on which to prosecute King for murder, or by making knowing or reckless false statements in Harwood's investigative report; (2) whether any false statements made by Harwood, together with his material omissions of facts—if true—such as King's having one leg, the fact that the bullet wounds in Breeden's skull were non-exiting, or Harwood's knowledge that the bullets in King's home did not match the bullets that killed Breeden, were material to King's prosecution; and (3) whether any such false statements, evidence, and omissions were independent of Harwood's grand-jury testimony, so as to constitute "laying the groundwork for an indictment," *Sankar*, 2012 WL 2923236, at *3, rather than the sort of "preparatory activity" in advance of a grand-jury hearing that would provide absolute immunity under *Rehberg*, 566 U.S. at 370. Thus, King has raised genuine issues of material fact sufficient to overcome, at least at summary judgment, the presumption that King's indictment is proof of probable cause. Accordingly, we hold that *Rehberg* does not bar King's claims on the basis of absolute immunity, nor does *Rehberg* preclude the possibility that King may prevail on the merits of her malicious-prosecution claim.

## CONCLUSION

In sum, the district court erred in holding that King's claims were time-barred, and the district court erred in holding that all Defendants were entitled to summary judgment. Although Harwood testified before the grand jury, King has raised genuine issues of material fact unrelated to his grand-jury testimony that are sufficient to overcome a motion for summary judgment based on either qualified immunity as a law-enforcement officer or absolute immunity as a grand-jury witness. Accordingly, the district court erred in granting summary judgment for Harwood based on his immunity from suit. We therefore **REVERSE** as to King's claim for malicious prosecution against Harwood.

The district court stated in its opinion that "all of Plaintiff's other claims are dependent upon her action for malicious prosecution" and dismissed them along with her malicious-prosecution claims. Accordingly, we also **REVERSE** as to any of King's state-law claims against Harwood that the district court dismissed on the grounds that either their timeliness or the district court's supplemental jurisdiction over them was dependent upon King's federal malicious-prosecution claim.

No. 16-5949                          *King v. Harwood, et al.*                          Page 30

    We **AFFIRM** as to King's remaining claims against Harwood, as to all of King's claims against the other Defendants, and as to King's motion for pre-summary-judgment discovery.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 16-5949

SUSAN JEAN KING,
      Plaintiff - Appellant,

   v.

TODD HARWOOD, VIC HUBBUCH, CHAD WHITE,
and JEFF MEDLEY, in their individual capacities;
COMMONWEALTH OF KENTUCKY, dba
Kentucky State Police; UNNAMED LAW ENFORCEMENT
OFFICERS; UNNAMED SUPERVISORS
OF INDIVIDUAL DEFENDANTS,
      Defendants - Appellees.

> **FILED**
> Mar 27, 2017
> DEBORAH S. HUNT, Clerk

Before:  BOGGS, SILER, and DONALD, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Kentucky at Louisville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED IN PART and AFFIRMED IN PART.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk