**SUSAN JEAN KING,**                                                          **Plaintiff,**

**v.**

**TODD HARWOOD, et al.,**                                              **Defendants.**

## Memorandum and Opinion Order

Before the Court are two motions – a motion filed by defendant Todd Harwood ("Harwood") to stay District Court proceedings (DN 34) pending the resolution of his petition for Writ of Certiorari and a motion to quash a subpoena *duces tecum* (DN 36) by a former defendant, the Kentucky State Police ("KSP"). Oral arguments were held on November 1, 2017. For the following reasons, the Court **DENIES** Harwood's motion to stay proceedings. Because the merits of KSP's motion to quash rest on entirely different law, the Court will issue a separate ruling on KSP's motion.

### I. Factual Background and Procedural History

### A. Factual Background

This action has its roots in a 2006 investigation and purported resolution of a cold case. (DN 1, #6.) In November 1998, police pulled the body of Kyle Breeden ("Breeden") out of the Kentucky River near Gratz, Kentucky. (*Id*.) Breeden had been shot twice in the back of the head with a gun capable of chambering .22 caliber rounds and had his legs bound with a guitar amplifier cable before being thrown into the river. (*Id*.) Although Breeden's ex-girlfriend, the electric guitar player Susan King ("King"), was among the suspects the police investigated, they

1

could not obtain a search warrant of King's home. (*Id*. at 7–8.) At the time, no one was arrested for Breeden's murder. (*Id*. at 7–8.) The case sat dormant for nearly seven years until 2006, when it was assigned to detective Harwood. *King v. Harwood*, 852 F. 3d 568, 572 (6th Cir. 2017).

Harwood promptly obtained a search warrant of King's home – and subsequently a second – using information similar to the information with which the police had failed to obtain a warrant years prior. (DN 1, #8); *King*, 852 F. 3d at 574. The evidence obtained from warrants included bullet holes in King's kitchen floor made by .22 caliber rounds and over one hundred twenty-five bullets recovered from a tree in King's backyard. (DN 1, #11); *King*, 852 F. 3d at 574. Based on the warrants' results, Harwood testified before a grand jury to obtain an indictment against King for Breeden's murder, and according to King, gave false testimony. (DN 1, #12); *King*, 852 F. 3d at 575. Such "false testimony" included a failure to mention King's amputated leg and that several ballistics analyses of the bullets recovered from King's home did not provide conclusive evidence that she murdered Breeden. (DN 1, #12); *King*, 852 F. 3d at 575. The grand jury indicted King for Breeden's murder. At a subsequent grand jury hearing at which Harwood also testified, King was also indicted for tampering with physical evidence. (DN 1, #13); *King*, 852 F. 3d at 575. In 2008, King entered an *Alford* plea, under the terms of which she was sentenced to ten years of incarceration. *King*, 852 F. 3d at 575.

In May 2012, a known murderer named Richard Jarrell ("Jarrell") allegedly confessed to a Louisville Metro Police ("LMPD") detective that he was the one who had killed Breeden. (DN 1, #16); *King*, 852 F. 3d at 575–76. Harwood met with Jarrell, who later recanted his purported confession; King alleges that Harwood intimidated Jarrell into the retraction. (DN 1, #17–18); *King*, 852 F. 3d at 576. Nevertheless, the LMPD detective to whom Jarrell had allegedly

confessed forwarded a copy of Jarrell's confession to the Kentucky Innocence Project, which began work on attempting to overturn King's conviction. *King*, 852 F. 3d at 576. King's claim worked its way up to the Kentucky Court of Appeals which, in July 2014, vacated King's *Alford* plea. *Id*. *See also King v. Com*., 2014 WL 3547480 (Ky. Ct. App. July 18, 2014). The criminal case against King was formally terminated on October 9, 2014. *King*, 852 F. 3d at 576.

### B. Procedural History

King filed the instant action under 42 U.S.C. § 1983 on October 1, 2015, alleging malicious prosecution under the Fourth Amendment and other charges against Harwood, the KPS, several of Harwood's supervisors, and other related parties. (DN 1.) On June 1, 2016, this Court granted the defendants' motion for summary judgment on the grounds that (1) King's claims were time-barred by the one year statute of limitations, and alternatively, that (2) all defendants were entitled to qualified immunity. *King*, 852 F. 3d at 576–77. *See also King v. Hardwood*, 2016 WL 309044 (W.D. Ky. June 1, 2016).

