UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:15-CV-762-CHB

**SUSAN JEAN KING,**

                             **Plaintiff,**

v.

**TODD HARWOOD, et al.,**                   **Defendants.**

## REPORT AND RECOMMENDATION

Before the Court is the Motion to Dismiss filed by Defendant, Todd Harwood ("Harwood"). (DN 76.) District Judge Claria Horn Boom referred Harwood's motion to the undersigned "for a hearing, if necessary, and for findings of fact, conclusions of law, and recommendation." (DN 83.) Plaintiff, Susan Jean King ("King") filed a response (DN 79), and Harwood filed a reply in support of his motion (DN 81). Therefore, this matter is ripe for review.

For the reasons set forth herein, the undersigned **RECOMMENDS** that Harwood's Motion to Dismiss (DN 76) be **DENIED**.

**I.  FINDINGS OF FACT**

  **A.  Factual and Procedural Background**

This case relates to King's arrest and imprisonment for the murder of Kyle Breeden. Breeden's body was discovered on November 5, 1998 in the Kentucky River. (DN 79, at PageID # 684.) Breeden's cause of death was two non-exiting .22 caliber magnum gunshot wounds to the head. (DN 1, at PageID # 6.) As part of the investigation of Breeden's murder, Kentucky State Police ("KSP") learned of bullet holes in the floor of King's home. (*Id.* at 7.) King's Complaint alleged:

>  37.    On November 3, 1999, Sergeant Carey Duncan met with King in her home and advised her that KSP had information that a firearm had been discharged within her home and asked to see the holes.
>
>  38.    King showed Sergeant Duncan the *two* holes and explained that she fired a .22 caliber handgun into the floor and ceiling to scare away a person . . . who was making sexual advances toward her.

(*Id.* (emphasis added))  In his deposition, Sergeant Duncan testified that King voluntarily showed him her floor and the two bullet holes there but that he did not remember if he saw any other bullet holes.  (DN 80-2, at PageID # 724.)  Sergeant Duncan testified that if there were other holes, he "hoped" he would have documented the same in his case report.  (*Id.*)  However, he also testified as follows when questioned by Jason S. Morgan, counsel for Harwood, regarding his viewing of the bullet holes:

> MORGAN:   Did Ms. King consent to the search through her attorney?
>
> DUNCAN:   I don't recall if it was through her attorney.  It was a cursory look actually.  It's hard to say it was even a search.  It was just a look.  It seemed like there's a rug over these holes --
>
> MORGAN:   Okay.
>
> DUNCAN:   -- like a throw rug.
>
> MORGAN:   Okay.
>
> DUNCAN:   And it was just a quick look, and then the consent was withdrawn, you could say.
>
> MORGAN:   Okay. Is it fair to say she didn't allow you to get down on your hands and knees to look at the entirety of the floor?
>
> DUNCAN:   That's exactly right, yes.
>
> . . .
>
> MORGAN:   Okay. Was Susan King at that time, to your recollection, kind of controlling you, where you were in the home and what you could look at?

2

> DUNCAN: Oh, absolutely. It was a courtesy on her part; otherwise, I wouldn't have been able to look at all anyway. So, you know, I was being courteous to her because she was allowing us at least into her home or me into her home. I don't remember if anybody was with me.
>
> MORGAN: Okay. And fair to say she did not allow you to get under the home to dig out any projectiles from any wood structure of the home or anything like that?
>
> DUNCAN: That's exactly correct.

(DN 76-1, at PageID # 643-44.) KSP attempted to obtain a search warrant for King's home but was unable to obtain one. (DN 1, at PageID # 7.)

