UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| SUSAN JEAN KING, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:15-CV-762-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| TODD HARWOOD, | ) | **ORDER ON DEFENDANT'S MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| Defendant. | ) | |
| | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Todd Harwood's Motion for Summary

Judgment. [R. 91]  Plaintiff Susan King has responded [R. 96], and Defendant filed his reply [R.

104].  Thus, this matter is ripe for decision.  For the reasons discussed below, the Court denies

Defendant's Motion as to Count I (malicious prosecution under 42 U.S.C. § 1983 and Kentucky

state law) and grants Defendant's Motion with respect to Counts VII (emotional distress), Count

VIII (civil conspiracy), and Count IX (negligence/gross negligence/recklessness).

## I.   Background Facts

This case relates to the investigation, arrest, prosecution, and imprisonment of Plaintiff

Susan King for the murder of Kyle Breeden.  The relevant facts have been laid out in great detail

in several previous opinions in this case, including the opinion of the Sixth Circuit.  Thus, this

opinion will only briefly cover the relevant background facts.  Breeden went missing on October

26, 1998, and his body was found in the Kentucky River on November 5, 1998. [R. 1 ¶¶ 24, 30]

His legs were bound with a guitar-amplifier cord. [R. 1 ¶ 26]  While he was killed by two non-

exiting .22 caliber magnum gunshot wounds to the head, [R. 1 ¶ 25], he also had a superficial graze wound on the top of his left shoulder. [R. 97-14]

### A.    Initial Investigation

At least six Kentucky State Police ("KSP") detectives investigated the murder, including Sergeant Duncan and Detectives Figg and Bess. [*Id.* ¶ 28]  By December 30, 1998, KSP had developed a list of twenty-seven names that KSP considered relevant to the case. [R. 97-9]  King's name was included on the list because of her romantic relationship with Breeden. [*Id.*]  She also told Sergeant Duncan that she had at least three serious physical fights with Breeden, and that a judge had issued an Emergency Protective Order (EPO) against both of them. [R. 91-3 Com. Atty 463–64][1]  Between the time that Breeden went missing and time he was found, King had told others that she had a vision that Breeden was in "water and weeds." [*Id.* Com. Atty. 376]  The detectives also knew that King played the guitar. [R. 91-3 Com. Atty. 375]

On October 27, 1999, after nearly a year of investigating, Detectives Figg, Bess, and Bates met with King for several hours and tried unsuccessfully to obtain her consent to search her home. [R. 97-5 Com. Atty. 608]  They also attempted, and failed, to obtain a search warrant for want of probable cause. [*Id.* Com. Atty. 609; R. 1 ¶ 40]  One week later, Sergeant Duncan met with King in her home after being invited in by her then live-in boyfriend, Curtis Carruthers. [R. 97-7 Com. Atty. 630]  Duncan told King that KSP had received information that a firearm had been discharged in her home. [*Id.*]  King explained that several years prior, "a man named Bo . . . had come uninvited to her home" and "made sexual advances towards her," so "she told him to leave." [*Id.*]  She then "picked up a .22 handgun and fired three shots: one in the kitchen floor, one in the kitchen ceiling and one in the driveway . . . in an effort to make him leave." [*Id.* Com. Atty. 631]

---

[1] The page numbers for interviews conducted by law enforcement are labeled as "Com. Atty." in the bottom right hand corner of each page.

King said that Breeden had since pawned that gun. [*Id.*] King then showed Duncan two bullet holes in her kitchen floor, one of which she stated was from the "Bo" incident. [*Id.*] She also stated that the prior residents in the home "had also caused holes in the home by gunfire." [*Id.*]

King initially granted Duncan permission to search under and around her floor to find the bullets that had caused the holes, but withdrew her permission based on advice from counsel while he was preparing a consent-to-search document. [*Id.*] As such, Duncan performed more of a "cursory look" than a full-fledged search, since he was there by King's permission. [R. 97-6 pp. 34–35] Nonetheless, Duncan's notes from the encounter do not indicate that he saw other bullet holes on King's floor or any substance (such as blood) on King's floor near the holes, and Duncan stated that he would have included such details in his report. [*Id.* pp. 18–19, 22] According to Duncan's notes, he informed her counsel that he did not believe that King was responsible for Breeden's death. [R. 91-3 Com. Atty. 631]

After this meeting, Duncan directed Detective Figg to apply for another search warrant. [R. 1 ¶ 39; R. 97-6 pp. 20–21] At this time, the detectives knew that King played the guitar, that King and Breeden had a history of domestic violence (including a domestic violence order), that there were two bullet holes in King's floor, and that King had claimed to have a "vision" that Breeden would be found in the water. [R. 91-3 Com. Atty. 368, 375, 463–64, 467, 631; R. 97-2 pp. 78–81; R. 97-6 pp. 21–22] However, they were again unable to obtain a search warrant for King's residence because the prosecutor determined there was no probable cause. [R. 1 ¶ 40; R. 97-5 Com. Atty. 609]

### B.     Harwood's Investigation

After the case had been cold for nearly seven years, KSP Detective Todd Harwood was assigned to work it on May 22, 2006. [R. 97-11 p. 11; R. 97-12] Harwood reviewed the case file

and met with the original investigators to get up to speed on the investigation. [R. 97-2 pp. 77–78] He also conducted several "initial factfinding" interviews in person and by telephone to try and clear some of the suspects from the original investigation. [R. 97-2 pp. 111–14] However, he did not download the recordings of the interviews conducted over the phone to preserve them, which was good practice in criminal cases according to Harwood's supervisor. [*Id.*; R. 97-10 pp. 17–18] In fact, much of Harwood's investigation is not documented, including two of the initial conversations he had with King herself. [R. 97-2 pp. 111, 139–41]

On June 12, 2006, Harwood met with the Commonwealth Attorney and requested a search warrant for King's home. [*Id.* p. 135] When Harwood sought this search warrant, he had essentially the same evidence that was available to the previous detectives, and he knew that the original detectives had been denied a search warrant. [*Id.* pp. 78–81] Harwood's affidavit in support of the search warrant ("June 12 Affidavit") provided that:

> The affiant is the detective presently in charge of the murder investigation of Kyle "Deannie" [sic] Breeden. The cause of death was apparently two gunshot wounds to the head from a 22 caliber firearm using magnum ammunition. The decedent's legs were bound with a guitar amplifier cable. The decedent was found floating in the Kentucky River at the separation point between Henry and Owen Counties. On November 3, 1999, two 22 caliber bullit [sic] holes were seen in King's kitchen floor by a state police detective. This information was provided by Susan King and she stated that the holes were from a 22 caliber weapon and was caused as a result of a domestic altercation with "Bo", a motorcycle guy. This happened according to her three to six years before 1999. King stated that Breeden had sold or pawned the weapon some time before and she has no knowledge of it [sic] location or whereabouts.
>
> Prior to the finding of the decedent's body Susan King told Debbie Jordan, Ronnnnie [sic] Haydon and Mildred Breeden that she had had dreams or premonitions that [sic] Breeden being found in water. These conversations were confirmed by interviews in 1998 and 1999. Susan King and Breeden were good friends and lovers in the weeks prior to his disappearance. Breeden had stated that King had taken $300.00 from him. (See sep. sheet for continuation)

Continuation sheet:

Breeden had stated to individuals that he would get his money back and further that he had told his mother, Mildred Breeden, that King had some of his property and

that he would get it from her. Breeden and King were good friends with Ronnie
Haydon and Jackie Callahan (now the wife of Ronnie Haydon) who only lived one
to two miles from Susan King. A prior boyfriend of Callahan had found large bleach
stains in Callahan's car two to three weeks two weeks [sic] or so after Breeden's
death. This was confirmed by Detective Bess.

Susan King plays the guitar and this fact was confirmed by interviews with Larry
Mobley, Ronnie Haydon and Shawn Wright. Decedent was bound at the legs with
a [sic] amplifier/guitar cord.

Fragments of the bullits [sic] that killed Breeden were recovered and are available
for comparison with other samples.

Acting on the information received, Affiant conducted the following independent
investigation:

May 31, 2006 Susan King was again interviewed and at her residence a guitar, an
amplifier and other musical instruments were observed at King's residence.

[R. 91-10] The warrant sought "property or things used as means of committing a

crime" and "property or things in possession of a person to whom it was delivered for the purpose

of concealing it or preventing its discovery and which is intended to be used as a means

of committing a crime." [*Id.*] The affidavit omitted the fact that the bullets which killed Breeden

were non-exiting, meaning they could not have caused the two bullet holes in King's floor. [R. 97-

14] It also omitted the fact that King weighed 108 pounds and had only one leg and no prosthetic,

which obviously would make it less likely that she would be able to kill Breeden, tie him up, drag

his body out of the house to an unknown car, and drive forty miles to dump his body in the

Kentucky River. [R. 1 p. 11 ¶ 78–79] It also omitted the fact that King did not have a car, which

Harwood knew. [R. 97-26 1:08:15–1:08:18]

Nevertheless, Harwood received the search warrant. [R. 91-11] Harwood went with

several other officers to execute the warrant on June 12, 2006, and the search took over six hours.

[R. 91-11, R. 97-2 p. 198] King claims that Harwood demanded that she leave her house and go

with him during the search, and told her "[i]f you don't get in my car, I will take away your

crutches, handcuff you, and drag you across that gravel driveway and put you in my car." [R. 97-

20 pp. 179–80]  According to King, Harwood drove around at more than 100 miles an hour and yelled at her trying to get her to confess to killing Breeden for most of the six hours. [*Id.* pp. 180–81, 188]  The officers searching King's home relayed the results of the search to Harwood, who then questioned King about them as he drove her around. [R. 97-2 pp. 171–72]

Meanwhile, back at King's house, Officers seized a section of her kitchen floor containing four bullet holes, including one with a .22 caliber bullet fragment lodged inside. [R. 91-11]  A KSP forensic examination conducted on June 21, 2006 indicated that the bullet in King's floor was a different configuration than the bullets found in Breeden. [R. 91-19]  However, the report stated that due to the condition of the bullet in King's floor, the bullets "could neither be identified nor eliminated as having been fired from the same unknown firearm." [*Id.*]  Harwood claims that during his questioning, King acknowledged that she previously owned a .22 caliber firearm that, according to Harwood's notes, fired "either a 22-magnum or 22-long rifle round" (he did not record his questioning of King or take notes beyond a general overview during the interview, instead writing up his report from memory afterwards). [R. 91-16 Com. Atty. 036; R. 97-2 p. 171] King told Harwood that the gun was given to her by her ex-husband Jimmy King, but had later been pawned. [*Id.*]

The detective team also searched the crawlspace underneath the section of the floor containing the bullet holes.  Harwood's report states that

> [T]he insulation underneath the kitchen floor had been removed in a manner in which it appeared that someone was rooting through and removing the insulation, as if looking for a bullet. Additionally, a boat cushion and beer cans . . . were found within arms reach of the area directly underneath the bullet holes, as if someone had been sitting on the boat cushion rooting through the insulation.
>
> During the execution of the warrant, the detective team discovered that the dirt, in the crawlspace underneath the home, and lying directly below the bullet holes and in a 3' circular area, was not as compact as the surrounding dirt around it. It appeared that the dirt had been sifted in a manner in which someone was digging through it, as if looking for a bullet.

[R. 91-12]  Harwood stated that it looked like the insulation was "bunched up." [R. 97-2 p. 185]

Detective Hubbuch stated that it looked "as if somebody had spent some time down there." [R. 97-11 p. 37]  King informed Harwood that she had installed insulation in the crawlspace in late 2003.