On appeal, the Sixth Circuit reversed this Court's opinion in part and affirmed it in part. First, it determined that the one year statute of limitations had begun to run on the day the criminal charges were formally dismissed (October 9, 2014), so King's complaint was not time-barred. *King*, 852 F. 3d at 578–79. Second, it held that Harwood did not have absolute immunity protecting him from suit by King, as Harwood's actions exceeded the conduct that the United States Supreme Court held was protected in *Rehberg v. Paul*, 556 U.S. 356 (2012), a case concerning the scope of testimonial immunity at grand jury proceedings. *King*, 852 F. 3d at 587–90. Formulating a new exception to the long-held rule that a grand jury indictment creates an unrebuttable presumption of probable cause, the Sixth Circuit held:

> [W]here (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad *588 enough to encompass conspiring to commit perjury before the grand jury), the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive

*Id.* at 587–88.  The Sixth Circuit found that at the present stage of litigation, King had satisfied its new test, and it remanded the case back to this Court for further proceedings on King's §1983 malicious prosecution and state law claims.  *Id.* at 591–92.  It did, however, affirm this Court's grant of summary judgment in favor of the defendants for King's claims against all defendants other than Harwood, including KSP.  *Id.* at 592.

Harwood filed his petition for Writ of Certiorari to the United States Supreme Court on August 15, 2017.  (DN 32).  He then filed the present motion to stay the proceedings before this Court, pending the outcome of his Writ, on September 7, 2017.  (DN 34.)  The next day, King emailed KSP's counsel notice that she had mailed a subpoena *duces tecum* to KSP.  Despite a request from KSP to stay the subpoena pending action by the Supreme Court, King insisted on a response.  (DN 36, #454.)  On October 10, KSP filed a motion to quash King's subpoena, mostly arguing that it should be quashed pending potential Supreme Court review.  (DN 36.)

## II. Summary of Law

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel, and for litigants, and the entry of such an order ordinarily rests with the sound discretion of the District Court."  *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F. 3d 611, 626–27 (6th Cir. 2014)

4

(quoting *Ohio Envtl. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir.1977)). Indeed, Districts Courts ordinarily have the authority to issue stays where those stays would be a valid exercise of their discretion. *Ryan v. Gonzales*, 568 U.S. 57, 76 (2013) (citing *Rhines v. Weber*, 544 U.S. 269, 276 (2005)). The burden is on the moving party to show that there is a pressing need for delay and that neither the other party nor the public will suffer harm for the entry of the order. *Mobley v. City of Detroit*, 938 F. Supp. 2d 688, 690 (E.D. Mich. 2013) (citing *Ohio Envtl. Counsel*, 565 F. 2d at 396)).

When a litigant asks the District Court for a stay pending a petition for Writ of Certiorari, the litigant must demonstrate: (1) a reasonable probability that four Justices would vote to grant certiorari; (2) a significant possibility that the Supreme Court would reverse the judgment below; and (3) a likelihood of irreparable harm, assuming the correctness of the litigant's position, if the judgment is not stayed. *U.S. v. Mandyzcz*, 321 F. Supp. 2d 862, 864 (E.D. Mich. 2004) (citing *Packwood v. Senate Select Comm. on Ethics*, 510 U.S. 1319, 1319–20 (1994) (Rhenquist, J., in chambers)). A demonstration of each of the three factors is required. *Mandyzcz*, 321 F. Supp. 2d at 866 (quoting *Packwood*, 114 510 U.S. at 1319–20)). Even if a litigant satisfies all three elements, a stay may still be denied when the equities do not weigh in favor of the stay. *Barnes v. E-Systems, Inc. Group Medical & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers).

The Court will examine each element in turn to determine if Harwood has met his burden.

# III. Analysis

## A. Reasonable Probability That Four Justices Would Vote to Grant Certiorari

When faced with the question of whether there is a reasonable probability that four justices would grant certiorari, District Courts in this circuit have looked to Rule 10 of the U.S. Supreme Court Rules for guidance. *F.D.I.C. v. First American Title Ins. Co.*, 2015 WL 418122 (E.D. Mich. Jan. 30, 2015) at *3. Rule 10 provides guidance to litigants as to what the Supreme Court justices consider in deciding whether or not to grant a petitioner's Writ of Certiorari. It states, in pertinent part:

> The following, although neither controlling nor fully measuring the Court's discretion, indicate the character of the reasons the Court considers:
>
> (a) A United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter; has decided an important federal question in a way that conflicts with a decision by a state court of last resort; or has so far departed from the accepted and usual course of judicial proceedings, or sanctioned such a departure by a lower court, as to call for an exercise of this Court's supervisory power;
>
> (b) A state court of last resort has decided an important federal question in a way that conflicts with the decision of another state court of last resort or of a United States court of appeals;
>
> (c) A state court or a United States court of appeals has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court.