King alleged in her Complaint that the case went cold for a period until it was assigned to Detective Harwood in May 2006. (*Id.* at 8.) Harwood obtained search warrants for King's home, and pursuant to those search warrants, law enforcement discovered that there were actually *four* bullet holes in King's floor, not just the two observed by Sergeant Duncan in 1999. (DN 76, at PageID # 627; DN 79, at PageID # 685-87; DN 1, at PageID # 8-10.) KSP removed the section of the kitchen floor containing the bullet holes and recovered a .22 caliber bullet; however, the bullet did not match the bullets recovered from Breeden's body. (DN 1, at PageID # 9-10.) The bullet in King's kitchen floor was a .22 caliber bullet with a copper wash, but the bullet from Breeden's skull was a .22 caliber magnum bullet with a complete copper jacket. (*Id.* at 12.) One of the bullet holes in the kitchen floor tested positive for blood, and laboratory testing later confirmed that it was positive for male DNA. (*Id.* at 10.) However, it was not confirmed that it was Breeden's blood on the kitchen floor. (*Id.*) Further, it was unclear whether the bullet hole from which blood was recovered was one of the *two* bullet holes originally observed by Sergeant Duncan in 1999. (*Id.*) King alleged all of the above in her Complaint.

In the spring of 2007, King was indicted for Breeden's murder and tampering with physical evidence. (DN 79, at PageID # 687.) King subsequently entered an *Alford* plea to manslaughter

and the tampering charge in August 2008, receiving a ten-year prison sentence. (DN 1, at PageID # 14-15.) On May 18, 2012, King filed motions to vacate her previous judgment of conviction and for a jury trial claiming she was innocent of the charges and relying in support on newly discovered evidence of a confession by another individual to Breeden's murder. *King v. Commonwealth*, No. 2012-CA-001985-MR, 2014 WL 3547480, at *1 (Ky. Ct. App. July 18, 2014). The trial court denied her motions, but the Kentucky Court of Appeals reversed, remanding the case for a jury trial. (*Id.* at *3, *6.) Ultimately, the trial court dismissed the charges against King. (DN 1, at PageID # 19.)

On October 1, 2015, King filed a Verified Complaint against Harwood, other police officers, and the Kentucky State Police (collectively "Defendants") pursuant to 42 U.S.C. § 1983 and various state law causes of action. (DN 1.) On June 1, 2016, this Court granted Defendants' hybrid Motion to Dismiss/Motion for Summary Judgment and entered judgment in favor of the Defendants. (DNs 18, 19.) King appealed, and the Sixth Circuit reversed as to King's § 1983 malicious prosecution, intentional/negligent infliction of emotional distress, civil conspiracy, and negligence claims against Harwood. *King v. Harwood*, 852 F.3d 568, 572 (6th Cir. 2017). The case has proceeded solely on those claims.

On May 30, 2018, the parties took King's deposition for the first time. (DNs 76-2, 80-4.) During her deposition, King was asked questions regarding the bullet holes in her floor. (DN 76-2, at PageID # 652-53; DN 80-4, at PageID # 730.) When asked by counsel for Harwood, Stephen G. Amato, "How did the bullet holes that were discovered in the later investigation get there?" (DN 76-2, at PageID # 653; DN 80-4, at PageID # 730.) King replied, "That has nothing to do with this case." (DN 76-2, at PageID # 653; DN 80-4, at PageID # 730.) King's counsel then indicated that he objected to the question because the bullet holes "weren't there at the initial

4

investigation and they couldn't have had anything to do with Mr. Breeden's death." (DN 76-2, at PageID # 653; DN 80-4, at PageID # 730.) King's counsel instructed King not to answer the question. (DN 76-2, at PageID # 653-54; DN 80-4, at PageID # 730.) King's counsel and Harwood's counsel had a lengthy discussion on the record about the objection and agreed to continue King's deposition and address the issue after the deposition. (DN 76-2, at PageID # 660-61; DN 80-4, at PageID # 730-32.)

The Parties requested a telephonic status conference with the undersigned to discuss their dispute as required by the Court's Scheduling Order (DN 33). On October 19, 2018, the Parties explained their relative positions regarding the questions posed to King at her deposition concerning the bullet holes in her floor. (DN 70.) The undersigned gave the parties some preliminary guidance on these issues, suggesting that at present he believed the cause of the other two bullet holes was relevant. (DN 106, at PageID # 1818-19, 1822-23.) The undersigned indicated that the preliminary guidance was not meant to foreclose King from filing a motion for protective order if she wanted to do so. (*Id.* at 1824.) King's counsel requested time to discuss it with his co-counsel and determine whether to file a motion. (*Id.* at 1825.) Accordingly, the undersigned ordered the Parties to file a joint status report indicating whether the Parties agreed to continue King's deposition or whether King would like to file a motion for protective order. (DN 70.) On October 26, 2018, the Parties filed a joint status report indicating that they had agreed to go forward with King's continued deposition. (DN 71.)