[R. 91-16 Com. Atty. 039]  She also says some of the beer cans were from when she installed the insulation. [R. 97-20 pp. 99–100]  One of the three beer cans was manufactured in 1995 and the other two were manufactured in 2003. [R. 97-2 pp. 191–92]

The officers also found a scrape mark on the linoleum in King's kitchen during this search. Harwood's report characterizes the floor as follows:

> [S]omeone had removed the top layer of the linoleum in a pathway extending from the bullet holes to the back door sliding glass door. The pathway would be consistent with the width of a body and if someone had drug [sic] a body across the linoleum to the back door. Additionally, based upon the stains on the edge of the linoleum, it appears that some type of industrial solvent was used to clean or degrade a portion of the linoleum extending from the bullet holes to the sliding glass – back door.

[R. 91-12]  In his report, Harwood described the results of the search as a "crime scene clean-up." [*Id.*]  However, subsequent lab tests performed prior to her indictment showed no traces of cleaning materials on the floor [R. 97-39], and King indicated that the stain was from kerosene from a heater. [R. 97-20 p. 37]  King claims that she told Harwood that workers for a company called Purofirst, which had performed water remediation in 2003 after King's kitchen flooded, caused the scrapes on the floor. [R. 97-20 pp. 96–97]  Harwood later requested a subpoena for the insurance file for King's home in which he detailed King's explanation. [R. 97-29]  Upon completion of the search, law enforcement seized the section of King's kitchen floor with the four bullet holes, the boat cushion, the three beer cans, a guitar amplifier, two guitars, and various pictures of "individuals playing guitars." [R. 91-12]

On June 15, 2006, Harwood conducted an interview with Jacqueline Haydon. [R. 97-2 p. 225] Harwood got a written statement from Haydon, one of the only written statements he obtained during the investigation, although he does not remember why. [*Id.* p. 220] Haydon was one of the (many) original suspects in 1999 [R. 97-9 Com. Atty. 458; R. 97-2 p. 227], and Harwood still considered her a suspect when he interviewed her. [R. 97-3 Com. Atty. 009] In the original investigation, King reported to officers that there were bleach stains in Haydon's car. [R. 97-2 Com. Atty. 635–36] This was confirmed by follow up interviews with Danny Martin, Haydon's former boyfriend, who said there were bleach stains in the car when he met Haydon, roughly two weeks after Breeden's death. [R. 91-38 Com. Atty. 3437–38] Harwood suspected that the car could have been used to move Breeden's body, although after testing, no blood was found in the car. [R. 97-2 p. 168]

During the interview, Harwood informed Haydon that she was a suspect in the investigation and questioned her about whether she had moved Breeden's body. [R. 97-2 pp. 224–25, 227] Haydon claimed that the bleach stains were in the car when she purchased the car, which conflicted with her prior account (where she said she had spilled the bleach in the car). [*Id.* p. 228; R. 91-38 Com. Atty. 3438] Harwood also may have told Haydon that King said that Haydon could have been involved with Breeden's death. [*Id.* p. 227] In her written 2006 statement, Haydon stated that a couple of days after Breeden's body was found in 1998 (roughly two weeks after he had disappeared), she saw a "blood stain on the wood under that linoleum and 2 bullet holes going back toward the sliding glass doors" in King's house. [R. 91-39] She claimed to see this after King moved in her chair, which moved the rug on the floor that was covering this stain. [*Id.*] Haydon did not tell the investigating officers this when she was interviewed during the original investigation several years earlier. [R. 97-3 Com. Atty. 014]

On July 27, 2006, Harwood met with the Commonwealth Attorney to request another search warrant of King's home. Harwood prepared a report which included seven reasons why there was probable cause for the search warrant ("7 Reasons Report"). [*See* R. 97-30]  These reasons were based on Harwood's conclusions from the June 12, 2006 search, his interview with Haydon, and an interview with Carruthers, King's former boyfriend. [*Id.*]  Harwood's report indicated that Carruthers told him that King had some .22 magnum ammunition that she had gotten rid of after a detective interviewed her. [*Id.* Com. Atty. 061]  He also stated that there was an old tree near her house that she used for target practice. [*Id.*]  Harwood submitted a sworn affidavit in support of this warrant ("July 27 Affidavit"), which reads as follows:

> Prior search warrant was served on the above date and tests were conducted on the bullet fragment found in the flooring under the kitchen but said fragment was too damaged to be able to be compared.
>
> During and subsequent to above search, it was learned that Susan King has been the owner of several guns that fired 22 magnum and 22 long rifle ammunition and that King fired and target shot from her deck into a dead tree northwest of the deck on the house. This was stated by Susan King and confirmed by Curtis Curreuthers [sic] and Jimmy King. It was learned during the search that Jacqueline Haydon observed bullet holes and blood stains on the kitchen floor approximately two days after the Breeden body was found and two weeks after his disappearance. Said Jacqueline Haydon saw the bullet holes and blood stains when Susan King moved her chair in the kitchen and which pulled the linoleum seam apart and exposed the wood underneath and in the linoleum itself. Susan King immediately moved the rug to cover these items.

R. 91-18]  The affidavit specifically sought "ammunition and an old vanity which was used to store 22 cal. ammunition. Further, it is desired to cut and remove part of [sic] old tree to recover projectiles for 22 cal tests and comparison with bullet fragment recovered from the Breeden body." [*Id.*]  Harwood received the warrant and law enforcement seized, among other things, a portion of the tree with 144 bullet fragments and three guitar amplifier cords from King's home. [R. 97-2 p. 252; R. 91-17]  Subsequent KSP lab testing was not able to match any of the bullet fragments found in the tree to those found in Breeden. [R. 97-2 pp. 252–53; R. 97-32 pp. 33–37]

9

The KSP lab also ran additional tests on the bullet holes found in King's kitchen floor. On September 30, 2006, a presumptive blood test done on one of the bullet holes in King's floor returned a positive result. [R. 91-19] It is unknown whether this bullet hole was one that was observed in the original 1999 investigation or not. [R. 97-46 p. 22] Presumptive tests do not conclusively establish the presence of blood; confirmation tests are required since they can have false positives caused by the presence of substances like animal blood, vegetation, metal, or certain chemicals. [R. 97-46 pp. 11–12] No confirmation test was performed that conclusively established the presence of blood. [*Id.* p. 12] A separate DNA test indicated the presence of male human DNA, but the quantity was insufficient for comparative analysis.[2] [*Id.*]

Finally, Harwood followed up on information from the original investigation regarding King and Breeden's history of domestic violence. On December 11, 2006, Harwood obtained King's Domestic Violence Petition against Breeden from the Spencer County Circuit Clerk's Office. [R. 91-23] These records indicated that King had re-docketed the Domestic Violence Order ("D.V.O.") against Breeden on September 29, 1998, roughly a month before Breeden went missing. [*Id.* p. 4358]

On January 19, 2007, Harwood met with the Commonwealth Attorney to request either an arrest warrant for King or that the case be submitted directly to the grand jury to obtain an indictment. [R. 91-9 Com. Atty. 090; R. 97-2 pp. 299–300] Harwood then prepared a report for the Commonwealth Attorney to request an indictment for King (the "Grand Jury Packet") summarizing the reasons why he believed there was probable cause for King's indictment. [*Id.*] Harwood's theory was that King shot Breeden in her home, then with assistance removed Breeden's body and transported it to the Kentucky River where she dumped it. [R. 91-9 Com.

---

[2] Later testing could only narrow the possible sources of the DNA to 50% of all male Caucasians. [R. 97-46 p. 35; *see* R. 91-24; 91-25; 91-26]

Atty. 010–11]  King claims that Harwood made numerous false statements and material omissions in his Grand Jury Packet.  On April 5, 2007, Harwood testified before the grand jury, and King claims he made the same false statements and omissions as contained in his report. [R. 1 pp. 12–13 ¶ 82–90]  King was indicted for the murder of Kyle Breeden and arrested that day. [R. 97-2 p. 307]  Then on June 7, 2007, Harwood testified again before the grand jury, and King was indicted for tampering with physical evidence. [*Id.* pp. 307–08]

### C.  King's Alford Plea and Ultimate Vindication

#### 1.  King's Alford Plea

In August of 2008, King was offered a plea deal in which the Commonwealth agreed to recommend a sentence of ten years for manslaughter and five years for tampering with physical evidence, with the sentences to run concurrently. [R. 1 p. 14 ¶ 101]  King claims that her court-appointed attorney did not believe that she was innocent and believed that she would get the death penalty if she went to trial. [*Id.* ¶ 103]  King also claims that Harwood told her he would make sure she spent the rest of her life in jail and that she would get the electric chair. [*Id.* p. 15 ¶ 104]  King entered an *Alford* plea on September 17, 2008, in which she accepted the plea agreement while maintaining her innocence. [R. 91-28]  She received a sentence of ten years imprisonment. [R. 91-29]  Harwood would receive a "Commissioner's Commendation for his outstanding achievement in solving Breeden's murder" in May 2009, and would later be promoted to sergeant. [R. 1 p. 15 ¶ 110]

#### 2.  Jarrell's Confession

On May 4, 2012, a serial murder named Richard Jarrell confessed to Louisville Metro Police Department ("LMPD") detective Barron Morgan that he had killed Breeden, tied him up with a guitar amplifier cord, and thrown him into the Kentucky River. [R. 97-42 p. 2026]  Detective Scott Russ conducted a subsequent interview with Jarrell and learned that he was

confessing in the hopes of helping his brother, who was facing charges. [*Id.* p. 2027] He also provided a number of details about the murder that were not included in media reports. [R. 1 p. 16 ¶ 119; R. 97-42 pp. 2028–30] On May 11, 2012, Harwood interviewed Jarrell himself. [R. 91-32] Harwood claims to have recorded this interview, but later noticed that his recorder stopped working and so had only recorded three seconds of the interview. [R. 97-2 pp. 346–51] Harwood claims the recorder went missing, and he eventually reported it as missing on June 5, 2012. [*Id.* pp. 352–53; R. 97-45] King alleges that Harwood intimidated Jarrell into recanting his confession. [R. 1 p. 17 ¶ 125] After Harwood interviewed Jarrell, Jarrell refused to cooperate or provide any more information to the police. [*Id.* ¶ 126–29] KSP Captain Dean Hayes directed Harwood's supervisor that Harwood should not be allowed to interview Jarrell without a supervisor present. [R. 1 p. 18 ¶ 136; R. 97-10 pp. 18–19]

### 3.    King's Success in State Court

After being made aware of Jarrell's confession, the Kentucky Innocence Project filed a motion for a new trial on King's behalf. [R. 1 p. 18 ¶ 137]; *King v. Commonwealth*, No. 2012–CA–001985–MR, 2014 WL 3547480, at *1 (Ky. Ct. App. July 18, 2014). On October 5, 2012, the Spencer County Circuit Court denied King's motion because it found that her guilty plea foreclosed vacating her judgment under Kentucky law. *Commonwealth v. King*, No. 07-CR-00004 & 07-CR-00011, (Spencer Circuit Court, Oct. 5, 2012); *see also King*, 2014 WL 3547480, at *3. King appealed the decision, and on July 18, 2014, the Kentucky Court of Appeals reversed the circuit court's decision. *King*, 2014 WL 3547480, at *6. It characterized Jarrell's confession as "evidence that with reasonable certainty, [would] change the verdict or probably change the result." *Id.* On October 9, 2014, the Commonwealth dismissed King's charges at a hearing following remand from the Kentucky Court of Appeals. [R. 91-34]

## D.      Procedural History

On October 1, 2015, King filed her Verified Complaint in this action against Harwood and various other defendants bringing claims under 42 U.S.C. § 1983 along with Kentucky tort law claims. [R. 1]  On June 1, 2016, District Judge Gregory N. Stivers granted Defendants' hybrid Motion to Dismiss/Motion for Summary Judgment and entered judgment in favor of Defendants. [R. 18; R. 19]  The Sixth Circuit reversed the decision with respect to King's § 1983 malicious prosecution claim against Harwood. *King v. Harwood*, 852 F.3d 568, 591 (6th Cir. 2017).  It also reversed the decision for her state-law claims for which the Court's supplemental jurisdiction was dependent on King's federal malicious prosecution claim. *Id.*  King's remaining claims are her §1983 malicious prosecution claim and her state law claims for malicious prosecution; intentional, reckless, and negligent infliction of emotional distress; civil conspiracy; and negligence/gross negligence/recklessness. [R. 91-1 p. 17]  Harwood now moves for summary judgment on the remaining claims. [R. 91]

## II.      Standard of Review

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When determining a motion for summary judgment, a court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Lindsay v. Yates,* 578 F.3d 407, 414 (6th Cir. 2009).  The court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986).  When, as here, the defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. The initial burden of establishing no genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324. Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat that fact as undisputed. Fed. R. Civ. P. 56(e). Factual allegations contained in a verified complaint satisfy the burden of the nonmovant to respond to a motion for summary judgment. *King v. Harwood*, 852 F.3d 568, 577–78 (6th Cir. 2017) (quoting *Thaddeux-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999) (en banc)); *see also El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (a "verified complaint . . . carries the same weight as would an affidavit for purposes of summary judgment").