Sup. Ct. R. 10. Section (b) of Rule 10 is inapplicable here, as this case does not involve a decision by the Kentucky Supreme Court. Thus, the Court will consider: (1) if there is a circuit split on whether a malicious prosecution claim can be brought under the Fourth Amendment, and (2) if the Sixth Circuit's holding regarding Harwood's lack of absolute immunity runs afoul of Supreme Court precedent.

## 1. Circuit Split

Harwood first argues that the Sixth Circuit's decision adds to what already is a significant circuit split regarding whether a §1983 malicious prosecution claim can properly be brought under Fourth Amendment. (DN 34, 382–83.) He claims that the Fifth, Seventh, and Eighth Circuits have either expressly rejected the idea of a Fourth Amendment malicious prosecution claim or explicitly declined to rule on the issue. (DN 34, #383; DN 38, #472.) On the other hand, Harwood argues, the other nine circuits all recognize the claim, but have differed in regards to what elements are necessary to prove the claim. (DN 34, #383.) King claims that Harwood has "fabricated" the circuit split, pointing this Court toward comments in Justice Alito's dissent in the Supreme Court's recent decision in *Manuel v. City of Joliet*. (DN 35, #395.) There, King claims that Justice Alito stated "the First, Second, Third, Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh, and D.C. Circuits have all held that a Fourth Amendment malicious prosecution claim is cognizable through 42 U.S.C. §1983." *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 924 (2017) (Alito, J., Dissenting).

Before turning to merits of the issue, the Court pauses to point out King's misapprehension of Justice Alito's dissent in *Manuel*. King claims that, "[e]ven Justice Alito, upon whose dissent [Harwood] is attempting to rely, refutes [Harwood's] position[,]" and then proceeds to recite the quote in the preceding paragraph. (DN 35, #395–96.) But those are not Justice Alito's words. Rather, Justice Alito quoted from *Manuel's petition* for Writ of Certiorari to support his and Justice Thomas's argument that the Supreme Court failed to address the main issue in the case – whether the Fourth Amendment allows for a malicious prosecution claim.

*Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 923–24 (2017) (Alito, J., Dissenting).[1] King's

selective quotation made it appear that Justice Alito said something that he simply did not say.

The Court assumes that this was mere error on King's part and advises King to exercise more

caution in the future.

After a careful review of relevant circuit precedent, the Court agrees with Harwood that

there is a circuit split regarding whether a §1983 malicious prosecution claim can be brought

under the Fourth Amendment. As the law stands today, the First, Second, Third, Fourth, Sixth,

Ninth, Tenth, Eleventh, and D.C. Circuits all recognize malicious prosecution as an actionable

§1983 claim under the Fourth Amendment. *See, e.g., Hernandez-Cuevas v. Taylor*, 723 F. 3d 91

(1st Cir. 2013); *Spak v. Phillips*, 857 F. 3d 458, 461, n. 1 (2d Cir. 2017) ("The rule in the Second

Circuit is that plaintiffs may bring what is in effect a state law suit for malicious prosecution in

federal court under Section 1983, so long as they are able to demonstrate a deprivation of liberty

amounting to a seizure under the Fourth Amendment."); *McKenna v. City of Philadelphia*, 582 F.

---

[1] For context, the paragraph states in full:

> The question that was set out in Manuel's petition for a writ of certiorari and that we agreed to decide is as follows:
>
>> "[W]hether an individual's Fourth Amendment right to be free from unreasonable seizure continues beyond legal process so as to allow a malicious prosecution claim based upon the Fourth Amendment. This question was raised, but left unanswered, by this Court in Albright v. Oliver, 510 U.S. 266 [114 S.Ct. 807, 127 L.Ed.2d 114] (1994). Since then, the First, Second, Third, Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh, and D.C. Circuits have all held that a Fourth Amendment malicious prosecution claim is cognizable through 42 U.S.C. § 1983 ("Section 1983"). Only the Seventh Circuit holds that a Fourth Amendment Section 1983 malicious prosecution claim is not cognizable." Pet. for Cert. i (emphasis added).
>
> The question's reference to "a malicious prosecution claim" was surely no accident. First, the conflict on the malicious prosecution question was the centerpiece of Manuel's argument in favor of certiorari.1 *924 Second, unless Manuel is given the benefit of the unique accrual rule for malicious prosecution claims, his claim is untimely, and he is not entitled to relief.

*Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 923–24 (2017) (Alito, J., Dissenting).