King's second deposition was scheduled for November 21, 2018. (DN 72.) The afternoon before King's continued deposition, King's counsel contacted Harwood's counsel and stated that King would be asserting her Fifth Amendment privilege during the continued deposition as to questions about the two additional bullet holes observed in 2006. (DN 76, at PageID # 634.)

5

King's counsel represented in her response brief that up until the day before her continued deposition, King did not intend to assert her Fifth Amendment rights but that on that day, "counsel learned additional facts that were not previously known, which changed this determination." (DN 79, at PageID # 687.) Harwood's counsel elected to proceed with the deposition anyway. (DN 76, at PageID # 634; DN 79, at PageID # 687.) During the second deposition, King's counsel instructed her not to answer "anything relating to the other two holes in the floor" on the basis of her Fifth Amendment privilege against self-incrimination. (DN 76-3, at PageID # 669-70.) After a second telephonic status conference with the undersigned, Harwood sought and was granted leave to file the instant motion. (DN 75.)

### B. The Instant Motion

Harwood requested that the Court dismiss King's Complaint for failure to participate in discovery pursuant to Fed. R. Civ. P. 37(b). (DN 76.) Harwood argued that King had made the bullet holes about which she was now refusing to answer questions a central part of her case and was, therefore, subjecting Harwood to "irremediable prejudice" by refusing to answer questions regarding the cause of the two additional bullet holes observed in 2006. (*Id.* at PageID # 626.) Harwood stated that "the four total bullet holes [in King's kitchen floor] were a material part of the investigation and prosecution of King for Breeden's murder." (*Id.* at 636.) Therefore, Harwood argued that dismissal of King's complaint was warranted for her failure to answer questions regarding the same at her deposition. (*Id.*)

In response, King argued as an initial matter that Rule 37(b) sanctions were inappropriate because King had not disobeyed a court order in refusing to answer the deposition questions. (DN 79, at PageID # 688.) King further argued that the Court cannot compel her to waive her Fifth Amendment privilege. (*Id.*) King stated that knowing the cause of the two additional bullet holes

6

observed by law enforcement in 2006 was not necessary for Harwood to defend King's claims because the information is not relevant to whether Harwood acted with probable cause *at the time of his investigation*. (*Id.* at 691.) King argued that Harwood can only use information he knew at the time to establish probable cause for her prosecution. (*Id.* at 693.) Further, King argued that since the two bullet holes occurred after the initial 1996 investigation, they were not relevant to her claims. (*Id.* at 696.)

In his reply, Harwood emphasized that King's own response demonstrated that the presence of the four bullet holes was something Harwood took into account in his investigation. (DN 81, at PageID # 755.) Harwood noted that the portions of his own case report attached to King's response demonstrated that he believed she was being deceptive regarding the bullet holes and that the holes were material to his investigation. (*Id.* at 756.) Harwood also argued that because her objections at the first deposition were based on relevance and the basis for her objection only changed on the eve of her second deposition, her conduct is properly sanctionable. (*Id.* at 757.)

## II. CONCLUSIONS OF LAW

### A. Legal Standard

Fed. R. Civ. P. 37(b) provides in relevant part that "[i]f a party . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). The Rule specifies that such "just orders" may include "dismissing the action or proceeding in whole or in part." *Id.* at 37(b)(2)(A)(v). The Sixth Circuit has held that dismissal under Rule 37 is "the sanction of last resort" and "should be imposed only if the court concludes that the party's failure to cooperate in discovery was willful, in bad faith, or due to its own fault." *Bell v. Lakewood Eng'g and Mfg. Co.*,

15 F.3d 546, 552 (6th Cir. 1994). District courts within this Circuit analyze four factors in determining whether to grant sanctions: (1) "whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault"; (2) "whether the adversary was prejudiced by the party's failure to cooperate in discovery"; (3) "whether the party was warned that failure to cooperate could lead to the sanction"; and (4) when dismissal is sought, "whether less drastic sanctions were first imposed or considered." *Deere & Co. v. FIMCO Inc.*, No. 5:15-CV-105-TBR, 2017 WL 927233, at *3 (W.D. Ky. Mar. 8, 2017) (quoting *Peltz v. Moretti*, 292 Fed App'x 475, 479 (6th Cir. 2008)).