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

**III.    Discussion**

Harwood requests summary judgment on King's claims because he argues that King has failed to rebut the presumption of probable cause created by the grand jury indictment; that Harwood is entitled to qualified immunity because there was probable cause for King's

prosecution; and that King's criminal prosecution was not resolved in her favor. For the reasons below, the Court disagrees.

### A.     Law of the Case

Plaintiff first argues that Harwood's Motion for Summary Judgment should be denied because the same arguments were already rejected by the Sixth Circuit—that King had not rebutted the presumption of probable cause created by the grand jury's indictment and that Harwood was entitled to qualified immunity because there was probable cause for King's prosecution.[3] [R. 96 p. 20] King claims that the Sixth Circuit already found that there were genuine issues of material fact as to these issues. [*Id.* p. 23] Therefore, King argues, summary judgment should not be granted on her federal and state malicious prosecution claims. Defendant Harwood concedes that the Sixth Circuit ruled on these issues but argues that the law of the case doctrine is inapplicable when the record before the court is materially different. [R. 104 p. 3] Specifically, he argues that the Sixth Circuit's decision was made before discovery had taken place and that the facts in the record have since changed, warranting a re-examination of the issues. [*Id.* p. 5]

The law of the case doctrine provides that courts should not reconsider a matter once resolved in a prior proceeding. *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015). The doctrine ensures that an issue presented for the second time in the same case leads to the same result. *Id.* On remand, a district court must proceed "in accordance with the mandate and law of the case as established by the appellate court." *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006). The Court must "implement both the letter and the spirit of the appellate court's mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Id.*

---

[3] The Sixth Circuit did not address whether King's criminal prosecution was resolved in her favor.

The trial court, however, may reconsider a ruling "(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *Hanover Ins. Co. v. American Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997). Essentially, the law of the case doctrine is inapplicable if new evidence materially differs from the evidence in the record when the issue was first decided, and it undermines that decision. *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 418 F. App'x 430, 435 n.4 (6th Cir. 2011).

The record in this case has markedly changed since the Sixth Circuit's prior decision. The parties have attached nearly one hundred exhibits in their briefing, including numerous depositions taken since the Sixth Circuit's prior ruling. Even more importantly, the record now includes investigative reports in which King argues Harwood made false statements. The prior record was miniscule by comparison. *See* [R. 4; 14; 15] Nonetheless, the Court will not reconsider issues that the Sixth Circuit already decided unless new evidence in the record materially undermines that decision. Where Harwood identifies such new information, however, the Court will evaluate his arguments accordingly. As explained below, while the record has changed, it has not changed in Harwood's favor. The record as a whole even more clearly demonstrates the existence of multiple genuine issues of material fact than it did three years ago when the Sixth Circuit rendered its opinion.

### B.    Malicious Prosecution Under § 1983

The Sixth Circuit recognizes a constitutionally cognizable claim of malicious prosecution under the Fourth Amendment. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). To succeed on a claim for malicious prosecution under 42 U.S.C. § 1983, a plaintiff must show that:

(1) a criminal prosecution was initiated against the plaintiff, and the defendant made[,] influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017) (internal quotations omitted).

> **1.    Merits of King's Malicious Prosecution Claim, Elements (1) and (3): Harwood Made, Influenced, or Participated in the Decision to Prosecute King, and King Suffered a Fourth Amendment Deprivation of Liberty Apart from the Initial Seizure**

As a preliminary matter, Defendant has not challenged elements one and three and they are not meaningfully in dispute. King was incarcerated for years as a result of the prosecution, which easily suffices for the third element. [R. 1 ¶ 156] The first element is met when an officer sets the "wheels of government in motion by instigating a legal action," and falsifies affidavits to secure warrants, or fabricates evidence. *King*, 852 F.3d at 583–84. In other words, the question is whether the officer "could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty and the misconduct actually does so." *Jackson v. City of Cleveland*, 925 F.3d 793, 820 (6th Cir. 2019) (quoting *Sykes v. Anderson*, 625 F.3d 294, 316 (6th Cir. 2010)). This includes knowing misstatements to the prosecutor and misstatements and falsehoods in the officer's investigatory materials that influence a prosecutor's decision to bring charges. *Id.*; *Sykes*, 625 F.3d at 316. Even if Harwood had challenged this element, as explained below, there are genuine issues of material fact as to whether Harwood knowingly or recklessly made false statements and omissions in his affidavits and investigative reports and sought search warrants and King's indictment in the absence of probable cause.

2.  **Merits of King's Malicious Prosecution Claim, Element (2): King Continues to Show the Existence of a Genuine Issue of Material Fact as to Whether There Was Probable Cause to Support Her Prosecution**

Harwood does contest elements two and four.  He argues that (1) King has failed to rebut the presumption of probable cause created by the grand jury indictment (meaning that she cannot prevail on the merits of her malicious prosecution claim because she cannot show the element of a lack of probable cause); (2) even if King rebutted the *presumption* of probable cause, there actually was probable cause for King's prosecution (meaning that King still cannot show the element of a lack of probable cause and that Harwood is entitled to qualified immunity); and (3) the fourth element of a malicious prosecution claim is not met here because King's criminal prosecution was not resolved in her favor. [R. 91-1 p. 2]  For the reasons discussed below, the Court disagrees.  To the contrary, there are genuine issues of material fact as to all three issues.

The intervening additions to the record since the Sixth Circuit's opinion have not resolved the genuine issues of material fact (which King showed previously and has shown again) regarding whether there was probable cause to support her prosecution (the second element of malicious prosecution).  Whether there was sufficient probable cause for the criminal prosecution is an objective determination.  As the Sixth Circuit has recently explained, "probable cause to initiate a criminal prosecution exists where facts and circumstances [are] sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (quotation mark and citation omitted).  "As a general rule, the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *Id.* (internal quotations omitted).

A longstanding exception to this rule was when officers knowingly or recklessly present false testimony to the grand jury to obtain an indictment. *Id.*  However, in *Rehberg v. Paulk*, 556 U.S. 356, 369 (2012), the Supreme Court held that officers are entitled to absolute immunity for

grand jury testimony, meaning that King cannot use Harwood's grand jury testimony to rebut the presumption of probable cause created by a grand jury indictment. *King v. Harwood*, 852 F.3d 852, 586 (6th Cir. 2017). However, as *King* made clear, "evidence of an officer's actions *prior to and independent of* his grand-jury testimony may call into question the presumption of probable cause created by an indictment even if a malicious-prosecution plaintiff may not bring in evidence of the grand-jury testimony *itself* to do so." *King*, 852 F.3d at 590 (emphasis partly added). Thus, the presumption of probable cause provided by a facially valid grand jury indictment is rebuttable rather than conclusive where:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury) . . . .

*King*, 852 F.3d at 587–88. Applying that rule, the Sixth Circuit found in King's case that:

> King has raised genuine issues of material fact as to (1) whether Harwood set King's prosecution in motion by applying for search warrants despite the lack of probable cause to search, by seeking King's indictment despite the lack of probable cause on which to prosecute King for murder, or by making knowing or reckless false statements in Harwood's investigative report; (2) whether any false statements made by Harwood, together with his material omissions of facts—if true—such as King's having one leg, the fact that the bullet wounds in Breeden's skull were non-exiting, or Harwood's knowledge that the bullets in King's home did not match the bullets that killed Breeden, were material to King's prosecution; and (3) whether any such false statements, evidence, and omissions were independent of Harwood's grand-jury testimony, so as to constitute "laying the groundwork for an indictment," *Sankar*, 2012 WL 2923236, at *3, rather than the sort of "preparatory activity" in advance of a grand-jury hearing that would provide absolute immunity under *Rehberg*, 566 U.S. at 370, 132 S. Ct. 1497. Thus, King has raised genuine issues of material fact sufficient to overcome, at least at summary judgment, the presumption that King's indictment is proof of probable cause.

*Id.* at 591.  The Sixth Circuit noted that "Defendants' arguments [] reflect just how much of the dispute before us consists of contested facts." *King*, 852 F.3d at 583–84.  At the time of its ruling the Sixth Circuit had Harwood's June 12 Affidavit. [R. 14-19]  However, it did not have the July 27 Affidavit and was under the impression that Harwood used the same affidavit for both search warrants. *King*, 852 F.3d at 574 ("Harwood obtained a second search warrant, based on the same affidavit, on July 27, 2006 . . . .").  The Sixth Circuit also did not have the 7 Reasons Report and only had a portion of Harwood's Grand Jury Packet. *See* [R. 14-4]

a)      **Presumption of Probable Cause Created by the Indictment**

Harwood argues that King has failed to rebut the presumption of probable cause created by the grand jury's indictment because she has not raised a genuine issue of material fact as to whether Harwood knowingly or recklessly made false statements or falsified or fabricated evidence. [R. 91-1 p. 21]  While the Court finds it appropriate to evaluate the issue in light of the new evidence in the record, the existence of contested material facts has not changed.  In explaining why there is still a jury question as to whether the "'facts and circumstances' known to Harwood would be 'sufficient to lead an ordinarily prudent person to believe' that King was guilty of murdering Breeden," *King*, 852 F.3d at 582 (citation omitted), the Court will first address the presumption created by the grand jury indictment, separately analyzing each part of the three-prong test laid out in *King*.  Then it will then address the related but conceptually separate issues of probable cause for purposes of qualified immunity and probable cause to support the malicious prosecution claim. There are genuine issues of material fact as to whether Harwood can rebut the presumption of probable cause created by the grand jury indictment.

### i. *King* Prong One: There are Genuine Issues of Material Fact as to Whether Harwood, in the Course of Setting King's Prosecution in Motion, Either Knowingly or Recklessly Made False Statements and Omissions

The typical way the *King* exception applies is where an officer acts "knowingly or recklessly" in making affirmative false statements that were material to the prosecution other than in grand jury testimony. *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017). Whether omissions alone are sufficient for the first prong of the *King* test is not clear. *See Harris v. Goins*, No. 6:15-151-DCR, 2017 WL 3097613, at *12 (E.D. Ky. July 20, 2017). While the wording of the test set out in *King* suggests they may not be, the Sixth Circuit has subsequently recognized that "the exception similarly applies when an officer has 'misled the prosecutor, as well as the grand jury, through his deficient and reckless investigation and the critical *omission* of material evidence.'" *DiPasquale v. Hawkins*, 748 F. App'x 688, 693 (6th Cir. 2018) (quoting *Jones v. Clark County*, 690 F. App'x 334, 336 (6th Cir. 2017)) (emphasis added); *see also Carter v. Newby*, No. 5:17-cv-130-TBR, 2018 WL 3432126, at *6–7 (W.D. Ky. July 16, 2018); *Harris*, 2017 WL 3097613, at *12. An officer's statement is reckless when "viewing all the evidence, the affiant entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Peet v. City of Detroit*, 502 F.3d 557, 571 n.3 (6th Cir. 2007) (cleaned up). Similarly, an officer's omission is reckless when the officer "withholds a fact in his ken that any reasonable person would have known is the kind of thing the judge would wish to know." *Id.* (cleaned up).