3d 447 (3d Cir. 2009); *Humbert v. Mayor and City Council of Baltimore City*, 866 F. 3d 546 (4th Cir. 2017); *King v. Harwood*, 852 F. 3d 568 (6th Cir. 2017); *Beck v. City of Upland*, 527 F. 3d 853, 861, n. 7 (9th Cir. 2008); *Chavez-Torres v. City of Greeley*, 660 Fed. App'x. 627 (10th Cir. 2016); *Grider v. City of Auburn, Ala.*, 618 F. 3d 1240, 1256 (11th Cir. 2010) ("This Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under §1983."); *Pitt v. District of Columbia*, 491 F. 3d 494, 511 (C.A.D.C. 2007) ("We join the large majority of circuits in holding that malicious prosecution is actionable under 42 U.S.C. §1983 to the extent that the defendant's actions cause the plaintiff to be unreasonably "seized" without probable cause, in violation of the Fourth Amendment.).

On the other hand, the Fifth and Eighth Circuits have either explicitly rejected a Fourth Amendment §1983 malicious prosecution claim or have declined to rule on the issue. *See, e.g., Cuadra v. Houston Independent School Dist.*, 626 F. 3d 808, 812–13 (5th Cir. 2010) ("[A] freestanding 42 U.S.C. §1983 claim based solely on malicious prosecution [is] not viable . . . Rather, the claimant must allege that 'officials violated specific constitutional rights in connection with a malicious prosecution.'") (quoting *Castellano v. Fragozo*, 352 F. 3d 939, 958 (5th Cir. 2003 (en banc)); *Bates v. Hadden*, 576 Fed. App'x. 636, 639–40 (8th Cir. 2014) ("[W]e have observed [in past decisions] that malicious prosecution is not a constitutional injury [. . .]. As recently as 2012, we expressed uncertainty as to whether malicious prosecution is a constitutional violation at all.") (citing *Harrington v. City of Council Bluffs, Iowa*, 678 F. 3d 676, 680 (8th Cir. 2012)). The current state of the law in the Seventh Circuit is not as clear-cut.

Following the Supreme Court's abrogation of the Seventh Circuit's key holding in *Newsome v. McCabe* in its *Manuel* decision, whether a §1983 malicious prosecution claim may

be brought under the Fourth Amendment in the Seventh Circuit is in a state of flux. In *Newsome*,

the Seventh Circuit held that a malicious prosecution claim was not an appropriate §1983 action

under the Fourth Amendment. *Newsome v. McCabe*, 256 F. 3d 747, 750–51 (7th Cir. 2001). But

the Supreme Court, as Justice Alito points out in his dissent in *Manuel*, did not rule on whether

malicious prosecution claims could be brought under the Fourth Amendment. *Manuel*, 137 S.

Ct. at 923–24 (Alito, J., Dissenting). Instead, it remanded the case back to the Seventh Circuit to

decide on which date the statute of limitations on the plaintiff's claims began to run. *Id*. at 920.

This is crucial in determining whether a malicious prosecution claim is viable under the Fourth

Amendment, because the plaintiff had analogized his claims of a constitutional violation to the

common law tort of malicious prosecution, which has a statute of limitations that begins to run

when criminal proceedings are terminated. *Id*. at 921. The government, on the other hand,

argued that the alleged constitutional violation was most similar to the common law tort of false

arrest, with the statute of limitations starting on the date of the initiation of the legal process. *Id*.

The Supreme Court's sole holding, however, was that a "seizure" under the Fourth Amendment

can continue past an initial appearance in a criminal case. *Id*. As Justice Alito writes, it is still

possible for the Seventh Circuit to find that malicious prosecution is not a valid Fourth

Amendment claim and, at the same time, be consistent with the Supreme Court's holding in

*Manuel*:

> It is certainly true that the question whether a malicious prosecution claim
> may be brought under the Fourth Amendment subsumes the question whether a
> Fourth Amendment seizure continues past a first or initial appearance, but
> answering the latter question does not by any means resolve the Circuit split that
> Manuel cited and that we took this case to resolve. Suppose that the Seventh
> Circuit were to hold on remand that a Fourth Amendment seizure may continue
> up to the date when trial begins but no further. Such a holding would be consistent
> with the Court's holding in this case, but there would still be a conflict between

> Seventh Circuit case law and the decisions of other Circuits (on which Manuel relied, see ibid.), holding that a standard malicious prosecution claim (which requires a termination favorable to the defendant) may be brought under the Fourth Amendment.