    **B.**    **Analysis**

        **1.**    **Inapplicability of Sanctions Under Fed. R. Civ. P. 37(b)**

Harwood argued that "King's failure to answer the questions regarding the [cause of the] two bullet holes warrants a sanction of dismissal" under Fed. R. Civ. P. 37(b). (DN 76, at PageID # 637.) However, as King noted in her response, Rule 37(b) sanctions are only available for failure to obey a court order to provide or permit discovery. Fed. R. Civ. P. 37(b)(2)(A). Harwood argued that Rule 37(b) sanctions were still available here because the prerequisite order to compel would have been futile in this case, citing in support to a Third Circuit opinion, *McMullen v. Bay Ship Mgmt.,* 335 F.3d 215, 217 (3d Cir. 2003). In *McMullen*, during the pendency of plaintiff's breach of contract and unjust enrichment action, plaintiff became a named, but uncharged, co-conspirator in an information charging one of defendant's employees with "irregularities in carrying out a contract with the United States." *Id.* at 216. Plaintiff refused to answer written discovery based on his Fifth Amendment privilege and defendant filed a motion to compel. *Id.* at 217. In ruling on the motion to compel, the district court dismissed the case with prejudice, "conclud[ing] that in view of the plaintiff's unequivocal assertion that he would invoke his Fifth Amendment privilege,

8

the issuance of an order compelling discovery would be a futile act." *Id.* at 217. The Third Circuit reversed the dismissal but in doing so agreed with the district court that an order to compel "would have been a meaningless formality" and "an exercise in futility." *Id.*

While the undersigned recognizes the factual applicability of *McMullen* to the instant motion, Harwood provided no Sixth Circuit caselaw in support of his construction of Rule 37(b). Instead, the Sixth Circuit appears to have uniformly required a court order before the issuance of sanctions under Rule 37(b). In *Burley v. Gagacki*, the Sixth Circuit explained that

> [b]y its terms, Rule 37(b) requires a party seeking a sanction of default against a party to secure a court order compelling disclosure or discovery. Here, because plaintiffs never moved to compel disclosure or discovery, the . . . defendants did not violate any court order that would justify any sanction under Rule 37, let alone the sanction of last resort.

*Burley v. Gagacki*, 729 F.3d 610, 618 (6th Cir. 2013) (citations omitted); *see also Peltz*, 292 Fed. App'x at 479; *DeJesus v. Adkins*, 46 Fed. App'x 244, 246-47 (6th Cir. 2002). While *Burley* dealt with a default judgment, not specifically dismissal, as sought here, dismissal has likewise been deemed a sanction of "last resort," and Harwood provided no binding authority to suggest that this court can dismiss a case for failure to participate in discovery under Fed. R. Civ. P. 37(b) absent a prior court order compelling the same. Accordingly, the undersigned will recommend that Harwood's Motion to Dismiss be denied insofar as it seeks sanctions under Fed. R. Civ. P. 37(b). However, because the Parties have already extensively briefed the issues related to King's failure to answer the deposition questions regarding the cause of the two additional bullet holes discovered in 2006, the undersigned will recommend that the Court construe Harwood's Motion in part as a Motion to Compel so as to address the merits of the dispute even though the relief Harwood sought was improper.

### 2. Motion to Compel

Pursuant to Fed. R. Civ. P. 37(a), when a deponent fails to answer a question at a deposition, "a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1)(3)(B)(i). However, a party is only entitled to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). This language is broadly construed by the federal courts to include "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Further, it is well-established that "[t]he scope of discovery is within the sound discretion of the trial court." *LaFountain v. Simasko*, 38 F.3d 1216 (6th Cir. 1994) (unpublished table disposition); *see also S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008); *Hadfield v. Newpage Corp.*, No. 5:14-CV-00027-TBR-LLK, 2016 WL 427924, at *3 (W.D. Ky. Feb. 3, 2016).