Harwood does not contest that he set King's prosecution in motion, and for good reason. Harwood was the lead investigator on the case beginning in 2006, created countless investigative reports during his investigation, applied for multiple search warrants of King's residence, submitted affidavits in support of those search warrants, and sought an arrest warrant from the

Commonwealth Attorney or that the Commonwealth Attorney submit King's case directly to the grand jury. [R. 91-9] Therefore, the only issue is whether Harwood knowingly or recklessly made false statements or omissions in his affidavits or investigative reports.

### Initial Omissions

Among the affidavits and investigative reports that King cites,[4] nowhere did Harwood disclose that King had one leg with no prosthetic and only weighed 108 pounds, making it significantly less likely that she could have killed Breeden in her home and moved his nearly 190-pound body as he theorized. [R. 1 p. 11 ¶ 78–79] Nor did he include the fact that the Breeden had non-exiting bullet wounds, meaning not one of the four bullet holes (the two initially observed by Sergeant Duncan in 1999 and the additional two found during the June 12, 2006 search) was caused by the shots that killed Breeden. [R. 97-14] Harwood's argument that neither of these affect the probable cause analysis strains credulity. King's small stature and physical disability are squarely relevant to the likelihood that she killed Breeden and then was able to drag him across the floor and dump his body in the river. Without help it would have been nearly impossible for her to do so.[5]

Likewise, the fact that Breeden's wounds were non-exiting is something that "any reasonable person would have known [was] the kind of thing a judge would wish to know." *Peet*, 502 F.3d at 571 n.3. Harwood's June 12 Affidavit stated that Breeden died of two shots to the head, and that two bullet holes were found on King's floor. [R. 91-10] The obvious inference anyone reading the affidavit would make is that these were from the same two gunshots. Yet

---

[4] Harwood's June 12 Affidavit [R. 91-10], Harwood's July 27 Affidavit [R. 91-18], Harwood's 7 Reasons Report [R. 97-30], and Harwood's "Grand Jury Packet" [R. 97-3].

[5] Harwood also knew that King did not have a car which she could have used to transport Breeden's body, which he also omitted from his reports. [R. 97-26 at 1:08:10–1:08:18]

Harwood omitted the fact that this was impossible. Harwood states in his Grand Jury Packet [R. 91-9; R. 97-30] that there were four bullet holes but includes that there was the "presence of blood" in two of the holes. [R. 97-30 Com. Atty. 012] Again, the obvious inference would be that the blood came from the two shots that killed Breeden, which was impossible since the wounds were non-exiting and therefore could not have caused the bullet holes in the floor. Harwood claims that there "could have" been additional shots fired during Breeden's murder and that a graze wound found on Breeden could have been caused by another gun shot.[6] [R. 91-1 p. 2; R. 104 p. 14] However, the autopsy merely states that there was a "superficial graze wound" on Breeden's left shoulder. [R. 97-14] The autopsy does not indicate the cause of the wound, or even if it occurred pre- or post-mortem. [*Id.*] Regardless of whether there *could* have been additional shots fired during Breeden's murder, the fact remains that the only specifically identified bullet wounds in the autopsy were non-exiting. This fact is certainly one that a reasonable person should have known a judge making a probable-cause determination would have wanted to know. *See Peet*, 502 F.3d at 571 n.3.

These omissions are particularly salient considering that when Harwood attempted to obtain the first (June 12, 2006) search warrant of King's house, he had little more information than the prior detectives had, and Harwood knew that they had not been successful in obtaining a warrant due to lack of probable cause. [R. 97-2 pp. 78–81][7] Harwood claims that because he was acting with the same information that was available to the original detectives (another thing a

---

[6] Harwood includes in his request for indictment that "during Breeden's autopsy, 'graze like defects' are found on the victim's shoulder, which could be attributed to additional gunshots." [R. 97-3 Com. Atty. 006] However, the Court can find no evidence of the quoted language in the autopsy. The autopsy, at least as provided in the record, reads "Superficial Graze Wound, Top of Left Shoulder." [R. 97-14]

[7] The only additional information provided in Harwood's affidavit is that he interviewed King at her residence and observed "a guitar, an amplifier, and other musical instruments." [R. 91-10] Of course, the original detectives already knew that King played the guitar. [R. 97-2 p. 91-2 Com. Atty. 375]

judge evaluating an application for search warrant would want to know) that this somehow makes it impossible for him to have made false statements or omissions. [R. 91-1 p. 25]  But he does not explain, and the Court fails to see, why that logically follows.

Thus, there are genuine issues of material fact as to whether Harwood intentionally omitted exculpatory facts in his affidavit to mislead the judge.  Given the Sixth Circuit and other district courts' extension of prong one of the *King* test from affirmative statements to significant omissions, the Court finds that these two omissions alone satisfy the first prong of the *King* test. *See DiPasquale v. Hawkins*, 748 F. App'x 688, 693 (6th Cir. 2018); *Jones v. Clark County*, 690 F. App'x 334, 336 (6th Cir. 2017); *see also Harris v. Goins*, No. 6:15-151-DCR, 2017 WL 3097613, at *12 (E.D. Ky. July 20, 2017); *Carter v. Newby*, No. 5:17-cv-130-TBR, 2018 WL 3432126, at *6–7 (W.D. Ky. July 16, 2018).

### Affirmative False Statements and Further Related Omissions

Even if the omissions by themselves were not sufficient, there are also genuine issues of material fact as to whether Harwood knowingly or recklessly made affirmative false statements.  In her Response to Harwood's Motion for Summary Judgment [R. 96], King identifies a number of false statements that she claims Harwood knew were false or that Harwood was reckless in making. [R. 96 pp. 8, 11–12, 24–29]  These statements were made in a number of affidavits and reports, including: Harwood's 7 Reasons Report [R. 97-30; *see* R. 96 pp. 11–12]; Harwood's July 27 Affidavit [R. 91-18; *see* R. 96 pp. 11–12]; Harwood's report of an interview with Susan King on June 12 [R. 97-27; *see* R. 96 pp. 10–11, 26]; Harwood's report on the execution of the June 12 search warrant [R. 97-47; *see* R. 96 p. 27]; and Harwood's Grand Jury Packet [R. 97-3; *see* R. 96

pp. 25–29].[8]  King also identifies certain misleading omissions that Harwood made in his affidavits and investigative reports. [R. 96 pp. 8, 13–15, 29–31]

Harwood complains that King's attacks are based on "her interpretation of the facts and evidence."  However, this is the interpretation that matters, as long as it is not completely conclusory.  When evaluating a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party, in this case, King. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  The Court finds that Harwood's statements recounted below, while not an exhaustive list of all of his purportedly false statements, establish that there are genuine factual questions as to whether Harwood, in the course of setting King's prosecution in motion, knowingly or recklessly made false statements and omissions in his affidavits and investigative reports.

### *"Blood" Found in a Bullet Hole on King's Floor*

The first statement King points to as false is one Harwood made in his Grand Jury Packet prepared several months before his actual testimony. [R. 91-9 Com. Atty. 090, 012]  Harwood wrote that "*[t]he Kentucky State Police Forensic Laboratory has discovered the presence of blood, particularly MALE HUMAN DNA, on the third and fourth bullet holes.*" [R. 97-3 Com. Atty. 012] (emphasis in original).  First, only one bullet hole was tested for DNA. [R. 97-46 p. 38]  Second, King also argues that this is false because only a presumptive test for blood was performed and a confirmation test is required to actually establish the presence of blood.  The presumptive test can yield false positives when it reacts with substances like animal blood,

---

[8] Many of the statements are found in multiple reports, as Harwood's later "probable cause" reports appear to build on his earlier ones.  For example, Harwood's Grand Jury Packet (with seventeen numbered reasons to establish probable cause) includes the same or similar numbered reasons from his 7 Reasons Report, with some edits. *See* [R. 97-30; R. 97-3]  There also appears to be another report prepared for the commonwealth attorney for the June 12, 2006 search warrant with six reasons [R. 97-2 pp. 135–36], although the Court cannot locate that report in the record.

vegetation, metal, or certain chemicals. [R. 97-46 p. 11–12]  Harwood admitted in his deposition that he had training on blood tests and knew that an additional test was necessary to confirm the presence of blood. [R. 97-2 pp. 23–24]  Harwood argues that additional testing was in fact done, just in the form of DNA testing.  DNA was in fact found in one of the bullet holes.  However, this is not the same as a confirmation test for blood.  DNA exists in many human substances (hair, saliva, skin) not just blood, and Harwood concedes that DNA could have gotten in the hole if someone touched it (and in fact, the officers who executed the search warrant were not wearing gloves). [R. 97-2 p. 187]  Viewing these facts in the light most favorable to King, Harwood knowingly or recklessly included this false statement in his Grand Jury Packet.

### *Firing Capability of King's Gun(s)*

In his 7 Reasons Report, made to convince the Commonwealth Attorney to apply for the July 27 search warrant, Harwood wrote that King "acknowledged that she has owned several guns over the years, including *one* that fired *either* a 22-magnum *or* 22-long rifle round." [R. 97-30 Com. Atty. 060–61] (emphasis added).  However, in his July 27 Affidavit in support of the search warrant, Harwood wrote that "Susan King has been the owner of *several* guns that fired 22 magnum *and* 22 long rifle ammunition . . . ." [R. 91-18] (emphasis added).  The discrepancy between the two phrasings is significant.  The first statement is disjunctive and indicates that King was not sure of its capabilities: she owned one that could fire either 22 magnum or 22 long-rifle rounds.  Harwood confirmed in his deposition that King told him she was unsure which gun she had. [R. 97-2 p. 212] ("she indicated that she was unsure of which one and that it could have been a .22 magnum or a .22 long rifle").  The second statement, found in Harwood's July 27 Affidavit, is a conjunctive one: King owned *several* guns that could shoot both types of ammunition.  This

second statement has a significantly different meaning than the first, and, if false, would have been at least recklessly made by Harwood.

King argues that this change was made to make it seem like she owned a gun that could fire the type of bullets that were found in Breeden: .22 magnum bullets. [R. 96 pp. 11–12] King claims that Harwood knew that she owned only two .22 caliber semi-automatic pistols, a Ruger Mark I and a Ruger Mark II, which were both designed to fire standard .22 ammunition (the copper *washed* bullets found in King's floor), not magnum ammunition (the copper *jacketed* bullets found in Breeden). [R. 96 p. 12; R. 97-2 p. 201, 205] Harwood admitted in his deposition that this information was in the case file and that he believed King told this information to officers during the original investigation. [R. 97-2 pp. 201, 205] These two guns are incapable of firing magnum bullets, according to former KSP lab specialist Matthew Clements. [R. 97-32 pp. 37–38, 47]

Harwood argues that a .22 *magnum* pistol or revolver can fire both .22 magnum bullets and standard .22 bullets. [R. 91-1 p. 12] Clements confirms that this may be possible, despite the differences in configuration of the bullets. [R. 97-32 pp. 26–27] This argument, while potentially true, misses the point. While a .22 *magnum* firearm might be able to fire both types of bullets, both Clement and Dr. Gaut, an expert hired by Harwood, concede that the reverse is not true: a gun (like King's) designed to fire .22 standard bullets cannot fire .22 magnums. [R. 91-20 pp. 34–35; R. 97-32 pp. 29, 37–38, 47] Unless King owned a .22 magnum firearm, its potential firing capabilities are not relevant. But aside from King's statement, the only other evidence that indicates in any way that King owned a gun capable of firing .22 magnum ammunition is from a purported interview that Harwood had in 2006 with Carruthers, King's former boyfriend. Harwood's notes from that interview state that Carruthers told him that King gave 22-caliber

magnum shells to her neighbor Larry Mobley after being interviewed by Sargent Duncan in 1999. [R. 91-3 Com. Atty. 014]  While King admits that she gave away some .22 ammunition, there is a factual dispute as to whether the rounds were magnum or standard. *See* [R. 96 pp. 27–28 (citing R. 97-2 pp. 92, 337–38); R. 104 pp. 11–12]  Clearly, at the very least there is a genuine dispute of material fact as to whether Harwood made knowingly or recklessly false statements as to which guns King owned and their firing capabilities.