*Id.* at 923, n. 1 (Alito, J., Dissenting). Based on the Seventh Circuit's prior holdings and the fact that the Supreme Court did not hold that its previous position was incorrect, the Court concludes that the Seventh Circuit's prior position of not permitting §1983 claims under the Fourth amendment is still the law of the circuit. *Newsome v. McCabe*, 256 F. 3d 747 (7th Cir. 2001). At the time of this opinion's entry, the Seventh Circuit has yet to rule on the remanded *Manuel*.

Three Circuit Courts with precedent different from that of nine Circuit Courts is more than sufficient to constitute a circuit split. *See* Sup. Ct. R. 10(a) (stating that a circuit split occurs when "a United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter"). Therefore, the Court concludes that there is a current circuit split on the issue of malicious prosecution claims under the Fourth Amendment, and this factor weighs in favor of Harwood.

### 2. Contrary to Supreme Court Precedent

The Court now turns to whether the Sixth Circuit's holding that Harwood was not entitled to absolute immunity for his investigatory activities prior to his grand jury testimony is contrary to Supreme Court precedent. Harwood argues that this is the case, citing a recent Supreme Court case, *Rehberg v. Paulk*, as evidence of a conflict. (DN 34, #384–85.) In *Rehberg*, the Supreme Court held that grand jury witnesses, even law enforcement officers who purposefully lie on the stand, are entitled to the same absolute immunity from liability under §1983 as trial witnesses are. *Rehberg v. Paulk*, 566 U.S. 356, 359 (2012). According to Harwood, when the Sixth Circuit created a new exception where, under certain circumstances, an investigating officer who

also testifies at a grand jury is entitled to only qualified immunity, it went against Supreme Court precedent in *Rehberg*. (DN 34, #384–85.)

A brief discussion of *Rehberg* is necessary. In *Rehberg*, the Supreme Court discussed, at length, the difference between "complaining witnesses" and police officers who merely testify at grand jury proceedings. *Rehberg*, 556 U.S. at 370–73. A complaining witness is a person "who procure[s] an arrest and initiate[s] a criminal prosecution." *Id*. at 370. The Supreme Court also quoted from a prior case, *Wyatt v. Cole*, which stated complaining witnesses were those who set "the wheels of government in motion by instigating a legal action." *Id*. at 371 (quoting *Wyatt v. Cole*, 504 U.S. 158, 164–65 (1992). Prior Supreme Court cases have held that law enforcement officials "who [submit] affidavits in support of applications for arrest warrants [are] denied absolute immunity because they '[perform] the function of a complaining witness.'" *Id* at 370. (citing *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997); *Malley v. Briggs*, 475 U.S. 335, 340–41 (1986)). But, as the *Rehberg* Court stated, a complaining witness may or may not testify at a grand jury proceeding; in other words, it is not a requirement that for someone to be a complaining witness, he or she must testify before a grand jury. *Id*. at 371. Thus, the Supreme Court differentiated between an officer testifying at a grand jury and a complaining witness:

> Once the distinctive function performed by a "complaining witness" is understood, it is apparent that a law enforcement officer who testifies before a grand jury is not at all comparable to a "complaining witness." By testifying before a grand jury, a law enforcement officer does not perform the function of applying for an arrest warrant; nor does such an officer make the critical decision to initiate a prosecution. It is of course true that a detective or case agent who has performed or supervised most of the investigative work in a case may serve as an important witness in the grand jury proceeding and may very much want the grand jury to return an indictment. But such a witness, unlike a complaining witness at common law, does not make the decision to press criminal charges.

Instead, it is almost always a prosecutor who is responsible for the decision to present a case to a grand jury, and in many jurisdictions, even if an indictment is handed up, a prosecution cannot proceed unless the prosecutor signs the indictment. It would thus be anomalous to permit a police officer who testifies before a grand jury to be sued for maliciously procuring an unjust prosecution when it is the prosecutor, who is shielded by absolute immunity, who is actually responsible for the decision to prosecute.

*Id*. at 371–72 (internal citations omitted). These key distinctions highlighted why the Supreme Court arrived at the conclusion that civil plaintiffs may not use officer testimony at a grand jury hearing as evidence in civil suits (or any other, for that matter). The Supreme Court noted, however, that absolute immunity would not extend to witnesses – police officers or otherwise – who, outside of the grand jury room, falsify affidavits for arrest warrants or fabricate evidence to help solve a crime. *Id*. at n. 1 (citing *Kalina*, 522 U.S. 118 at 129–31; *Malley*, 475 U.S. at 340–45). Individuals participating in such actions enjoy only qualified immunity. *Id*.