Regarding an individual's assertion of his or her Fifth Amendment rights, the Supreme Court has held that the court may not make a litigant's assertion of his or her Fifth Amendment privilege "costly." *Griffin v. California*, 380 U.S. 609, 614 (1965). Specifically, the Supreme Court held in *Pillsbury Co. v. Conboy* that "a [d]istrict [c]ourt cannot compel [a litigant] to answer deposition questions, over a valid assertion of his [or her] Fifth Amendment right, absent a duly authorized assurance of immunity at the time." *Pillsbury Co. v. Conboy*, 459 U.S. 248, 256-57 (1983). However, courts have held that in cases where "assertion of the Fifth Amendment privilege would thwart 'discovery of issues at the heart of plaintiff's lawsuit,'" other sanctions, such as dismissal, are properly levied, in response to a motion to compel. *Swann v. City of Richmond*, 462 F. Supp. 2d 709, 712 (E.D. Va. 2006) (quoting *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1086 (5th Cir. 1979)). "To hold otherwise would, in terms of the customary

metaphor, enable [a] plaintiff to use his Fifth Amendment shield as a sword." *Wehling*, 608 F.2d at 1087. As argued by both Parties, under these circumstances, the Court must balance a plaintiff's Fifth Amendment right with the unfairness to the defendant, and "the Fifth Amendment privilege should be upheld unless defendants have substantial need for particular information and there is no other less burdensome effective means of obtaining it." *Serafino v. Hasbro, Inc.*, 82 F.3d 515, 518 (1st Cir. 1996). "[D]ismissal is appropriate only where other, less burdensome, remedies would be an ineffective means of preventing unfairness to defendant." *Wehling*, 608 F.2d at 1088. For the reasons set forth below, the undersigned finds that information concerning the cause of the two additional bullet holes observed during the 2006 investigation is not relevant to either King's claims or Harwood's defense.[1] Therefore, the undersigned finds Harwood has not demonstrated a "substantial need" for the information and will recommend his motion be denied.

King's remaining claims against Harwood are a § 1983 claim for malicious prosecution, intentional/negligent infliction of emotional distress, civil conspiracy, and negligence. *King*, 852 F.3d at 591-92. In order to prove her § 1983 malicious prosecution claim, King will have to demonstrate that (1) Harwood initiated or participated in the decision to initiate criminal proceedings against her; (2) "there was a lack of probable cause for the criminal prosecution"; (3) King "suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure"; and (4) the criminal proceeding resolved in King's favor. *Id.* at 580; *see also Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). The Parties agree that King will not be able to use Harwood's grand jury testimony as a basis for her claims as "a grand jury

---

[1] The undersigned recognizes that this finding is different than the preliminary guidance he offered to the Parties during the October 23, 2018 telephonic status conference. (DN 70.) However, at the time of the status conference, the undersigned did not have the benefit of the briefs and exhibits submitted by the Parties, and neither the undersigned nor the Parties were aware that King would assert her Fifth Amendment privilege against self-incrimination with respect to the discovery sought.

11

witness has absolute immunity from any § 1983 claim based on the witness'[s] testimony." *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012); DN 79, at PageID # 691-93; DN 81, at PageID # 754. Instead, King will have to rely on Harwood's actions that were "prior to, and independent of, his grand-jury testimony" to prove her claims. *King*, 852 F.3d at 586. Likewise, King's state law claims are dependent upon Harwood's actions and motivations during his prosecution of King. *See Dukes v. Mid-Eastern Athletic Conference*, 213 F. Supp.3d 887, 893 (W.D. Ky. 2016) ("To sustain a claim for intentional infliction of emotional distress, the plaintiff must prove (1) the wrongdoer's conduct was intentional or reckless, (2) the conduct was outrageous and intolerable such that it offends the generally accepted standards of decency and morality, (3) a causal connection between the wrongdoer's conduct and the plaintiff's injuries, and (4) severe emotional distress."); *Pinnacle Surety Servs., Inc. v. Manion Stigger, LLP*, No. 3:15-cv-364-DJH, 2018 WL 1522698, at *9 (W.D. Ky. Mar. 28, 2018) (quoting *Vivid Impact Co. v. Ellis*, No. 3:17-cv-509-JHM, 2017 WL 5505024, at *5 (W.D. Ky. Nov. 16, 2017)) ("The elements of a civil conspiracy are: (1) an agreement or combination, (2) that is unlawful or corrupt, (3) entered into by two or more persons, (4) for the purpose of accomplishing an unlawful goal."); *Fulcher v. United States*, 88 F. Supp. 3d 763, 770 (W.D. Ky. 2015) (noting that to succeed on a negligence claim under Kentucky law, a plaintiff must prove (1) a duty of care owed by the defendant, (2) a breach of that duty; and (3) actual and proximate causation of an injury to the plaintiff").