### *Bullet Comparison*

In the Grand Jury Packet, Harwood wrote that "***the 22-caliber fragment [from King's floor], due to deformation, cannot be analyzed against the bullets found in Breeden's skull.***" [R. 97-3 Com. Atty. 012] (emphasis in original).  Harwood also wrote that the bullet fragment from the floor was "too damaged to be able to be compared" in his July 27 Affidavit. [R. 91-18]  King argues that Harwood knew that the bullets found in her floor actually *had* been compared to the ones found in Breeden and that their configuration was different.  The bullets found in King's floor were standard .22 caliber, which have a copper wash. [R. 97-32 pp. 24–26]  However, the bullets found in Breeden were .22 caliber magnums, which have a copper jacket. [*Id.*]  Harwood admits that he knew the configuration was different because he received a lab report from Forensic Science Specialist Matthew Clements dated June 21, 2006. [R. 97-2 pp. 254–55, 271]  Harwood claims that what he wrote is consistent with Clements's lab report.  Clements's report states "[t]he configuration of [the bullets found in King's floor] differs from [the bullets found in Breeden]; however, due to the mutilated condition and lack of identifiable characteristics . . . the bullets could neither be identified nor eliminated as having been fired from the same unknown firearm." [R. 91-19]  Clements's report does not state that the bullets could not be analyzed.  Rather, it states that they *were* analyzed and that the bullets had different configurations (magnum versus standard).

That is, the bullets in King's floor were not the same as those found in Breeden. Even if the results did not conclusively show whether the bullets could have been fired from the same gun, this is not the same thing—particularly when considering the firing capacities of magnum versus standard .22 firearms as discussed above. Again, giving King all reasonable inferences, Harwood wrote a statement in his Grand Jury Packet and July 27 Affidavit that he knew to be false.

### King's Explanation(s) for Floor Damage

King next points to Harwood's statements regarding damage to the linoleum on her kitchen floor as being recklessly false. Harwood wrote in his Grand Jury Packet and 7 Reasons Report that there was a portion of the linoleum in the kitchen area that was removed, and that it "would be consistent with the width of a body and if someone had drug a body across the linoleum to the back door." [R. 97-3 Com. Atty. 012; R. 97-30 Com. Atty 060] King claims that Harwood had no evidence to support this assertion and that it was reckless speculation. Harwood argues that since he and Detective Hubbuch both believed that the scrape was the width of a body and observed that the scrape went from the area on the floor where the bullet holes were located to the door, he was not reckless in his characterization of the floor damage. However, even Detective Hubbuch admitted that there was no actual evidence to support this theory. [R. 97-11 pp. 48–49]

King also claims that she told Harwood that the scrapes were caused by Purofirst, a company that replaced linoleum in her kitchen after it flooded. [R. 91-2 pp. 96–97] Harwood was clearly aware of this, as when he requested a subpoena for the insurance file for King's home, he wrote that "[o]ne of King's original assertions was that individuals involved in the repair of flood damage to her home, in or around July of 2003, had somehow caused the damage to the kitchen floor and purposely scraped away linoleum." [R. 97-29] According to Harwood, he spoke with Bluegrass Flooring, a company that installed carpet over the linoleum, and based on their

conversation was satisfied that they did not cause the scrape marks on King's floor. [R. 91-1 p. 7 n.13; R. 97-2 pp. 291–93] However, he did not contact Purofirst, despite the fact that he knew Purofirst had removed a layer of linoleum. [R. 97-2 pp. 291–92] A Purofirst production manager also confirmed that the scrape marks were caused by removing a layer of linoleum, and that Purofirst removed the entire top layer of linoleum in King's kitchen. [R. 97-28 at 46:00–50:00] Harwood was aware that Purofirst had removed linoleum on King's floor, and King told him the "individuals involved in the repair of flood damage to her home" caused it. [R. 97-29] In light of this evidence, there are genuine issues of material fact for the jury to decide as to whether Harwood's characterization of the scrape marks in his reports was reckless, or if there were obvious reasons to doubt the accuracy of the information he reported.

Further, regardless of whether Harwood's failure to follow up on the reasons provided by King was reckless or merely negligent, Harwood specifically wrote in his report detailing his exchange with King that she "had no excuse or reason for the missing linoleum." [R. 97-27 Com. Atty. 038] But as just discussed, that is simply false. Harwood tries to save his statement by arguing that King provided *multiple* inconsistent explanations (in her 2018 deposition) for the cause of the scrape marks: that they were caused either by the company that removed the linoleum or a heater. [R. 91-1 p. 7 n.13; R. 104 p. 9] This, he argues, somehow makes his claim in his 2006 report that she had *no* excuse for the missing linoleum true. The problems with this argument are legion. First, Harwood mischaracterizes King's deposition. King stated that the heater caused a *stain* on the linoleum, not the scrape marks. [R. 91-2 pp. 96–97] Second, Harwood does not claim that King gave him this explanation back in 2006 during the investigation. In fact, his own request for subpoena explicitly stated that King told him the company that removed the linoleum caused the scrape marks. [R. 97-29] And third, Harwood's statement was that King gave no reasons at

all—not multiple inconsistent reasons. Harwood cannot retroactively change his statement at all, much less to change "none" to "multiple inconsistent." Given that the Court must view the facts in the light most favorable to King, this is another potentially false statement that Harwood knowingly made in one of his reports.

### *Insulation Under King's Floor*

The next false statement King identifies relates to the insulation under her floor. In his 7 Reasons Report and his Grand Jury Packet, Harwood wrote that:

> [T]he insulation underneath the kitchen floor had been removed in a manner in which it appeared that someone was rooting through, and removing the insulation, as if looking for a bullet. Additionally, a boat cushion and beer cans were found within arms reach of the area directly underneath the bullet holes, as if someone had been sitting on the boat cushion removing the insulation. Additionally, other areas in the crawl space contained intact insulation without any tampering or removal.

[R. 97-3 Com. Atty. 013; 97-30 Com. Atty. 060]; *see also* [R. 97-27 Com. Atty. 039]. King claims that Harwood went into the crawlspace and knew that the insulation in her crawlspace was not intact. She has provided a picture purporting to show the state of the insulation. [R. 96 p. 27] Harwood claims that this picture was taken years later and that he found the insulation to be much neater at the time of the search.

King further argues that Harwood's theory regarding the significance of the boat cushion and beer cans—that she sat on the cushion drinking beers and rooting through the insulation for bullets—is completely unfounded, and thus a recklessly-made false statement. Detective Hubbuch, who participated in the search of King's house stated that the boat cushion and beer cans made it seem like "somebody had spent time down there." [R. 97-11 p. 37] Harwood also emphasizes that King admitted that she "probably" laid on the boat cushion and drank beers. However, King claims that she did this when she put insulation in her crawlspace. [R. 97-20 pp. 99–101] Harwood's notes from 2006 show that he knew of her explanation; Harwood wrote that

31

King told him that she had put insulation in the crawlspace in late 2003. [R. 97-27 Com. Atty. 039] Harwood's theory is also weakened by the dates of the beer cans. One of the three cans was manufactured in 1995, while the other two were manufactured in November of 2003—both years apart from both Breeden's death and the original investigation. [R. 97-2 pp. 191–92] Harwood's reports omit this fact, which would clearly be misleading to a reader of the reports. Harwood's theory requires assuming that King either drank (at least) three or four-year-old beer or else waited at least three years after the initial investigation ended to look for bullets in the insulation. Whether Harwood knowingly or recklessly made false statements and omissions on this point is a factual dispute for a jury that the Court cannot resolve at this time.

### Foundation of King's Home

King next points to Harwood's report on the execution of the July 27 warrant, where he wrote that the dirt underneath King's home in a crawlspace below the bullet holes "was not as compact as the surrounding dirt around it. It appeared that the dirt had been sifted in a manner in which someone was digging through it, as if looking for a bullet." [R. 97-47 Com. Atty. 031] King claims that this statement is blatantly false, as her house was built on a concrete foundation. She has provided current PVA records that show the foundation of the house is "poured concrete." [R. 97-48] Harwood claims that current PVA records do not prove that her house had a concrete foundation in 2006. Detective Hubbuch also mentions seeing hard-packed dirt in the crawlspace. [R. 91-13 p. 37] A reasonable jury could believe King and conclude that this statement was false (and that Harwood was at least reckless in making it), or it could believe Harwood and Hubbuch.

Thus, this factual dispute is material and further illustrates the genuine issues of material fact that remain for a jury to decide.

        ii.    **_King_ Prong Two: There are Genuine Issues of Material Fact as to Whether the False Statements and Evidence, Together with Any Concomitant Misleading Omissions, Were Material to King's Ultimate Prosecution**

Prong two of the *King* test asks whether "the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff." *King v. Harwood*, 852 F.3d 568, 587 (6th Cir. 2017). Normal causation principles apply to this inquiry. *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 337 (1986)). As long as "reasonable minds could differ," the materiality of false statements or omissions is a question for the jury. *See Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) (citing *United States v. Gaudin*, 515 U.S. 506, 521 (1995)). The Sixth Circuit previously held that King had raised genuine issues of material fact as to the materiality of Harwood's false statements and omissions. *King*, 852 F.3d at 591. Given that the number of these purportedly false statements and omissions has only increased since the Sixth Circuit's decision, the Court finds that reasonable minds could differ as to whether or not they were material to King's prosecution. Thus, there are genuine issues of material fact as to their materiality.

        iii.    **_King_ Prong Three: There are Genuine Issues of Material Fact as to Whether the False Statements, Evidence, and Omissions Consist Solely of Grand Jury Testimony or Preparation for That Testimony**

The third prong of *King* asks whether "the false statements, evidence, and omissions . . . consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury)." *King*, 852 F.3d at 587–88. King has identified statements in various affidavits and reports, all months

33

before Harwood's April 5, 2007 grand jury testimony.[9]  The only report that even comes close to Harwood's grand jury testimony is his Grand Jury Packet. [R. 91-9]  While the date on the packet reads "04/03/07," this is not the date that the report was made, but rather the date Harwood printed it. [R. 97-2 pp. 103–06]  In fact, Harwood appears to have finished this Grand Jury Packet on January 25, 2007, after meeting with the Commonwealth Attorney to request an arrest warrant for Susan King. [R. 91-9 Com. Atty. 090]; *see Stillwagon v. City of Deleware, Ohio*, 747 F. App'x 361, 373 (6th Cir. 2018) (finding that materials, even in a grand jury packet, prepared four months before the grand jury testimony could be viewed as laying the groundwork for an indictment rather than preparatory activity for grand-jury testimony, and thus not protected by absolute immunity). Additionally, much of this report was based on Harwood's prior reports and contains sections copied directly from those reports. *Compare* [R. R. 91-9; 97-3] *with* [R. 97-30].  At the very least, a question for the jury exists as to whether (and which of) the purported false statements consist solely of preparation for grand jury testimony. *See Stillwagon v. City of Deleware, Ohio*, 274 F. Supp. 3d 714, 759 (S.D. Ohio 2017).

Therefore, the Court finds that there are genuine issues of material fact bearing on all three prongs of the *King* test for rebutting the presumption of probable cause created by the grand jury indictment, meaning Harwood is not entitled to summary judgment.