To fully understand the Sixth Circuit's opinion in *King v. Harwood*, it is also important to note the standard for malicious prosecution. In the Sixth Circuit, a plaintiff wishing to pursue a §1983 claim for malicious prosecution must show that: (1) a criminal prosecution was initiated against the plaintiff, and the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F. 3d 294, 309–10 (2010). There is no malice requirement. *Id*. at 310.

King argues that the Sixth Circuit's opinion in *King v. Harwood* comports with *Rehberg*. (DN 35, #399.) In *King*, the Sixth Circuit addressed *Rehberg* by stating that it:

[D]oes not affect the thin but conspicuous line between, on the one hand, law-enforcement officers who only provide grand-jury testimony (including related

13

"preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony," [quoting *Rehberg*] and including any conspiracy with prosecutors or other officers to testify falsely), and, on the other hand, law-enforcement officers who either (1) "set the wheels of government in motion by instigating a legal action," [quoting *Rehberg*, which was quoting *Wyatt v. Cole*] or (2) "falsify affidavits" or "fabricate evidence concerning an unsolved crime[.]" [quoting *Kalina* and *Malley*]. Only qualified immunity extends to the acts of officers in these latter situations.

*King v. Harwood*, 852 F. 3d 568, 584 (6th Cir. 2017) (internal citations omitted). The *King* Court goes on to address a related Sixth Circuit opinion from earlier in the year, *Sanders v. Jones*, 845 F. 3d 721 (6th Cir. 2017). In *Sanders*, the Sixth Circuit was tasked with applying *Rehberg* to Sixth Circuit precedent for the first time. *Id.* at 730. When discussing the lack of probable cause requirement elucidated in *Sykes*, the Sixth Circuit noted that grand jury indictments, when they are "fair upon [their] face," conclusively determine probable cause. *Id.* at 728 (citing *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)). *See also Kaley v. U.S.*, 134 S. Ct. 1090, 1097 (2014) ("[A]n indictment 'fair upon its face,' and returned by a 'properly constituted grand jury,' we have explained, 'conclusively determines the existence of probable cause' to believe the defendant perpetrated the offense alleged.") There had been an exception created by the Sixth Circuit, however, for indictments obtained when a defendant "knowingly or recklessly presented false testimony to the grand jury to obtain the indictment." *Id.* at 729 (citing *Webb v. U.S.*, 789 F. 3d 647, 660 (6th Cir. 2015). But the Sixth Circuit noted that *Rehberg* "in essence deletes the exception." *Id.* at 732. Thus, the *Sanders* Court concluded that pre-grand jury evidence, such as false statements in police reports, cannot, by themselves, overcome the presumption of probable cause created by a grand jury indictment. *Id.* This is because those statements (or other pre-testifying activities) did not factor into the grand jury's determination that probable cause supported indicting the suspect. *Id.* And if a police officer reads those

statements at a grand jury proceeding, according to *Rehberg*, he is immune from suit based upon his testimony. *Id.* at 733.

The *King* Court recognized that the *Sanders* Court's holding is a "harsh" decision. *King*, 852 F. 3d at 587. But it then crafts a new test for determining when a plaintiff may overcome the presumption of probable cause created via grand jury indictments:

> We hold that where (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury), the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive.

*Id.* at 588.

The question becomes, then, whether the exception crafted by the Sixth Circuit in *King* is contrary to the Supreme Court's holding in *Rehberg*.

Based on the preceding summation, the Court cannot conclude that it is. Although the *King* Court's conclusion that there is a genuine issue of material fact as to whether Harwood "set the prosecution in motion" by applying for search warrants appears to contradict the Supreme Court's differentiation between complaining witnesses and grand jury testifiers, its aforementioned new exception does not. *King*, 852 F. 3d at 591. Nothing in the *King* exception allows a plaintiff to reach a police officer's grand jury testimony and use that as evidence of liability (as *Rehberg* explicitly prohibits). Instead, it expands on unprotected pre-grand jury activities – such as filing affidavits – thereby crafting a new way for a criminal defendant turned civil plaintiff to overcome the presumption of probable cause created when a grand jury issues an

indictment. In *Rehberg*, as explained in greater detail above, the Supreme Court recognized that there were some pre-testifying activities, other than ordinary preparation for testifying, that would not fall under *Rehberg*'s new protections. *Rehberg v. Paulk*, 566 U.S. 356, 370, n.1 (2012) (citing *Kalina v. Fletcher*, 522 U.S. 118, 129–131 (1997); *Malley v. Briggs*, 475 U.S. 335, 340–45 (1986) (only qualified immunity for officers who falsify affidavits); *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993) (only qualified immunity for officers who fabricate evidence concerning an unsolved crime)). The *King* exception specifically addresses those activities. The undersigned interprets *Rehberg* as granting absolute immunity to an officer's grand jury testimony itself but not to other actions an officer might take with regard to the underlying information. So, for instance, a law enforcement officer might manufacture crime scene evidence and testify about that evidence at a grand jury proceeding. Under the *King* exception, a civil plaintiff is barred from using what the officer said before the grand jury, but could rely on the officer's (hypothetical) falsification of evidence. Therefore, the Court concludes that the *King* exception is not contrary to Supreme Court precedent. Thus, this factor weighs in favor of denying the stay.