While the record and the Parties' motions contain many allegations regarding Harwood's actions and knowledge, the Parties have provided no support or suggestion that Harwood knew the source of the two additional bullet holes discovered during his 2006 investigation of King. Indeed, Harwood's attempts to seek this information in discovery suggest that Harwood still does not know the source of those other two bullet holes given that the knowledge would obviate his

need to obtain the same in discovery. Because Harwood apparently did not know the source of the two additional bullet holes observed in 2006 at the time of his investigation, it is unclear how learning the cause of those two bullet holes now would bear on Harwood's actions during his investigation, whether King's criminal prosecution lacked probable cause, Harwood's duties as a police officer, and/or Harwood's intent at the time. Nor does Harwood's response clearly articulate how the cause of the two additional bullet holes discovered in 2006 would be relevant to any of his defenses. Instead, he merely alleges that King has made the bullet holes "the heart of this case." (DN 76, at PageID # 639.) Harwood is correct that King appears to rely heavily on certain facts about the bullet holes. For example, King alleges that the .22 caliber bullet recovered from her kitchen floor had a copper wash as opposed to a complete copper jacket like the one recovered from Breeden's skull, and therefore, Harwood should have known the bullet holes were not caused in Breeden's murder. (DN 1, at PageID # 9-10.) However, King does not appear to base her claims on the affirmative cause of the two additional bullet holes observed by law enforcement in 2006, which is what Harwood is seeking to discover here. Instead, King merely challenges Harwood's actions, inferences, and motives based on the facts available to him at the time of his investigation, including facts about all four bullet holes. As King is not basing her claims on the *cause* of the two additional bullet holes and Harwood has not demonstrated how the same bears on his defense, the undersigned finds the same is not relevant in the instant case. Therefore, the undersigned finds Harwood has no substantial need to discover this information in light of King's assertion of her Fifth Amendment privilege and will recommend his motion be denied.

In making this finding, the undersigned is not persuaded by King's assertions that the bullet holes are not relevant because they were undoubtedly caused after the murder. (DN 79, at PageID # 696.) Sergeant Duncan testified that his observations of the bullet holes in King's kitchen floor

13

in 1996 was wholly controlled by King, that the holes were at least partially covered by a rug at the time, and that he by no means was permitted to do an exhaustive search of the floor, only a "look." (DN 76-1, at PageID # 643-44.) The picture of the four bullet holes presented by King demonstrates that two of the holes could have easily been covered at one time or another with a rug, leaving the other two holes visible. (DN 80-8.) The Parties did not provide any testimony or evidence to suggest that they were able to conclusively identify any four of the holes as those that Sergeant Duncan observed in 1999 versus those additional holes that were discovered in 2006. Therefore, the undersigned finds no merit to King's contention that the two additional holes were undoubtedly caused after the murder because it is also possible from the facts present by the Parties that the holes were simply not observed by Sergeant Duncan in 1999.

Because the undersigned has found that the information concerning the cause of the other two bullet holes is not relevant and Harwood has, therefore, not demonstrated substantial need for the information, the undersigned need not consider whether other remedies short of dismissal would prevent unfairness to Harwood.

### III. RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that Harwood's Motion to Dismiss (DN 76) be **DENIED**.

cc: Counsel of record

## **Notice**

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations. A copy shall forthwith be electronically transmitted or mailed to all parties. 28 U.S.C. § 636(b)(1)(C). Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations. Fed. R. Civ. P. 72(b)(2). Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal. *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).