> **b)** **There are Genuine Issues of Material Fact Regarding Whether There Was Probable Cause Sufficient to Support King's Claim for Malicious Prosecution**

Of course, just because a plaintiff rebuts the *presumption* of probable cause for the prosecution created by the indictment does not mean he or she has satisfied the second *element* of malicious prosecution (which requires showing that there was *not* probable cause for the

---

[9] Harwood has not made any arguments regarding this prong of the *King* test.

prosecution).  On the other hand, a finding of probable cause in this case would not only make it impossible for King to meet the second element of her malicious prosecution claim but would also entitle Harwood to qualified immunity. *See Harris v. Goins*, No. CV 6:15-151-DCR, 2017 WL 3097613 *8 (E.D. Ky. July 20, 2017).  Since Harwood challenges the issue of probable cause in his qualified immunity argument, the Court will address it there and will not repeat the analysis here.  However, the Court notes that, for the same reasons as discussed in the section on qualified immunity, genuine issues of material fact remain as to whether there was probable cause for King's prosecution sufficient to support the second element of her malicious prosecution claim.

      **3.**      **Merits of King's Malicious Prosecution Claim, Element (4): There are Genuine Issues of Material Fact as to Whether the Criminal Proceedings Against King Were Resolved in Her Favor**

Finally, Defendants claim that summary judgment should be granted because King cannot establish the final element of her § 1983 malicious prosecution claim: that the criminal proceedings against her were resolved in her favor. [R. 91-1 p. 32]  The purpose of this element is to "avoi[d] parallel litigation over the issues of probable cause and guilt . . . and . . . preclude[e] the possibility of the claimant succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." *Heck v. Humphrey*, 512 U.S. 477, 484 (1994).

**Applicable Test**

"There is no binding precedent in [the Sixth] [C]ircuit as to whether a dismissal without prejudice can constitute a favorable termination for § 1983 purposes." *Parnell v. City of Detroit*, 786 F. App'x 43, 51 (6th Cir. 2019).  Defendants cite various district court opinions to argue that a dismissal without prejudice is not a favorable termination. [R. 91-1 pp. 32–33; R. 104 pp. 16–17] The Sixth Circuit has, however, allowed a plaintiff's malicious prosecution claim to reach a jury

when there was evidence that the prosecution had been abandoned, using a test provided by the Restatement of Torts to guide its analysis. *Parnell*, 786 F. App'x at 51. The Restatement provides that "an abandonment of a prosecution by the prosecutor . . . generally constitutes a termination in favor of the accused, so long as the final decision indicates that the accused is innocent." *Parnell*, 786 F. App'x at 51 (citing Restatement (Second) of Torts, §§ 659, 660) (1977)). A prosecutor can formally abandon a prosecution by any method allowable in their jurisdiction, such as the entry of a *nolle prosequi* or through a motion to dismiss. Restatement (Second) of Torts § 659 cmt. e. "[I]t is not necessary that the proceedings should have gone so far as to preclude further prosecution on the ground of double jeopardy." *Id.* cmt. b. Therefore, although the termination of an indictment does not prevent the initiation of new proceedings for the same offense, "it constitutes a termination of the original proceedings in favor of the accused unless the new proceedings have been initiated before the trial of the civil action," but "only when [the termination] is such as to indicate the innocence of the accused." *Id.* cmt. b; § 660 cmt. a. The Restatement also provides exceptions to when an abandonment constitutes a favorable termination, including (1) an agreement or compromise with the accused, (2) misconduct by the accused, (3) a request of mercy by the accused, or (4) if new proceedings for the same offense have been properly instituted.[10] *Id.* § 660.

---

[10] § 660 reads in full:

> A termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if
>
>> (a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused; or
>> (b) the charge is withdrawn or the prosecution abandoned because of misconduct on the part of the accused or in his behalf for the purpose of preventing proper trial; or
>> (c) the charge is withdrawn or the proceeding abandoned out of mercy requested or accepted by the accused; or
>> (d) new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused.

As Defendant acknowledges, other Circuits have adopted tests similar to the Restatement's—that a dismissal of criminal proceedings is a favorable termination for purposes of § 1983 when it indicates the accused's innocence. *See Margheim v. Buljko*, 855 F.3d 1077, 1086 (10th Cir. 2017); *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004). Some district courts in the Sixth Circuit have followed suit. *See Hoskins v. Knox Cty.*, No. 17-84-DLB-HAI, 2018 WL 1352163, at *9 (E.D. Ky. March 15, 2018); *Elvridge v. Rice*, No. 3:11-40-DCR, 2011 WL 6014407, at *4–5 (E.D. Ky. Dec. 2, 2011). Others have not, pointing to the absence of Sixth Circuit caselaw on the issue. *See, e.g.*, *Thorton v. City of Columbus*, 171 F.Supp.3d 702, 710 (S.D. Ohio 2016). Kentucky state courts have also used the Restatement's test for malicious prosecution claims under Kentucky state law. *See Davidson v. Castner–Knott Dry Goods Co.*, 202 S.W.3d 597, 605 (Ky. App. 2006). As numerous other circuits have explicitly endorsed this approach and the Sixth Circuit has cited it favorably, the Court will use it to analyze the issue.

### Analysis

To determine whether a dismissal was indicative of the accused's innocence, courts look at the stated *reasons* for the dismissal as well as the *circumstances* surrounding the dismissal. *See, e.g.*, *Margheim*, 855 F.3d at 1086 (citing *Wilkins v. DeReyes*, 528 F.3d 790, 803 (10th Cir. 2008)). The Tenth Circuit distinguished between dismissals based on "technical" or "procedural" grounds and ones relating to the merits. *Id.* Dismissals based on technical or procedural grounds, such as speedy trial violations or suppression of evidence based on constitutional grounds, would not be indicative of an accused's innocence. *Id.* On the other hand, "if the circumstances show that *unreliable* evidence has been suppressed and the prosecution then abandons the case because of lack of sufficient reliable evidence, that would be a circumstance where the dismissal is indicative

of innocence." *Wilkins*, 528 F.3d at 805 (emphasis added). Harwood argues that King's proceedings were not terminated in her favor because the Kentucky Court of Appeals did not make a specific factual finding that she was actually innocent. [R. 91-1 p. 33; R. 104 p. 17] However, he has not shown that any court has adopted such a rigid requirement. Rather, courts have demanded that the proceedings be "indicative" of innocence, not that they conclusively establish the accused's innocence. *See, e.g.*, *Margheim*, 855 F.3d at 1086.

The Commonwealth of Kentucky dismissed the indictment against King without prejudice by oral motion on October 9, 2014. [R. 17, 9:17:16–9:17:26] The Commonwealth did not give any reasons for its motion and the order of dismissal did not include any. [R. 91-34] Therefore, it is necessary to examine the circumstances surrounding the dismissal to determine whether it indicated King's innocence. *See Margheim*, 855 F.3d at 1086. On May 18, 2012, the Kentucky Innocence Project became aware that a serial murderer had confessed to killing Breedan and filed motions on behalf of King seeking to vacate her *Alford* plea and further seeking a trial by jury. *King v. Commonwealth*, No. 2012–CA–001985–MR, 2014 WL 3547480, at *1–2 (Ky. Ct. App. July 18, 2014). The Spencer Circuit Court denied the motions because King had pleaded guilty, but found that the confession would, "with reasonable certainty, change the verdict or probably change the result if a new trial was granted." *Id.* at *6. The Kentucky Court of Appeals, however, reversed the circuit court and vacated King's *Alford* plea because it found that evidence of "actual innocence" entitled King to post-conviction remedy regardless if she had pleaded guilty. *Id.* at *5. On remand for a jury trial upon the indicted offenses, King moved to dismiss the indictment. At a hearing for that motion, the Commonwealth voluntarily dismissed the indictment itself, albeit without prejudice. [R. 17]

There is no evidence that the Commonwealth dismissed King's claims because of some technicality or procedural defect. Rather, when faced with new evidence—which the Kentucky courts found would, "with reasonable certainty, change the verdict or probably change the result," the commonwealth abandoned its prosecution. *King v. Commonwealth*, 2014 WL 3547480 at *6. In his brief, Harwood stresses that King had been released for nearly two years by the time the charges were dismissed after serving her sentence from her *Alford* plea, but fails to articulate why this is relevant. [R. 91-1 p. 33; R. 104 p. 17] If his argument is that the Court should infer that this is the reason the Commonwealth dismissed the indictment against King, the Court will not do so. The prosecutor gave no reasons for dismissal and the Court will not speculate as to hypothetical ones, particularly on summary judgment where the Court must view the facts in the light most favorable to King, not Harwood.

This case does not involve any of the scenarios that fit into the Restatement's exceptions in § 660, which have also been adopted by many of the Circuits. *See, e.g.*, *Wilkins*, 528 F.3d at 803–04. The indictment was not dismissed due to a compromise with King—in fact, when the Commonwealth moved to dismiss her indictment without prejudice, her counsel demanded the Commonwealth set a date for trial and try the case. [R. 17] There is also no evidence that the indictment was dismissed because of any misconduct by King or at her request for mercy, and no new proceedings against her were ever filed. *See* Restatement (Second) of Torts § 660(a)–(d). Viewing the Commonwealth's dismissal in light of these circumstances, at the very least there are genuine issues of material fact as to whether the dismissal was indicative of King's innocence. Certainly, on the record before the Court, Harwood is not entitled to judgment as a matter of law on this issue.

Finally, the Court notes that finding otherwise would allow prosecutors to avoid malicious prosecution claims entirely in scenarios such as King's merely by voluntarily dismissing indictments without prejudice. This would incentivize prosecutors never to dismiss indictments with prejudice, no matter how weak the charges, even in the face of significant evidence of misconduct by the government, leaving such charges hanging over an accused's head indefinitely.

C.      **Qualified Immunity Defense: King Continues to Show the Existence of a Genuine Issue of Material Fact as to Whether Harwood Knowingly or Recklessly Set Her Prosecution in Motion Despite the Absence of Probable Cause to Support a Murder Conviction**

Harwood argues that even if King successfully rebutted the *presumption* of probable cause created by the indictment, he is entitled to qualified immunity because there was still probable cause for the prosecution. [R. 91-1 pp. 27–31] "Since the defendant [] ha[s] raised the qualified immunity defense, plaintiff bears the burden of showing that defendant [is] not entitled to qualified immunity." *Johnson v. Mosley*, 790 F.3d 649, 653 (6th Cir. 2015). "Law-enforcement officers enjoy qualified immunity from suit when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *King v. Harwood*, 852 F.3d 568, 582 (6th Cir. 2017). The Court considers only the facts knowable to Harwood but draws "all reasonable inferences" in favor of King at summary judgment. *Id.*

**This Case Involves a Clearly Established Right of Which a Reasonable Person Would Have Known**

The Sixth Circuit has made clear that "individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has made, influenced, or participated in the decision to prosecute the plaintiff by, for example, knowingly or recklessly making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants." *Id.* at 583 (internal quotations omitted). An officer who seeks a warrant or tries to persuade the prosecutor to convene a grand jury without probable cause violates clearly

40

established constitutional rights. *Id.* Harwood loses qualified immunity if he "recklessly or knowingly" violated King's clearly established right to be free from malicious prosecution. *Id.* at 580 (quoting *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015)).

### There are Genuine Issues of Material Fact as to Whether Harwood Violated King's Clearly Established Right

Harwood argues that King has not shown that he knowingly or recklessly made any false statements and that he did not violate any constitutional rights since there was probable cause for the prosecution. [R. 91-1 p. 28] As discussed in the previous section, there are genuine issues of material fact as to whether Harwood knowingly or recklessly made false statements and material omissions in his affidavits and investigative reports. Therefore, the only question is whether there was probable cause to initiate the criminal proceedings against King. *See Sykes v. Anderson*, 625 F.3d 294, 311 (6th Cir. 2010).

Probable cause exists to initiate a criminal prosecution where the "facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused is guilty of the crime charged." *Mott v. Mayer*, 524 F. App'x 179, 186 (6th Cir. 2013) (internal quotations omitted). Unlike probable cause for searches or arrests, this requires that the facts and circumstances must lead a reasonable person to believe that the accused committed the *particular offense charged*, not just any offense. *Id.* at 187. If an affidavit or report contains false statements or material omissions, the Court must set aside any false statements and include any material omitted information in order to determine whether there was probable cause. *McCallum v. Geelhod*, 742 F. App'x 985, 991 (6th Cir. 2018) (citing *Sykes*, 625 F.3d at 305); *see also Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006); *Mills v. Barnard*, 869 F.3d 473, 482–83 (6th Cir. 2017).