Nevertheless, based on the presence of a circuit split regarding the constitutional viability of malicious prosecution claims, the Court believes that there is a reasonable probability that four Justices will grant Harwood's petition for Writ of Certiorari. *See Braxton v. U.S.*, 500 U.S. 344, 347 (1991) (a "principal purpose" of the Supreme Court's certiorari jurisdiction is to resolve circuit splits); *Nunez v. U.S.*, 554 U.S. 911 (2008) (Scalia, J., dissenting from the decision to grant certiorari) ("I had thought that the main purpose of our certiorari jurisdiction was to

eliminate circuit splits"); *City and County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (stating that certiorari jurisdiction exists to clarify the state of the law).

## B. Significant Possibility of a Supreme Court Reversal

Next, the Court must determine if there is a "significant possibility" that the Supreme Court would reverse any aspect of the Sixth Circuit's opinion in *King v. Harwood*. Unlike the first and third factors of this test, the "significant possibility of reversal" element does not appear to have a concrete set of factors for District and Circuit Courts to apply. In the past, District Courts considering this element have analyzed the Circuit Court's decision through the lens of Supreme Court history and precedent. *U.S. v. Mandycz*, 321 F. Supp. 2d 862, 865–66 (E.D. Mich. 2004). Supreme Court Justices conducting an analysis of this element have looked to whether the Circuit Court's opinion is contrary to Supreme Court precedent or the federal Constitution. *Barnes v. E-Systems, Inc. Group Hosp. Medical & Surgical Ins. Plan*, 501 U.S. 1301, 1303–04 (1991) (Scalia, J., in chambers). Thus, the Court is left with little guidance on how to best weigh this element.

After reviewing the applicable case law, the undersigned does not believe that there is a "significant possibility" that the Sixth Circuit's decision will be reversed. The Supreme Court could reverse the Sixth Circuit on two grounds: (1) a §1983 malicious prosecution claim is not actionable under the Fourth Amendment; or (2) the Sixth Circuit's *King* exception is contrary to Supreme Court precedent. Looking to the former first, the current circuit split is 9-3 in favor of allowing §1983 malicious prosecution claims under the Fourth Amendment. While the undersigned does not presume to know the minds of any of the Supreme Court Justices, it is important to note that the Sixth Circuit falls into the majority view that malicious prosecution

17

claims are actionable under the Fourth Amendment. It is not an outlier or rogue circuit that has come to a conclusion of law contrary to every other circuit. In the Court's opinion, this fact means that Supreme Court reversal is less likely than if the Sixth Circuit was in the minority. Thus, the Court concludes that reversal on this ground is not a "significant possibility."

Examining the *King* exception leads to a similar result. As described in greater detail in the preceding section, the Court does not believe that the key holding in *King* goes against Supreme Court precedent, *Rehberg* specifically. Therefore, the Court concludes that reversal on this ground is also not a "significant possibility." Thus, the Court cannot conclude that there is a significant possibility that the Sixth Circuit's opinion in *King v. Harwood* will be overturned by the Supreme Court.

## C. Likelihood of Irreparable Harm

Although the Court has determined that there is no significant possibility of reversal, it will nonetheless address the final factor – whether Harwood will suffer irreparable harm if the stay is not granted. Harwood argues that he will suffer irreparable harm if he is forced to litigate against King's "legally improper claims, including providing testimony, discovery, and other invasive aspects of litigation." (DN 34, #387.) Harwood also claims that without a stay, he will suffer "needless expense, costs, and anxiety." (*Id.*) At oral argument, Harwood expanded his list of potential harms to include damage to other KSP troopers: if Harwood is forced to improperly litigate the case, then the KSP defense fund will potentially be expended without cause, leaving other KSP troopers without money to pay for their legal expenses. King argues that Harwood's claims of significant financial expenditure, anxiety, and harm to his reputation due to media coverage are not sufficient to meet the "irreparable" standard. (DN 35, #404–6.)