First, Harwood points to the actions of numerous others in an attempt to show that there was probable cause to initiate proceedings against King, such as the fact that both search warrants were granted by a state court judge; the fact that the Commonwealth's Attorney moved forward with King's prosecution; the fact that the grand jury issued indictments; and the fact that King pleaded guilty to the offense. [R. 91-1 pp. 28–29]  These arguments do little to show probable cause independent of Harwood's own false statements and material omissions, since King's entire argument is that these statements and omissions are what misled these other parties. *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) ("Police officers cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court.").  King's *Alford* plea is also irrelevant, as probable cause is based on the facts knowable to Harwood *at the time*, and King did not plead until after the indictment. [R. 91-28]  Harwood cannot use this information retroactively to justify a probable cause determination. *See King v. Harwood*, No. 3:15-cv-762-CHB, 2019 WL 4751553, at *6 (W.D. Ky. Sept. 30, 2019).

In King, the Sixth Circuit previously held that there were genuine issues of material fact as to whether there was probable cause to initiate proceedings against King, stating:

> Giving King all reasonable inferences from the factual record, Harwood knew that King's gun was not the murder weapon (and no evidence of record links King to the weapon that bullets that *did* kill Breeden); Harwood knew that the bullet holes in King's floor were not caused by the bullets that killed Breeden; and the only pieces of evidence that Harwood had to go on were (1) King's premonitions that Breeden would be found "in water," (2) King's prior relationship with Breeden, and (3) the fact that King owned a guitar and an amplifier. . . . Moreover, Defendants do not appear to contest the assertion that when Harwood sought search warrants for King's home, he was armed with no more evidence than what was known to Officers Figg and Bess at the time of the initial investigation, and those officers were unable even to obtain a search warrant, let alone an indictment for murder.

*King v. Harwood*, 852 F.3d 568, 583 (6th Cir. 2017); *see also id.* at 582 (addressing probable cause in the context of the second element of malicious prosecution). Just as before, Harwood "cite[s] no caselaw to support the proposition that this evidence, without more, can sustain a conviction for murder—or that any reasonable officer would believe that it could." *King*, 852 F.3d at 583. Still, the existence of probable cause in § 1983 actions is a question for the jury unless there is only one reasonable determination possible. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1989). Probable cause must be founded "on both the inculpatory and exculpatory evidence" known to the officer. *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). "Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) However, "officers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." *Id.* at 372.

As the Sixth Circuit noted, this case is inordinately centered on disputed facts. *King*, 852 F.3d at 583–84. The development of the record since the Sixth Circuit's decision has not changed that fact. As discussed above, King claims that Harwood made significant omissions and misrepresented evidence in his affidavits and reports when seeking her indictment. This includes exculpatory evidence such as the fact that King weighed 100 pounds "soaking wet" [R. 97-2 p. 260] and had one leg and no prosthetic at the time—facts that significantly undercut Harwood's theory that she killed him, dragged him to an unknown car (King did not own a car), and threw him over a bridge into the river. *See* [R. 97-2 p. 260] Moreover, Harwood omitted the exculpatory fact that Breeden's bullet wounds were non-exiting, meaning that he knew that none of the bullet

holes in King's floor could have come from the shots that killed Breeden.[11] [R. 97-14]  He also

knew that the configurations of the bullets from King's floor did not match those found in

Breeden.  None of the bullet holes found in the tree outside King's home matched those that killed

Breeden either. [R. 97-2 pp. 252–53; R. 97-32 pp. 33–37]  In fact, there was little evidence that

King ever even owned a gun capable of firing the types of bullets that killed Breeden (.22

magnum).

Harwood further argues that there was probable cause based on evidence found in King's

home during the June 12 search, combined with his theories regarding that evidence.  The

linoleum on King's floor was scraped up from the location of the bullet holes to the door. [R. 97-3

Com. Atty. 012]  But this is another example where Harwood appears to have ignored potentially

exculpatory evidence.  This is because even though King told him that the damage was caused by

the people who repaired her floor after a flood, Harwood attributed the damage instead  to King

removing the linoleum after dragging Breeden's body across the floor—despite having no

evidence of this theory.  Harwood did not attempt to corroborate King's explanation with Purofirst

(or otherwise follow up on that explanation) even though he had records that showed Purofirst

replaced the linoleum in King's floor. [R. 97-2 pp. 291–92]  Again, officers cannot simply turn a

blind eye to potentially exculpatory evidence when making probable cause determinations.

The search also uncovered evidence that there was a boat cushion and beer cans in the

crawlspace underneath the floor where the bullet holes were and that the insulation underneath the

bullet holes was not intact. [R. 97-3 Com. Atty. 013]  King told Harwood that she replaced the

insulation in 2003. [R. 97-27 Com. Atty. 039]  Harwood nonetheless speculated that at some point

King spent time rooting through her insulation for bullets, sitting on the boat cushion and drinking

---

[11] Bullet holes three and four were not discovered until the June 12, 2006 search, and there is no evidence that they were in King's floor at the time Sergeant Duncan observed the first two bullet holes in her floor.

beers. [*Id.*]  Yet the beer cans potentially refute this theory, given that they were manufactured in 1995 and 2003. [R. 97-2 pp. 191–92]  It is hard to imagine that King would find it necessary to root through insulation to locate bullets to cover up purported crime, but would first wait for years after she showed a detective the bullet holes to do so.  The dates of the 2003 beer cans also directly support King's explanation—that she went down and installed insulation some time in 2003.

A presumptive test performed on the bullet holes in King's floor indicated the presence of blood in two of the bullet holes. [R. 97-3 Com. Atty. 012]  Harwood knew that the test was not conclusive without confirmation tests, and no confirmation tests were performed. [R. 97-2 pp. 23–24]  It is also unknown which bullet holes the samples came from, and Sergeant Duncan only saw two bullet holes when he visited King's home in 1999.  Therefore, it cannot be said with any certainty that the bullet holes that presumptively tested positive even existed in 1999, let alone in 1998 when Breeden went missing.  Male DNA was found in the same sample, but there is no evidence who the DNA is from or how the DNA got there. [R. 91-24; R. 97-2 p. 187]  Since DNA can come from many human substances, it could have been from the officers conducting the search of King's house, who did not wear gloves. [*Id.*]

Finally, Harwood interviewed Jacqueline Haydon, a former friend of King, on June 15, 2006. [R. 97-3 Com. Atty. 014]  She was also interviewed during the initial investigation in 1999. [*Id.*]  This time, seven years after her initial interview and eight years after Breeden's death, Haydon told Harwood that she had seen bullet holes and blood on King's floor roughly fourteen days after Breeden's disappearance. [*Id.*; R. 91-39]  Aside from the late date of these revelations, Haydon's account has numerous issues impacting its reliability.  First, Haydon was a suspect herself in the investigation. [R. 97-3 Com. Atty. 009]  Moreover, bleach had been found in the

trunk of her car approximately two to three weeks after Breeden's death. [*Id.* Com. Atty. 018]  She initially told officers that she spilled the bleach. [*Id.*]  However, during the same interview where she told Harwood about the bullet holes in King's floor, she changed her story and told him that the stains were already in the car when she purchased it from Larry Mobley.[12] [*Id.*]  This was the second change in her statement according to Harwood. [R. 97-2 p. 228]  Harwood thought that Haydon was being deceptive and had her submit to a polygraph. [*Id.* 97-2 pp. 229–30]  A reasonable jury could easily find that Haydon changed her statement regarding the bleach in her car and provided Harwood with evidence pointing the finger at King (evidence that she apparently forgot to mention to the prior investigators in 1999, or anyone else for the intervening seven years) to distract from her potential culpability as a suspect. *See, e.g.*, *Wesley v. Campbell*, 779 F.3d 421, 429–430 (6th Cir. 2015) (holding that probable cause does not exist where there is a reason for the officer to believe a witness was lying).

True, the record contains some potentially incriminating evidence, including the fact that King and Breeden had a history of domestic violence and that King reinstated her D.V.O roughly a month before Breeden went missing.  She also had taken $300 from Breeden, told others that she had a "vision" that Breeden would be found in the water, and  Breeden was found with his legs bound by a guitar amplifier court (King plays the guitar).  However, it is a classic jury question whether the full picture of all the evidence in this case, including the potentially exculpatory evidence, constitutes facts and circumstances sufficient to lead an ordinarily prudent person to believe that King was guilty of murder.  The Court simply cannot resolve all the factual disputes at this time, nor can it say, given the evidence before it, that there is only one reasonable determination possible regarding the existence of probable cause. *See Pyles v. Raisor*, 60 F.3d

---

[12] Vehicle Registration Records do not indicate that Haydon purchased the car from Mobley [R. 97-40], although there is no indication that Harwood knew this at the time.

1211, 1215 (6th Cir. 1989); *see also Davis v. Gallagher*, No. 19-1241, at *8–9 (6th Cir. Feb. 28, 2020) (slip copy) (holding that when evaluating the existence of probable cause, even self-serving statements in affidavits can create genuine issues of material fact unless they are "blatantly and demonstrably false").  As noted, Harwood cites no caselaw to suggest that the evidence, viewed in the light most favorably to King, could sustain a conviction for murder, nor that a reasonable officer would think it could.  Having reexamined the record in light of developments since the Sixth Circuit's remand, the Court finds that King has once again raised genuine issues of fact as to the existence of probable cause, such that Harwood is not entitled to summary judgment based on qualified immunity.

### D.      State Law Claims

### 1.      Kentucky Malicious Prosecution

Harwood also argues that he is entitled to summary judgment on King's state law malicious prosecution claim.  The elements of a claim for malicious prosecution under Kentucky law are that:

> 1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff; 2) the defendant acted without probable cause; 3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based; 4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and 5) the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016).  Like its federal counterpart, for a claim of malicious prosecution under Kentucky law, a grand jury indictment presents a presumption of probable cause that can be rebutted by the plaintiff. *Davidson v. Castner–Knott Dry Goods Co.*, 202 S.W.3d 597, 607 (Ky. App. 2006); *see also Wilson v. Clem*, No. 2018-CA-0003000, 2019 WL 5090397, at *3–4 (Ky. App. Oct. 11, 2019).  The element that distinguishes the state law claim

from the federal claim is malice, but under Kentucky law "malice can be inferred from a lack of probable cause." *Phat's Bar & Grill v. Louisville Jefferson Cty. Metro Gov't*, 918 F. Supp. 2d 654, 665 (W.D. Ky. 2013) (quoting *Massey v. McKinley*, 690 S.W.2d 131, 134 (Ky. 1985)).[13] Harwood's arguments regarding this claim mirror his arguments regarding King's § 1983 malicious prosecution claim; he claims that King has failed to rebut the presumption of probable cause created by the grand jury indictments, there was probable cause for King's prosecution, and King's criminal proceedings were not resolved in her favor. The Court has already addressed these in its discussion of King's § 1983 claims, where it found them unpersuasive. Thus, Harwood has not demonstrated that he is entitled to summary judgment on this claim either.[14]

### 2.      Other State Law Claims

Harwood requests summary judgment on King's other state law claims as well. King failed to respond to Harwood's arguments on these claims. However, "the Federal Rules of Civil Procedure still require the moving party to demonstrate the absence of a disputed question of material fact and a ground that would entitle the moving party to judgment as a matter of law." *Miller v. Shore Financial Services, Inc.*, 141 F. App'x 417, 419 (6th Cir. 2005) (citing *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998)). Even though King did not respond to these arguments, the Court must, at a minimum, ensure that Harwood has discharged his burden of demonstrating the absence of a genuine issue of material fact as to these claims under Fed. R. Civ. P. 56(c).