18

While there is not a lot of case law regarding what constitutes "irreparable harm" in the realm of motions to stay pending potential Supreme Court review, there is extensive law in the area of injunctive relief. An injury will be deemed irreparable when it "is not fully compensable by monetary damages or [the] nature of the loss would make damages hard to calculate." *S. Glazer's Distributors of Ohio v. Great Lakes Brewing Co.*, 860 F. 3d 844, 852 (6th Cir. 2017). "Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough." *Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F. 3d 927, 930 (6th Cir. 2002) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Even substantial and un-recoupable litigation expenses do not rise to the level of being irreparable. *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F. 3d 716, n. 20 (9th Cir. 2017) (citing *Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 24 (1974)). Other circuits considering whether an injury is irreparable have determined that speculative injuries do not rise to that level of severity. *See, e.g., Boardman v. Pacific Seafood Group*, 822 F. 3d 1011, 1022 (9th Cir. 2016); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F. 3d 638, 660 (2d Cir. 2015); *Crowe & Dunlevy, P.C. v. Stidham*, 640 F. 3d 1140, 1157 (10th Cir. 2011).

Here, Harwood has not demonstrated that he will be irreparably harmed if the case is not stayed. Harwood's claims of financial harm – whether to himself or the KSP trooper defense fund – are simply insufficient to meet the irreparability standard and go against the precedent of not only the Sixth Circuit, but several other Circuits. *See, e.g., Baker*, 310 F. 3d at 930; *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F. 3d 1129, 1134–35 (D.C.C. 2017); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F. 2d 969, 975 (2d Cir. 1989). Even if Harwood's argument did not go against well-established precedent, there is a key flaw in it: if the Supreme

Court were to grant Harwood all the relief he seeks, King's Kentucky state law claims against him would still remain. As such, Harwood *will* eventually be conducting discovery in this case, whether that discovery takes place in the near term in this Court or later in the Jefferson Circuit Court. Because of this inevitability, his argument that immediate discovery will somehow cause him irreparable harm lacks merit. As to the claim that the KSP defense fund may be depleted by discovery in this action, Harwood offered nothing but that – a claim; there is no evidence before the Court supporting it.

Regarding Harwood's claims of anxiety and mental stress, although the Court recognizes the inevitable stress that flows from being named as a defendant in any lawsuit, especially a high-profile one, Harwood's claims of anxiety are not sufficient for this Court to deem them irreparable harm. His claims are merely conclusory and not supported by any affidavits or other evidence that would give them credibility. Conclusory statements of injury, especially those regarding mental stress, are insufficient to demonstrate irreparable harm. *See, e.g., Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21–22 (D.D.C. 2013) (finding that the plaintiff had not met the irreparability standard when she alleged anxiety and stress stemming from a hostile work environment; plaintiff's allegations were conclusory). The Court does not mean to say that anxiety or other forms of mental anguish can never rise to the level of irreparability. On the contrary, courts have found that in certain circumstances with the appropriate corroboration, they may. *See, e.g., Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Edu*, 858 F. 3d 1034, 1045–46 (7th Cir. 2017) (transgender student's mental distress and anxiety constituted irreparable harm where the defendant's act of denying the student the "integral" use of the bathroom of his choice hindered his transition, worsened his depression, and contributed to

suicidal thoughts – all according to his psychologist); *Harris v. Wall*, 217 F. Supp. 3d 541, 560 (D.R.I. 2016) ("Plaintiff has enhanced his showing of irreparable harm [the loss of his religious freedom] with his averment that he experienced severe anxiety when he felt forced to choose his religious practice over leaving his [prison] cell").

Harwood's allegations are quite different from the plaintiffs' in *Whitaker* and *Harris*. Not only does he not offer any proof of mental stress from a doctor, psychologist, or other licensed medical professional, but if the Court were to take his argument to its logical conclusion, then virtually every defendant named in a high-profile lawsuit could meet the irreparability threshold because of the stress it would cause them. Such a finding would be contrary to the purposefully high standard of irreparability. *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (irreparable harm is "not an easy burden to fulfill") (citing *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485 (3d Cir.2000)).

Therefore, the Court holds that Harwood has not demonstrated that he will suffer from an irreparable injury if the proceedings before this Court is not stayed pending Supreme Court review. Because Harwood must satisfy all three elements of the Supreme Court's test before the Court reaches the final "balancing of the equities" step – and Harwood has not done so – the Court need not engage in the balancing test.

### IV. Conclusion

For the foregoing reasons, Harwood's motion to stay (DN 34) is **DENIED**. The Court will issue a separate ruling on KSP's motion to quash in due course.

cc:  Counsel of record