---

[13] Harwood has made no arguments regarding the element of malice.

[14] Harwood has not argued that he is entitled to qualified immunity on his state law claims. However the Court notes that while Kentucky law provides qualified immunity for law enforcement officers who act in good faith, malice and good faith are mutually exclusive—the same evidence that establishes malice negates the defense of qualified immunity. *Martin*, 507 S.W.3d at 5.

### a)  Civil Conspiracy

In Count VIII, King asserts a civil conspiracy claim, arguing that Harwood conspired with other officers to "accomplish an unlawful purpose by unlawful means," including "the malicious prosecution of [her]." [R. 1 p. 28 ¶¶ 199–200]  The elements of civil conspiracy under Kentucky law are "1) an agreement or combination, 2) that is unlawful or corrupt, 3) entered into by two or more persons, 4) for the purpose of accomplishing an unlawful goal." *Ellington v. Fed. Home Loan Mortg. Corp.*, 13 F. Supp. 3d 723, 730 (W.D. Ky. 2014) (citation omitted).  "In order to prevail on a claim of civil conspiracy, the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008).  Civil conspiracy is a theory under which a plaintiff may recover from multiple defendants for an underlying tort. *Christian Cnty. Clerk ex rel. Kem v. Mortg. Elec. Registration Sys.*, Inc., 515 F. App'x. 451, 458–59 (6th Cir. 2013).  "[T]here must be proof that the defendants acted tortiously pursuant to a common design, or that they rendered substantial assistance to others to accomplish the tortious act." *Peoples Bank*, 277 S.W.3d at 261.

Harwood argues that since King's underlying malicious prosecution claim fails, her civil conspiracy claim must fail as well.  However, as discussed, genuine issues of material fact foreclose summary judgment on King's claim for malicious prosecution.  He also argues that there is no evidence of any agreement between Harwood and any other person to commit a corrupt or unlawful act.  As mentioned, King made no arguments as to the civil conspiracy claim.  Her Verified Complaint alleges the elements of civil conspiracy, and states that the "Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means . . . including, but not limited to the

malicious prosecution of King and the intentional infliction of emotional distress upon her." [R. 1 p. 28 ¶ 199–200]

But while it is true that allegations in a verified complaint "have the same force and effect as an affidavit for purposes of responding to a motion for summary judgment," *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (quotation marks omitted), these allegations, even when taken as true, are not enough to create a genuine issue of material fact as to the civil conspiracy claim. This is because the factual allegations of the complaint simply contain no facts which would allow a reasonable jury to find that Harwood entered into an unlawful or corrupt agreement with anyone else. And her recitals of the elements of a civil conspiracy claim certainly cannot supply the necessary facts. By themselves, they are not even sufficient to withstand a motion to dismiss, as they amount to nothing more than "naked assertion[s] devoid of further factual enhancement," without "any factual flesh on the bones of a legal conclusion." *Lyttle v. Farley*, No. 6:16-114-KKC-HAI, 2017 WL 3431394, at *4, *5 (E.D. Ky. Aug. 9, 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Yet aside from these threadbare recitals, there are no other allegations in the verified complaint to support that there was an unlawful or corrupt agreement between Harwood and anyone. Further, unlike in *Harris*, here there is no surviving Section 1983 conspiracy claim which has similar facts and analysis to apply to a state law claim as well. *Contra Harris v. Goins*, No. 6:15-151-DCR, 2017 WL 3097613, at *22 (E.D. Ky. July 20, 2017). Thus, King cannot even show the first element of her civil conspiracy claim, which must therefore fail.

> **b)      Intentional, Reckless, and/or Negligent Infliction of Emotional Distress**

King alleges in Count VII that "Defendants intentionally, recklessly, and/or negligently directly and proximately caused King to be falsely arrested, maliciously prosecuted, and

wrongfully incarcerated, and artificially and deliberately prolonged her detention." [R. 1 p. 27 ¶ 194]  She claims that "Defendants' actions caused King to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of her wrongful incarceration, and to fear for her physical safety throughout the period of her incarceration." [*Id.* ¶ 195]  Finally, she pleads that "the Defendants' actions caused King to experience severe emotional distress," and that "Defendants' conduct is beyond the bounds of any standard of decency, so as to be utterly intolerable in a civilized society." [*Id.* ¶ 196–97]

As a preliminary matter, under Kentucky law, intentional and reckless infliction of emotional distress are also characterized as the tort of "outrage."[15] *Green v. Floyd County, Ky.*, 803 F. Supp. 2d 652, 655 n.1 (E.D. Ky. 2011).  Outrage is permissible when the defendant "solely intended to cause extreme emotional distress." *Id.* (citing *Brewer v. Hillard*, 15 S.W.3d 1, 7-8 (Ky. Ct. App. 1999).  "When the claim of emotional distress is a supplement to another tort claim, such as false imprisonment, the burden of showing sole intent cannot be met." *Lovins v. Hurt*, No. 11-216-JBC, 2011 WL 5592771, at *3 (E.D. Ky. Nov. 16, 2011) (citing *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. Ct. App. 1993)); *see also Childers v. Geile*, 367 S.W.3d 576, 580 (Ky. 2012) ("[W]here an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie."); *Brewer*, 15 S.W.3d at 8 ("infliction of emotional distress[] is a gap-filler tort intended to provide a remedy when no other tort is adequate").  Here, the traditional

---

[15] The elements of intentional infliction of emotional distress, or outrage, are as follows: (1) the wrongdoer's conduct must be intentional or reckless; (2) the conduct must be outrageous and intolerable in that it offends against generally accepted standards of decency and morality; (3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress must be severe. *Gilbert v. Barkes*, 987 S.W.2d 772, 777 (Ky. 1999).

tort of malicious prosecution is available to King, and this tort allows recovery for damages caused by emotional distress. *See Carter v. Porter*, 617 F. Supp. 2d 514, 520 (E.D. Ky. 2008) (citing *McCoy v. RWT, Inc.*, Nos. 2003-CA-002177-MR, 2003-CA-002241-MR, 2005 WL 1593651, at *5 (Ky. Ct. App. July 8, 2005), *rev'd on other grounds*, 244 S.W.3d 44 (Ky. 2008)). Moreover, King does not allege that Harwood "*solely* intended to cause extreme emotional distress." Thus, her outrage claim must fail. *Green*, 803 F. Supp. 2d at 655 (emphasis added); *see also Estep v. Combs*, 366 F. Supp. 3d 863, 887–88 (E.D. Ky. 2018).

King's negligent infliction of emotional distress claim also fails, as plaintiffs "cannot proceed with a claim for negligence where the claim is really a malicious prosecution claim." *Bertram v. Federal Express Corp.*, No. 05-28-C, 2008 WL 170063, at *7 (W.D. Ky. Jan. 17, 2008) (citing *Hill v. Wilmott*, 561 S.W.2d 331, 334 (Ky. Ct. App. 1978)); *see also Harris v. Goins*, No. 6:15-151-DCR, 2017 WL 3097613, at *21 (E.D. Ky. July 20, 2017). Judge Coffman's thoughtful analysis makes the rationale for this rule clear:

> The policy considerations addressed by the elements of a malicious prosecution action would be thwarted if the plaintiff were allowed to proceed on a theory of negligence. The plaintiff may not avoid the higher standards of malicious-prosecution claims by bringing negligence claims against the defendants under the same facts that constitute his other claims.

*Bertram*, 2008 WL 170063, at *7. Accordingly, Harwood is entitled to summary judgment on King's claim for negligent infliction of emotional distress.

### c) Negligence, Gross Negligence, and Recklessness

Finally, in Count IX, King asserts a claim for "negligence/gross negligence/recklessness" against Harwood. Harwood argues that these claims should be dismissed for the same reason as her emotional distress claims fail, namely, that King should not be able to use these claims as an end-run around her malicious prosecution claim. [R. 91-1 p. 37] King has not responded to Harwood's argument on this count.

Just as with her negligent infliction of emotional distress claim, since King's negligence claim against Harwood is based on the same facts that make up her malicious prosecution claim, it cannot succeed.[16] *See Bertram v. Federal Express Corp.*, No. 05-28-C, 2008 WL 170063, at *7 (W.D. Ky. Jan. 17, 2008) (citing *Hill v. Wilmott*, 561 S.W.2d 331, 334 (Ky. Ct. App. 1978)).  In a malicious prosecution action, malice is defined as the "intentional doing of a wrongful act to the injury of another, with an evil or unlawful motive or purpose." *Johnson v. Baker*, No. 1:08-CV-00038, 2009 WL 3514576, at *3 (W.D. Ky. Oct. 29, 2009) (quoting *Stearns Coal Co. v. Johnson*, 37 S.W.2d 38, 40 (Ky. 1931)).  District courts have held that negligence claims are barred in this scenario because a plaintiff cannot avoid the higher standards of a malicious prosecution claim (malice) by bringing a negligence claim under the same facts. *Id.*  The same rationale applies to King's claim of "recklessness," since this is likewise a lower standard than malice.[17]

King's gross negligence claim faces the same problem, and several district courts have held that gross negligence is also inapplicable when the facts are more properly suited for a malicious prosecution claim. *See Estep v. Combs*, 366 F. Supp. 3d 863, 886 (E.D. Ky. 2018); *Juillerat v. United States*, No. 3:16-CV-276-TBR, 2017 WL 4927677, at *10 (W.D. Ky. Oct. 31, 2017).  The "prevailing" definition of gross negligence is a "wanton or reckless disregard for the safety of other persons." *Kinney v. Butcher*, 131 S.W.3d 357, 359 (Ky. App. 2004) (quoting *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 52 (Ky. 2003)); *see also Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 59 (Ky. 2013) (holding that to prove gross negligence, a plaintiff must prove his or her negligence claim, and then prove that the negligence was "accompanied by wanton or

---

[16] King's negligence/gross negligence/recklessness claim was initially asserted against all individually named defendants, all of whom except for Harwood have since been dismissed.

[17] Recklessness is not a stand-alone claim under Kentucky law.  Rather, a plaintiff who succeeds on a claim of negligence may recover punitive damages if the conduct meets the standard of recklessness. *Williams v. Wilson*, 972 S.W.2d 260, 263 (1998).

reckless disregard for the lives, safety, or property of others"). Moreover, the Kentucky Supreme Court made clear that "[g]ross negligence, however it may be qualified, is conduct lacking intent or actual knowledge of the result." *Williams v. Wilson*, 972 S.W.2d 260, 264 (1998). This is a lower standard than malice and therefore the logic of *Bertram* is equally applicable. *See Bertram*, 2008 WL 170063, at *7. Since King cannot use negligence, gross negligence, or recklessness as a means of circumventing her state-law malicious prosecution claim, Harwood is entitled to summary judgment on King's claims in Count IX.

IV.    **Conclusion**

For the foregoing reasons, Harwood's Motion for Summary Judgment [R. 91] is denied as to Count I (malicious prosecution under § 1983 and Kentucky state law), and granted as to Counts VII (emotional distress), Count VIII (civil conspiracy), except for her theory based on malicious prosecution, and Count IX (negligence/gross negligence/recklessness). Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.    Defendant Harwood's Motion for Summary Judgment **[R. 91]** is **GRANTED in part** and **DENIED in part** consistent with this Memorandum Opinion and Order.

2.     Summary Judgment is **GRANTED** in favor of Defendant on **Count VII** (intentional, negligent, and/or reckless infliction of emotional distress).

3.    Summary Judgment is **GRANTED** in favor of Defendant on **Count VIII** (civil conspiracy).

4.    Summary Judgment is **GRANTED** in favor of Defendant on **Count IX** (Negligence/Gross Negligence/Recklessness).

5.      Summary Judgment is **DENIED** with respect to **Count I** (§ 1983 Malicious

Prosecution and Malicious Prosecution under Kentucky state law).

This the 1st day of April, 2020.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY